# [Unitrin Auto & Home Ins. Co. v. Karp](#)

United States District Court for the District of Maryland

August 24, 2020, Decided; August 24, 2020, Filed

Civil Case No. SAG-17-3341

**Reporter**
2020 U.S. Dist. LEXIS 153207 *

UNITRIN AUTO AND HOME INSURANCE COMPANY, Plaintiff, v. ROBERT KARP, et al., Defendants.

**Prior History:** [*Unitrin Auto & Home Ins. Co. v. Karp, 2018 U.S. Dist. LEXIS 165859 (D. Md., Sept. 26, 2018)*](#)

## Core Terms

pollution, coverage, ambiguous, oil, Counterclaim, heating, contaminant, declaratory, default, prudent, manganese, monoxide, carbon, paint, non-moving, welding, genuine, environmental, unambiguous, irritant

**Counsel:** [*1] For Unitrin Auto and Home Insurance Company, Plaintiff: Jeffrey T Brown, LEAD ATTORNEY, DeCaro Doran Siciliano Gallagher and DeBlasis LLP, Bowie, MD.

For PennyMac Loan Services, Defendant: James Sumter Carter, Jr., John Albert Gibbons, Blank Rome LLP, Washington, DC.

**Judges:** Stephanie A. Gallagher, United States District Judge.

**Opinion by:** Stephanie A. Gallagher

## Opinion

### MEMORANDUM OPINION

Plaintiff Unitrin Auto and Home Insurance Company ("Unitrin") filed this declaratory judgment action against Defendants Robert and Chaya Karp ("the Karps") and PennyMac Loan Services ("PennyMac"), seeking declaratory relief defining the scope of coverage of an insurance policy covering the Karps' home. ECF 1. PennyMac, the mortgage holder for the Karps' property, filed a counterclaim against Unitrin, seeking contradictory declaratory relief, in addition to monetary damages for Unitrin's alleged breach of contract and failure to act in good faith. ECF 37. Unitrin and PennyMac have now filed cross-motions for summary judgment. ECF 59, 61. I have reviewed those motions, along with the relevant oppositions and replies. ECF 62, 65. No hearing is necessary. *See* [*Loc. R. 105.6*](#) (D. Md. 2018). For the reasons that follow, Unitrin's Motion for Summary Judgment, [*2] ECF 59, will be denied, although this Court will dismiss Count Three of the Counterclaim, without prejudice, for lack of subject matter jurisdiction, and PennyMac's Cross-Motion for Summary Judgment, ECF 61, will be granted in part and denied in part. Unitrin's Motion for Default Judgment as to the Karps, ECF 60, will be denied. Finally, Unitrin's Motion to Strike PennyMac's Reply, ECF 66, will also be denied.

### I. FACTUAL BACKGROUND

The Karps purchased "Kemper Preferred" policy number RC 761778 from Unitrin ("the Policy") to insure their residence at 3911 Glengyle Avenue, Baltimore, Maryland. ECF 59-4. The Policy's effective dates were July 6, 2016 through July 6, 2017. *Id.* The Policy insures against direct loss to property, but also contains an

exclusion ("the absolute pollution exclusion") which provides:

> [w]e do not insure loss. . . :
> 2. Caused by:
>  e. Any of the following:
>  . . .
>  5) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C of this policy.

ECF 59-4 at 20. The Policy defines "pollutants" to include "any solid, liquid, gaseous or [*3] thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.*

On or about June 2, 2017, the Karps' son discovered a hole in a copper feed line between the oil tank and the furnace. ECF 59-16 at 1. Home heating oil had leaked from the hole onto the tile floor of their basement. ECF 59-13 at 2. The Karps filed a claim under their Unitrin policy, which was originally processed by the "fast response unit" in Unitrin's Charlotte Claims Center. ECF 59-6 at 69:12-70:15; 132:16-133:11. After receiving the Karps' claim, Unitrin began remediating the damage to their basement. ECF 59-7 at 518:1-519:10.

In September of 2017, approximately three months after the incident, Unitrin assigned senior claim representative Allen Stack to review and manage the claim process. ECF 59-16 at 1. Stack reviewed the Karps' Policy, and informed Robert Karp and the public adjuster retained by the Karps, Adam Levitt, that he believed the pollution exclusion excluded coverage for the loss. ECF 59-7 at 516:17-21; ECF 59-8 at 192:5-16. On November 9, 2017, Unitrin issued a formal coverage denial letter to the Karps, which explained that although coverage would be denied, [*4] Unitrin would complete payment of any clean-up and remediation expenses it had agreed to pay before issuing the coverage denial letter. ECF 59-9. Levitt confirmed, at his deposition, that Unitrin paid all of the expenses it had agreed to pay for remediation. ECF 59-8 at 190:9-191:2; 215:12-15; 216:16-217:8. In total, Unitrin paid $86,988.93 for the Karps' loss, including $57,198.71 to remediate the damage to the residence. ECF 61-11.

The Karps' health was adversely affected by the discharge of home heating oil, such that they vacated the dwelling and eventually stopped making mortgage payments to their mortgagor, PennyMac. ECF 61-12 at 157:2-19. Because PennyMac, as mortgagor, also enjoyed certain rights under the Policy, both Robert Karp and PennyMac filed complaints, at separate times, with the Maryland Insurance Administration ("MIA"), alleging that Unitrin engaged in unfair claims practices by denying the claim.[1] The MIA decided in favor of Unitrin as to the issues raised by Robert Karp. ECF 59-13. Karp appealed the decision to the Office of Administrative Hearings, which held a two-day evidentiary hearing. ECF 59-14. After hearing the evidence, the Administrative Law Judge upheld [*5] the MIA's determination that Unitrin had not engaged in unfair claim settlement practices by denying Karp's claim. ECF 59-15. The Final Order issued on October 22, 2018, and it was not appealed. *Id.* On September 10, 2018, PennyMac filed its own complaint with the MIA. ECF 59-18. On March 29, 2019, after PennyMac had filed its Counterclaim against Unitrin in this Court, the MIA also decided PennyMac's complaint in Unitrin's favor. *Id.*

In its Complaint in this case, Unitrin seeks a declaratory judgment declaring that it owes no coverage to the Karps or to PennyMac under the Policy, as a result of the absolute pollution exclusion. ECF 1. PennyMac filed a Counterclaim, in which it seeks a declaratory judgment that it is entitled to joint coverage with the Karps; that the damage from the incident is covered by the Policy; that Unitrin is estopped from terminating coverage; and that the Policy requires Unitrin to provide coverage to PennyMac, even if coverage is unavailable to the Karps. ECF 37. PennyMac also asserts claims for monetary damages for breach of contract, and for failure to act in good faith. *Id.*

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Under *Rule 56(a) of the Federal Rules of Civil Procedure*, summary judgment is appropriate only [*6] "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad® Subsidiary Best Buy Stores, L.P., 823 F. Supp. 2d 334, 348 (D. Md. 2011)* (citing *Pulliam Inv. Co. v. Cameo Props., 810 F.2d 1282, 1286 (4th Cir. 1987))*. If the

---

[1] PennyMac is expressly named as the mortgagee in the Policy (ECF 59-4 at 4), and the Policy includes a "mortgage clause" affording the mortgagee certain rights to recover losses incurred. ECF 59-4 at 26.

moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id. at 349* (quoting *Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315-16 (4th Cir. 1993))*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id. at 348* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))*. Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id. at 349* (quoting *Miskin v. Baxter Healthcare Corp., 107 F. Supp. 2d 669, 671 (D. Md. 1999))*.

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id. at 352*. The non-moving party "must produce competent evidence on each element of [its] claim." *Id. at 348-49* (quoting *Miskin, 107 F. Supp. 2d at 671*). If the non-moving party [*7] fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id. at 352* (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Coleman v. United States, 369 F. App'x 459, 461 (4th Cir. 2010)* (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (quoting *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962))*.

## III. ANALYSIS

### A. Motion to Strike PennyMac's Reply

The Court will address Unitrin's Motion to Strike first, to establish the scope of the materials to be considered in addressing the substantive motions. Unitrin argues that PennyMac's Reply exceeded the scope of Unitrin's Opposition to PennyMac's (belatedly filed) Motion for Summary Judgment, and instead constituted an impermissible surreply to Unitrin's Motion for Summary Judgment. ECF 66. Regardless of the merits of that position, this Court has repeatedly expressed the view that a Motion to Strike is not an appropriate procedural vehicle to use in this context. *See, e.g., Dowdy v. Santander Consumer U.S.A., Inc., Civil No. SAG-19-01386, 2019 U.S. Dist. LEXIS 183905, 2019 WL 5455554, at *5 (D. Md. Oct. 14, 2019)* (citing *Maxtena, Inc. v. Marks, Civil No. DKC-11-0945, 2012 U.S. Dist. LEXIS 3931, 2012 WL 113386 (D. Md. Jan. 12, 2012*) for the proposition that [*8] the "Federal Rules of Civil Procedure only permit a motion to strike matters contained in pleadings, not those contained in other motions, briefs, or attachments."). Unitrin's Motion to Strike will therefore be denied. The Court notes, however, that no material that could be construed as a "surreply" proved dispositive with respect to the merits of the parties' positions.

### B. Declaratory Judgment Counts

Turning to the substantive issues, both parties to this insurance coverage dispute suggest that the other side is taking an unreasonable view of what they consider to be clearly binding precedent, instead of recognizing what are in fact thorny legal issues presented by this case. Cases throughout the country interpreting the absolute pollution exclusion, in various contexts, are both legion and inconsistent. Even focusing one's review on Maryland case law does not result in a completely self-evident answer to the legal questions stemming from the incident in the Karps' home.

The parties do, however, generally agree as to the principles governing this Court's interpretation of the Policy. In assessing whether an exclusion in an insurance contract is applicable, the insurer bears the burden [*9] of establishing that the exclusion applies. *White Pine Ins. Co. v. Taylor, 233 Md. App. 479, 165 A.3d 624, 634 (2017)*. Maryland law treats insurance policies the same as any other contract, and does not require that the policies "be construed most strongly against the insurer." *Catalina Enters., Inc. Pension Tr. v. Hartford Fire Ins. Co., 67 F.3d 63, 65 (4th Cir. 1995)* (citing *Collier v. MD—Individual Practice Ass'n, 327 Md. 1, 5, 607 A.2d 537 (1992))*. Instead, Maryland courts must construe the policy as a whole in order to ascertain the parties' intent. *Cheney v. Bell Nat'l Life Ins. Co., 315 Md. 761, 766-67, 556 A.2d 1135 (1989)*. "[W]here a contract is plain and unambiguous, there is no room for construction." *Bd. of Trs. v. Sherman, 280 Md. 373, 380,*

373 A.2d 626 (1977).

When looking at the policy's text, courts must "accord words their ordinary and accepted meanings," or that meaning which "a reasonable person would attach to the term," Pac. Indem. Co. v. Interstate Fire & Cas. Co., 302 Md. 383, 388, 488 A.2d 486 (1985), absent evidence that the parties intended to employ the term in question "in a special or technical sense," Cheney, 315 Md. at 766. The parties' intent can also be derived from "the character of the contract, its object and purposes, and the factual circumstances of the parties at the time of execution." Catalina, 67 F.3d at 65 (citing Collier, 327 Md. at 5). Courts may determine questions of interpretation of a policy provision as a matter of law, so long as (1) the provision's text is unambiguous, or (2) if the text is ambiguous, "if there is no factual dispute in the evidence." Pac. Indem., 302 Md. at 389. Where the text of a policy is ambiguous, the Court may consult extrinsic evidence. Clendenin Bros. v. U.S. Fire Ins. Co., 390 Md. 449, 459, 889 A.2d 387 (2006) **[*10]**. Ambiguity exists where a term in a policy, "when read by a reasonably prudent person," is "susceptible of more than one meaning." United Servs. Auto Ass'n v. Riley, 393 Md. 55, 80, 899 A.2d 819 (2006).

If, after considering extrinsic evidence, an ambiguity remains and there is no material evidentiary factual dispute, the ambiguity is construed against the party who drafted the policy, which is generally the insurer. See, e.g., Beale v. American Nat'l Lawyers Ins. Reciprocal (Risk Retention Group), 379 Md. 643, 660, 843 A.2d 78 (2004); see also Haynes v. Am. Cas. Co., 228 Md. 394, 400, 179 A.2d 900 (1962) ("[W]here an insurance company, in attempting to limit coverage, employs ambiguous language, the ambiguity will be resolved against [the insurer] as the one who drafted the instrument, as is true in the construction of contracts generally.").

With these principles in mind, the Court begins by considering the issue at the heart of the parties' dispute: Maryland's interpretation of the absolute pollution exclusion, and how it would apply in the context of home heating oil. A review of the most relevant Maryland cases is instructive.

Unitrin relies on Bernhardt v. Hartford Fire Ins. Co., 102 Md. App. 45, 648 A.2d 1047 (1994), which was decided by the Court of Special Appeals of Maryland. *Bernhardt* addressed a situation in which tenants sued their landlord, Norman Bernhardt, for damages they suffered resulting from the escape of carbon monoxide fumes from the central heating system in their building. **[*11]** Id. at 47. Bernhardt tendered the tenants' claims to his comprehensive business liability insurer, Hartford. Id. at 48. Hartford denied coverage, citing the absolute pollution exclusion in Bernhardt's policy. Id.

Bernhardt did "not deny that carbon monoxide is a pollutant within the literal language of the policy exclusion." Id. at 50. Instead, in relevant part, he argued that policy's language was ambiguous, because the parties had intended to apply the exclusion "only to persistent industrial pollution of the environment, and not to an accident of the kind generally covered by a comprehensive business liability policy." Id. After a lengthy review of the history of the absolute pollution exclusion, the Court of Special Appeals determined, "Whether the absolute pollution exclusion is viewed as clear and unambiguous will, of necessity, depend upon the facts of each case to which it is applied." Id. at 50-52. The Court disagreed "with the landlord's contention that the absolute pollution exclusion is ambiguous when applied to the facts of this case." Id. at 53-54. It instead relied on the fact that, "The carbon monoxide gas in this case was a 'gaseous . . . irritant or contaminant' and constituted 'fumes' and 'chemicals' within the clear **[*12]** language of the definition of 'pollutant.'" Id. at 55. The Court also declined Bernhardt's invitation to limit the absolute pollution exclusion to "industrial" or "industry-related" activities, because the exclusion does not contain those words, and because the absolute pollution exclusion is included as an endorsement in policies for non-industrial businesses and even for homeowners. Id. at 55-56. While ruling in favor of the insurer in the *Bernhardt* case, the Court expressly warned that, "The insurance industry has constructed an 'absolute' exclusion so broad in its application that it sweeps away coverage well beyond that which might be required to meet the industry's legitimate aims. It has done so, however, at least in the context of this case, in contract language that is clear and unambiguous." Id. at 57.

Shortly after *Bernhardt*, the Court of Appeals of Maryland addressed the absolute pollution exclusion in Sullins v. Allstate Ins. Co., 340 Md. 503, 667 A.2d 617 (1995). The Sullinses were landlords who were sued by their tenant, who alleged that the tenant's child had ingested lead paint at the Sullinses' residential property. Id. at 507. The Sullinses sought defense and indemnification from Allstate, who had issued their homeowner's policy, including an endorsement providing **[*13]** liability coverage for their rental properties. Id. Allstate denied coverage, citing the absolute pollution exclusion. Id. at 507-08.

The Court of Appeals considered first whether, in the context presented in *Sullins*, the absolute pollution exclusion was ambiguous. *Id. at 509-10*. It reasoned that:

> The terms in the exclusion, 'contaminants' and 'pollutants,' are susceptible of two interpretations by a reasonably prudent layperson. By one interpretation, these terms encompass lead paint; by another interpretation, they apply only to cases of environmental pollution or contamination, and not to products such as lead paint. Since no extrinsic evidence appears in the record at this time to clarify the intentions of the parties in using these terms, the policy must be construed against Allstate as the drafter of the policy.

*Id.* The Court noted other courts' inconsistent findings regarding whether lead paint constitutes a "contaminant" or "pollutant," including court determinations that "products, despite their toxic nature, are not 'pollutants' or 'contaminants' when used intentionally and legally."[2] *Id. at 512*. After a lengthy recitation, similar to that in *Bernhardt*, of the history and evolution of the absolute pollution exclusion, [*14] the Court explained:

> It appears from the foregoing discussion that the insurance industry intended the pollution exclusion to apply only to environmental pollution. That supports our conclusion that a reasonably prudent layperson may interpret the terms "pollution" and "contamination," in the circumstances of the case now before us, as *not* encompassing lead paint, a product used legally and intentionally. Since the terms 'pollution' and 'contamination' suggest more than one meaning to a reasonably prudent layperson, they are ambiguous and must be construed against Allstate, the drafter of the policy.

*Id. at 515-16*.

In 1998, the United States Court of Appeals for the Fourth Circuit considered and reconciled *Bernhardt* and *Sullins*, in *Assicurazioni Generali, S.p.A. v. Neil, 160 F.3d 997 (1998)*. *Neil* arose out of carbon monoxide poisoning experienced by guests at a hotel establishment. *Id. at 999*. The insurer denied coverage to the hotel, citing, in part, the absolute pollution exclusion. *Id. at 1000*. The hotel owners argued that "a Maryland court would limit the applicability of any pollution exclusion to instances of environmental pollution," in light of the language in *Sullins. Id. at 1001*. The district court had agreed, and had relied on *Sullins* to rule in favor of the hotel owners, reasoning that *Sullins* "led to [*15] the inescapable conclusion that the [Court of Appeals of Maryland] 'would reverse *Bernhardt* if that decision were to reach it for review.'" *Id. at 1003*.

The Fourth Circuit disagreed, and found that the district court should have applied the holding of the intermediate state court in *Bernhardt*. The Fourth Circuit noted that not only did *Sullins* decline to overrule *Bernhardt*, but it had actually cited *Bernhardt* multiple times while recounting the history of the absolute pollution exclusion. *Id. at 1004*. Ultimately, the Fourth Circuit found that *Sullins* had appropriately distinguished *Bernhardt*, because while the terms "contaminants" and "pollutants" were ambiguous in the context of lead paint chips, "carbon monoxide was clearly a 'gaseous . . . irritant or contaminant' and constituted 'fumes' and 'chemicals' within the clear language of the definition of pollutant." *Id. at 1005*. In other words, "notwithstanding its ultimate holding, nothing in *Sullins* would suggest disapproval of or disinclination to follow the intermediate court's decision in *Bernhardt* in a case, like the present one, with unambiguous policy language." *Id.* The Fourth Circuit emphasized that Maryland's high court had not concluded in *Sullins* that the [*16] absolute pollution exclusion was limited to "injuries resulting from environmental pollution," but instead had rested its holding "upon the ambiguity in the exclusion language before it and its resolution of that ambiguity against the insurer." *Id.* In the end, the Court ruled:

> For these reasons, we believe *Sullins* does not provide persuasive data that the Maryland Court of Appeals would refuse to follow *Bernhardt*. Since Neil offers no other persuasive data that *Bernhardt* does not accurately state Maryland law, we must follow it and hold that the pollution exclusion bars coverage for the injuries allegedly caused by carbon monoxide poisoning.

*Id. at 1006*.

The last significant entry in the series of relevant cases interpreting Maryland law is *Clendenin Bros., Inc. v. United States Fire Ins. Co., 390 Md. 449, 889 A.2d 387*

---

[2] The *Sullins* Court held "that conflicting opinions of policy language is not determinative of, but is a factor to be considered in determining the existence of ambiguity. . . . [I]f other judges have held alternative interpretations of the same language to be reasonable, that certainly lends some credence to the proposition that the language is ambiguous and must be resolved against the drafter." *Id. at 518*.

*(2006)*. Clendenin's employees sued their employer, alleging that "proper use of the Insured's welding products produced harmful localized fumes containing manganese which caused bodily harm and neurological damage." *Id. at 452-53*. Clendenin's insurer, U.S. Fire, argued that the absolute pollution exclusion applied to the welding-related claims. *Id.* The Court of Appeals noted that the issue of the exclusion's application to "localized, workplace manganese welding fumes" was an issue **[*17]** of first impression, *id. at 454*, but reviewed the relevant holdings in *Bernhardt* and *Sullins*, *id. at 454-57*. Echoing its rationale in *Sullins*, the Court reasoned:

> Guided by our principles of insurance contract interpretation, we conclude that the language of the pollution exclusion in the present case is ambiguous in the context of manganese welding fumes. A reasonably prudent person could construe the pollution exclusion clause in the present case as both including and not including manganese welding fumes.

*Id. at 461*. The Court found ambiguity because reasonably prudent persons (including, in a prior case, the United States Court of Appeals for the Fourth Circuit) could conclude that "the contractually defined term 'pollutant' encompasses manganese welding fumes," which are indisputably capable of harming human health. *Id. at 461*. Nevertheless, the Court of Appeals noted that "manganese, in certain concentration forms, has positive applications and long has been used in the normal course of business by welders," such that "a reasonably prudent person might not consider manganese generally to be an irritant or contaminant." *Id. at 462*. The Court emphasized that, in *Sullins*, it had "considered and rejected" the "potentially limitless view" that any substance **[*18]** with the potential to irritate or damage some person or property could constitute a pollutant subject to the exclusion. *Id. at 464*. Significantly, the Court went on to state, "[G]iven our assessment in *Sullins* of the historical development of the pollution exclusion clause, in conjunction with the conclusions reached by foreign courts reviewing similar policy language as is presently before us, we conclude that the policy exclusion does not apply beyond traditional environmental pollution situations." *Id. at 466*. In conclusion, the Court stated, "Accordingly, considering the policy as a whole, as well as the facts and circumstances surrounding its execution, we conclude that the language of the present total pollution exclusion is ambiguous in the context of manganese welding fumes."[3] *Id. at 467*.

A comparison of the absolute pollution exclusion clauses in the four cases reviewed above reveals no meaningful distinctions in terms of wording. The analysis conducted by the Maryland courts, instead, is a case-by-case analysis that turns on whether the substance at issue is exclusively viewed as a pollutant, placing it squarely within the exclusion's definitions, or whether the substance instead **[*19]** serves some useful purpose as a non-pollutant, rendering its status ambiguous. The home heating oil at issue in this case, which was intentionally introduced into the Karps' residence to serve a useful purpose, is more akin to the manganese in *Clendenin Bros.* and the lead paint chips in *Sullins* than it is to the carbon monoxide in *Bernhardt* and *Neil*. A reasonably prudent person could contend that home heating oil, which causes known deleterious effects to the occupants of the home when it is spilled, is a pollutant or contaminant, but a reasonably prudent person could also argue that this same oil, which is brought into the home for productive use in the furnace, is not a pollutant intended to be covered by the exclusion. This useful application, which does not exist for the carbon monoxide in the cases so heavily relied upon by Unitrin, creates the critical ambiguity here.

Tellingly, other courts interpreting the absolute pollution exclusion as it pertains to home heating oil have reached varied results. *Compare Eastern Cas. Inc. Co. v. Home Store, Inc., 19 Mass. L. Rptr. 363 (Sup. Ct. Mass. 2005)* (finding that the absolute pollution exclusion did not relieve the insure of its obligations to cover damages from a leak in the oil-fired heating system because an objectively **[*20]** reasonable insured would expect the damage to be covered) *with Barg v. Encompass Home & Auto Ins. Co., Civil No. 16-6049, 2018 U.S. Dist. LEXIS 8951, 2018 WL 487830, at *5 (E.D. Pa. 2018)* (finding that the absolute pollution exclusion applied to a home heating oil leak where "the record contains extensive evidence that heating oil is a contaminant"). Such conflicting judicial interpretations, while not dispositive, further support the existence of

---

[3] After *Clendenin Bros.*, the Court of Appeals of Maryland issued one additional case touching on the absolute pollution exclusion, in *Brownlee v. Liberty Mutual Fire Ins. Co., 456 Md. 579, 175 A.3d 697 (2017)*. Because the *Brownlee* opinion decided the limited question of whether a Georgia court's interpretation of the absolute pollution exclusion violated Maryland public policy, it does not directly bear upon the contractual interpretation issues relevant here.

ambiguity. *See Sullins, 340 Md. at 518*.

Unitrin argues that heating oil's status as a pollutant is not ambiguous because, when it spilled "it was not being used in the ordinary and expected course of business," and thus no reasonably prudent person could conclude the oil was not a pollutant. ECF 62 at 13. The heating oil, however, *was* being used how an ordinary household would—brought in to supply the house with heat—when it spilled. The spill was certainly not an intended result of the introduction of heating oil into the house, but neither was the inhalation of toxic fumes as part of the welding process in *Clendenin* nor the ingestion of lead paint in *Sullins*. Those cases teach that the ambiguity analysis is not cabined solely to whether the form in which the substance caused the harm is useful, but rather requires a broader view of the substance's "positive applications." The fact **[*21]** that a reasonably prudent person could conclude that heating oil in its un-spilled form has a useful application in the Karps' furnace is enough to give rise to ambiguity here.[4]

Unitrin attempts to distinguish *Clendenin Bros.* by pointing out that it involved a general commercial insurance policy as opposed to the homeowner's insurance policy at issue here, ECF 62 at 12, but that difference is not a substantive one insofar as this case is concerned. The terms of the Policy here and the one in *Clendenin Bros.* are very similar. *See* ECF 59-4 at 20; *Clendenin Bros., 390 Md. at 453* (using similar language regarding "discharge, dispersal, seepage, migration, release or escape of pollutants," as well as the exact same definition of pollutant). Indeed, *Clendenin Bros.* itself relied heavily on *Sullins*, which involved a homeowners insurance policy, to inform its commercial insurance policy analysis, *Clendenin Bros., 390 Md. at 463-67*, demonstrating that where such similar exclusionary language is at issue, courts need not erect a formalistic wall between the types of insurance policies used in their interpretive efforts.

In light of the ambiguity described above, and the lack of extrinsic evidence suggesting the parties' intent with respect to coverage of **[*22]** home heating oil, the Policy must be construed against its drafter, Unitrin.[5] As a result of this Court's determination that the absolute pollution exclusion is ambiguous in this context, Unitrin cannot invoke the exclusion to deny coverage under the policy. PennyMac's arguments about estoppel, and about its own coverage under the policy being broader than that afforded to the Karps, need not be addressed, and Unitrin's Motion for Summary Judgment as to its Complaint seeking a declaratory judgment will be denied.

The Court does need to address Unitrin's contention that PennyMac is barred by collateral estoppel from asserting its own affirmative claims against Unitrin. The MIA's disposition of PennyMac's complaint is not binding on this Court, and by law becomes a legal nullity upon the filing of a court action. *See Fakhoury v. Great N. Ins. Co., No. CIV. WDQ-12-0268, 2012 U.S. Dist. LEXIS 60382, 2012 WL 1554487, at *3 (D. Md. Apr. 30, 2012)* (noting that the MIA's decision is a nullity once an insured has filed a civil action under *§ 3-1701* of the Courts & Judicial Proceedings Article); *Thompson v. State Farm Mut. Auto. Ins. Co., 196 Md. App. 235, 251, 9 A.3d 112 (2010)* (finding that the MIA record is not before the court and the MIA decision appears to be a nullity once the insured files a civil action). Thus, **[*23]** collateral estoppel does not bar PennyMac's claims. PennyMac's motion for summary judgment as to Count

---

[4] Unitrin's emphasis that home heating oil in all of its forms is an irritant and thus satisfies the literal wording of the policy, ECF 59 at 15, similarly falls short. The fact that it is an irritant, even one that caused the Karps to move out, does not preclude the substance from having a useful purpose and thus does not alter the ambiguity analysis. *See Clendenin Bros., 390 Md. at 464*.

[5] Alternatively, while not exceedingly clear, it also appears that the Court of Appeals, in *Clendenin Bros.*, expressed some intent to limit application of the absolute pollution exclusion to "traditional environmental pollution situations." *See 390 Md. at 466* ("[W]e conclude that the policy exclusion does not apply beyond traditional environmental pollution situations."). While the Court did not offer a precise definition of that term, and appears to ultimately have based its holding on the ambiguity in the *Clendenin Bros.* policy, the Court of Appeals is disinclined to construe the total pollution exclusion broadly in situations like that presented in this case. *See id. at 468* (citing approvingly the Sixth Circuit's holding in *Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178 (6th Cir. 1999)*, which concluded "the total pollution exclusion clause at bar does not shield the insurer from liability for injuries caused by toxic substances that are still confined within the general area of their intended use."). Unitrin's suggestion that the apparent seepage of the Karps' home heating oil into the soil below the basement converts this incident into "traditional environmental pollution," ECF 62-1 at 15-16, is unpersuasive. The soil issue here clearly emanated from a leak within the Karps' residence, remained confined to the "general area of intended use" even if there is evidence of limited seepage into the immediate soil, and is not traditional environmental pollution affecting the property from an external source.

One of its Counterclaim will be granted, to the extent it seeks a declaratory judgment that the pollution exclusion does not exclude coverage for the incident.

## C. Count Two of Counterclaim: Breach of Contract

Unitrin seeks summary judgment in its favor as to Count Two of the Counterclaim. ECF 59-3 at 1 (seeking summary judgment "as to all claims" in the Counterclaim). While the memorandum in support of Unitrin's motion for summary judgment does not address Count Two expressly, presumably Unitrin contends that it could not have breached its contract with PennyMac, because it did not owe coverage in light of the exclusion. As discussed above, Unitrin's position lacks merit, and its motion for summary judgment as to Count Two of the Counterclaim will be denied.

PennyMac also moves for partial summary judgment as to its claims in Count Two.[6] On the present record, that motion will be denied. Despite this Court's conclusion that coverage is available to PennyMac under the Policy, the record does not clearly establish that PennyMac has expressly sought coverage for any monies it has expended, [*24] that have not been covered by Unitrin to date.

## D. Count Three: Good Faith

Both parties seek summary judgment as to the claim PennyMac asserts in Count Three: that Unitrin failed to act in good faith in deciding the coverage issues, as it is required to do by *Md. Code. Ann., Inc. § 27-1001(a)* and *Md. Code Ann, Cts. and Jud. Proc. § 3-1701*. The Maryland statute requires an insurer to make "an informed judgment based on honesty and diligence supported by evidence the insurer knew or should have known at the time the insurer made a decision on the claim." Md. Code Ann., Cts. and Jud. Proc. 3-1704(a)(4). An insurer's good faith is judged by the totality of the circumstances, including:

> efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way as to limit any potential prejudice to the insured; the substance of the coverage dispute or the weight of legal authority on the coverage issue; [and] the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage.

*All Class Constr., LLC v. Mutual Ben. Ins. Co., 3 F. Supp. 3d 409, 416 (D. Md. 2014)* (quoting *Cecilia Schwaber Trust Two v. Hartford Accident & Indem., Co., 636 F. Supp. 2d 481, 486-87 (D. Md. 2009))*. Denial of policy benefits does not constitute a "lack of good faith," because the insured is entitled only to pursue contract remedies. *Bierman Family Farm, LLC v. United Farm Family Inc. Co., 265 F. Supp. 3d 633, 637-38 (D. Md. 2017)*.

Unitrin raises, for the first time in this Motion, a lack of subject matter jurisdiction, alleging that PennyMac [*25] did not have the requisite final order from its administrative proceeding before the MIA in advance of filing its Counterclaim in this Court. ECF 59-3 at 7-10. As Judge Theodore D. Chuang recently reasoned:

> [T]he Maryland General Assembly has signaled that exhaustion of the MIA administrative process is a jurisdictional prerequisite to a claim under *Section 3-1701*. *Section 3-1701* states that absent certain circumstances not present here, "a party may not file an action under this subtitle before the dates of a final decision under *§ 27-1001* of the Insurance Article," the provision describing an administrative claim before the MIA. *Cts. & Jud. Proc. § 3-1701(c)(1)*. Crucially, this provision falls within Title 3 of the Courts and Judicial Proceedings Article of the Maryland Code, which is entitled "Courts of General Jurisdiction—Jurisdiction/Special Causes of Action." Thus, the Maryland legislature has expressed its intent that this exhaustion requirement constitute not merely an element of a claim, but a jurisdictional prerequisite to the presentation of such a claim in a Maryland court. Accordingly, an allegation that a plaintiff has failed to exhaust administrative remedies before bringing a *Section 3-1701* claim is properly considered as a challenge [*26] to the Court's subject matter jurisdiction. *See Class Produce Grp., LLC v. Harleysville Worcester Ins. Co., No. ELH-16-3431, 2017 U.S. Dist. LEXIS 83669, 2017 WL 2377105, at *6 (D. Md. May 31, 2017)* (stating that a motion to dismiss a claim under *Section 3-1701* for failure to exhaust administrative remedies is a challenge to the court's subject matter jurisdiction) (quoting *Carlyle v. Travelers Home & Marine Ins. Co., No. WDQ-13-2964, 2014 U.S. Dist. LEXIS 78890, 2014 WL 2573381, at *3 (D. Md. June 5, 2014))*.

---

[6] Like Unitrin, this Court did not read PennyMac's motion to include a claim for partial summary judgment as to Count Two. However, in its Reply, PennyMac asserts that it did intend its motion to encompass Count Two. ECF 65-1 at 2 n.1.

*Jackson v. Standard Fire Ins. Co., Civil No. TDC-17-1612, 2018 U.S. Dist. LEXIS 4220, 2018 WL 348148, at *3 (Jan. 9, 2018)*.

The timeline in this case is as follows: Unitrin filed its declaratory judgment action in this Court on November 9, 2017. ECF 1. PennyMac filed its administrative claim with the MIA on September 10, 2018, and filed its Counterclaim shortly thereafter, on October 24, 2018. ECF 37. While this case was pending, on March 29, 2019, the MIA issued its opinion on the administrative claim, which would constitute its final order under the statute. ECF 59-18. Although something of a technicality, it is undisputed that PennyMac, at the time of the Counterclaim's filing, lacked the final order required to provide subject matter jurisdiction for its Counterclaim.

In order to remedy the procedural defect without prejudicing either party, rather than granting summary judgment as urged by Unitrin, **[*27]** this Court will dismiss Count Three of the Counterclaim *sua sponte*, without prejudice. However, although it is not the basis for this Court's ruling, it is worth noting that PennyMac would have an uphill battle establishing Unitrin's failure to act in good faith, in light of the close legal questions discussed above. Its contention that Unitrin "ignored legal authority" or "decided to terminate coverage without consideration for *Clendenin Brothers*" is unpersuasive, in light of the somewhat balanced legal authority described above and other courts' determinations that home heating oil constitutes a pollutant. An insurer must be permitted to litigate close, debatable coverage issues without incurring a finding that it did not act in good faith, if a court ultimately rules for the insured. Moreover, there do not appear to be any factual issues, relating to whether home heating oil is a pollutant that Unitrin either ignored or failed to investigate.

In addition, PennyMac's repeated contention that Unitrin did not properly remediate the oil in the Karps' basement is a red herring with respect to the coverage decision. Whether or not the cleaning and remediation efforts were deficient, PennyMac **[*28]** has adduced no evidence linking such deficiencies to Unitrin's legal position or its subsequent denial of coverage. This case, then, bears all the hallmarks of a traditional contractual coverage dispute, and not an instance of bad faith. That said, because PennyMac subsequently obtained a final order from the MIA, Count Three of its Counterclaim will be dismissed without prejudice to PennyMac filing a motion seeking leave to amend its Counterclaim to re-assert a *§ 3-1701* claim, if it believes it to be viable.

### E. Motion for Default Judgment

Finally, Unitrin seeks default judgment against the Karps, who did not appear in court or defend this action. Despite a strong preference that cases be decided on the merits, "default judgment is available when the adversary process has been halted because of an essentially unresponsive party." *Disney Enters., Inc. v. Delane, 446 F. Supp. 2d 402, 405 (D. Md. 2006)* (citation and quotation marks omitted).

In considering a motion for default judgment, the Court generally "takes as true the well-pleaded factual allegations in the complaint, other than those pertaining to damages." *Choice Hotels Int'l, Inc. v. Vishal, Inc., No. PWG-13-2078, 2014 U.S. Dist. LEXIS 160347, 2014 WL 6391092, at *2 (D. Md. Nov. 14, 2014)* (Connelly, J.) (citing *Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780 (4th Cir. 2001))*. In cases involving multiple defendants, *Rule 54(b)* "authorizes entry of a final **[*29]** judgment as to one of multiple defendants in a civil action following an express finding that there is 'no just reason for delay.'" *Choice Hotels Intl., Inc. v. Mander, Civil No. GJH-14-3159, 2015 U.S. Dist. LEXIS 53551, 2015 WL 1880277 (Apr. 22, 2015)* (citing *Fed. R. Civ. P. 54(b)*). However, entry of a default judgment should not produce "logically inconsistent judgments resulting from an answering defendant's success on the merits and another defendant's suffering of a default judgment." *Jefferson v. Briner, Inc., 461 F. Supp. 2d 430, 434 (E.D. Va. 2006)*.

Given that this Court has ruled, on the merits, that Unitrin's declaratory judgment action lacks merit, it cannot enter default judgment against the Karps on Unitrin's declaratory judgment claim without producing inherently inconsistent judgments. Accordingly, Unitrin's motion for default judgment will be denied.

### IV. CONCLUSION

For the reasons set forth above, Unitrin's Motion for Summary Judgment, ECF 59, will be denied as to all counts, and PennyMac's Motion for Partial Summary Judgment, ECF 61, will be granted in part as to Count One, and otherwise denied. Specifically, PennyMac is entitled to a declaration that the absolute pollution exclusion does not bar coverage for the losses arising from the home heating oil leakage in the Karps'

basement. Genuine issues of material fact **[*30]** remain as to the other claims, including the other claims for declaratory relief. Unitrin's Motion for Default Judgment, ECF 60, and its Motion to Strike, ECF 66, will also be denied. Count III of PennyMac's Counterclaim will be dismissed without prejudice for lack of subject matter jurisdiction. A separate Order follows, which will include information about a scheduling conference to discuss the remaining proceedings in this litigation.

Dated: August 24, 2020

/s/ Stephanie A. Gallagher

United States District Judge

## ORDER

For the reasons stated in the accompanying memorandum opinion, it is this 24th day of August, 2020, ORDERED that Plaintiff's Motion for Summary Judgment, ECF 59, is **DENIED** as to all counts. Plaintiff's Motion for Default Judgment, ECF 60, and its Motion to Strike, ECF 66, are both **DENIED**. Defendant's Motion for Partial Summary Judgment, ECF 61, will be **GRANTED** in part as to Count I, and **DENIED** with respect to all other counts. Count III of Defendant's Counterclaim will be **DISMISSED WITHOUT PREJUDICE**. Defendant is **GRANTED** thirty (30) days within which to seek leave to amend its Counterclaim to remedy the deficiencies in the claim dismissed, should it so choose.

A telephonic **[*31]** scheduling conference will be held on **Wednesday, September 2, 2020 at 11 a.m.**, and the parties should be prepared to address scheduling issues, including whether there is consent to referral to a United States Magistrate Judge for a settlement conference. Chambers staff will circulate the conference call dial-in information.

/s/ Stephanie A. Gallagher

United States District Judge

**End of Document**