# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| AFM MATTRESS COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:20-cv-03556 |
| | ) | |
| v. | ) | Judge: Manish S. Shah |
| | ) | |
| MOTORISTS COMMERCIAL MUTUAL | ) | Magistrate Judge: M. David Weisman |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSES TO DEFENDANT'S REQUEST FOR PRODUCTION OF JURISDICTIONAL DOCUMENTS

Plaintiff AFM Mattress Company, LLC ("AFM"), by and through its attorneys, Brown,

Udell, Pomerantz & Delrahim, hereby responds to Defendant Motorists Commercial Mutual

Insurance Company's Request for Production of Jurisdictional Documents as follows:

## RESPONSES TO REQUESTS TO PRODUCE

**Request No. 1:**    AFM's complete and signed Operating Agreement in place and effective as of the date of the removal of this case to the United States District Court for the Northern District of Illinois, on June 18, 2020, including all schedules, exhibits and appendices thereto.

**RESPONSE:** AFM will produce non-privileged documents responsive to this request.

**Request No. 2:**    To the extent the document requested in Request No. 1 does not fully identify all members of AFM, all documents identifying the members of AFM as of the date of the removal of this case to the United States District Court for the Northern District of Illinois, on June 18, 2020.

**RESPONSE:** AFM objects to this request on the grounds that it is overbroad, unduly

burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to its objections, AFM states that its members are fully identified in the operating

agreement being produced in response to Request No. 1.

**Request No. 3:**   To the extent any members of AFM are not natural persons or corporations, all documents sufficient to show the identity and citizenship of all partnerships, organizations, limited liability companies, trusts or other entities constituting the members of AFM, and the identity and citizenship of all of their respective members and trustees, including those of all members of members in succession, until all natural persons who have direct or indirect ownership of AFM or who act as trustee for any trusts that have direct or indirect ownership of AFM are identified and their citizenship is disclosed.

**RESPONSE:** AFM objects to this request on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to its objections, AFM will produce an organizational chart identifying its members and the members of its members, in succession, and the operating agreements for the limited liability company members of AFM and its members, as applicable.   Further answering, AFM is disclosing the identity of the trustees of any trusts identified in the organizational chart, along with the permanent address of each such trustee, in responses to interrogatories served contemporaneously herewith.


**Request No. 4:**   The flow chart of the members and managers of AFM, along with their addresses, referred to by counsel for AFM in his email of October 15, 2020.

**RESPONSE:** AFM will produce a corrected version of its previously produced organizational chart (as referenced in response to Request No. 3).

Dated: November 11, 2020

Respectfully Submitted,
AFM MATTRESS COMPANY, LLC


By: ___*/s/ Bryan D. King*___
                One of their attorneys

Glenn L. Udell (ARDC # 6206064)
Michael S. Pomerantz (ARDC # 6205384)
Bryan King (ARDC # 6279203)
Brown, Udell, Pomerantz & Delrahim, Ltd.
225 W. Illinois Street, Suite 300
Chicago, IL 60654
312-475-9900
gudell@bupdlaw.com
mpomerantz@bupdlaw.com
bking@bupdlaw.com

# OPERATING AGREEMENT OF
# AFM MATTRESS COMPANY LLC,
# A DELAWARE LIMITED LIABILITY COMPANY

AFM000001

## OPERATING AGREEMENT OF
## AFM MATTRESS COMPANY LLC

THIS OPERATING AGREEMENT ("Operating Agreement") is made and entered into as of the 1st day of October, 2018, by AFM MATTRESS COMPANY LLC, a Delaware limited liability company (the "Company"), the manager and the members set forth on attached <u>Exhibit A</u>.

WHEREAS, the Company was formed as a Delaware limited liability company on October 1, 2018;

WHEREAS, the parties have reached an understanding concerning various aspects of (i) their business relationship with each other and (ii) the organization and operation of the Company and its business.

WHEREAS, the parties intend for this Agreement to control, to the extent stated or fairly implied, the business and affairs of the Company, including the Company's governance structure and the Company's dissolution, winding up and termination, as well as the relations among the Company's Members.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings:

1.1     <u>Act</u>. The "Act" shall mean the Delaware Limited Liability Company Act, as it may be amended from time to time.

1.2     <u>Affiliate</u>. "Affiliate" shall mean: (1) any Person directly or indirectly controlling, controlled by or under common control with another Person; (2) a Person owning or controlling ten percent (10%) or more of the outstanding voting securities of such other Person; (3) any officer, director, partner, spouse, parent, or lineal descendant of such other Person; and (4) if such other Person is an officer, director or partner, any company or partnership for which such Person acts in any capacity.

1.3     <u>Agreed Value</u>. "Agreed Value" is defined in Section 7.11.

1.4     <u>Articles of Organization</u>. The "Articles of Organization" shall mean the Certificate of Formation as filed with the Secretary of State of Delaware, as amended from time to time

1.5     <u>Capital Account</u>. "Capital Account" shall mean as of any given date the account maintained for each Member pursuant to Article 5.

1.6    <u>Capital Contribution</u>. "Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

1.7    <u>Capital Interest</u>. "Capital Interest" shall mean as of any given date the proportion that a Member's positive Capital Account bears to the aggregate positive Capital Accounts of all Members whose Capital Accounts have positive balances as of such date.

1.8    <u>Code</u>. The "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue laws.

1.9    <u>Company</u>. The "Company" shall mean AFM MATTRESS COMPANY LLC, a Delaware limited liability company.

1.10    <u>Company Property or Property</u>. "Company Property" or "Property" shall mean all properties, assets and rights of any type owned by the Company.

1.11    <u>Deficit Capital Account</u>. "Deficit Capital Account" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

    (a)    Credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704- 2(g)(l) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner for nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations); and

    (b)    Debit to such Capital Account the items described in Sections 1.704-I(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

    (c)    This definition of Deficit Capital Account is intended to comply with the provisions of Treasury Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and shall be interpreted consistently with those provisions.

1.12    <u>Dissociating Member</u>. "Dissociating Member" shall mean a Member for which an event of Dissociation has occurred.

1.13    <u>Dissociation</u>. "Dissociation" shall mean the notice by a Member to withdraw from the Company, a Transfer of all of a Member's Membership Interest, the expulsion of a Member, the bankruptcy or insolvency of a Member, the dissolution of a Member, or such other events as set forth in Section 35-45 of the Act.

1.14    <u>Distributable Cash</u>. "Distributable Cash" shall mean all cash, revenues and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company: (a) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (b) all cash expenditures incurred in the normal

2

AFM000003

operation of the Company's business; and (c) Reserves as the Manager deems reasonably necessary for working capital and to pay taxes, insurance, debt service and other costs or expenses incident to the ownership and operation of the business of the Company.

1.15    Economic Interest. "Economic Interest" shall mean a Member's or Economic Interest Owner's share of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not confer any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members or Manager.

1.16    Economic Interest Owner. "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.17    Economic Interest Units. "Economic Interest Units" shall mean ownership interests in the Company held by Economic Interest Owners. Economic Interest Units shall have an Economic Interest only. Subject to the provisions herein, each Economic Interest Unit has equal rights with every other Membership Unit and Economic Interest Unit with respect to sharing of profits and losses and with respect to distributions. An Economic Interest Unit may be diluted if the Company issues additional Units.

1.18    Entity. "Entity" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust or foreign business organization.

1.19    Fiscal Year. "Fiscal Year" shall mean the Company's fiscal year as determined by the Manager. The initial Fiscal Year shall be the calendar year.

1.20    Intentionally Omitted.

1.21    Majority Interest. "Majority Interest" shall mean the Members holding in the aggregate in excess of sixty-six and 67/100ths percent (66.67%) of all Membership Units outstanding at the time of any determination.

1.22    Manager. "Manager" or "Managers" shall mean one (1) or more managers who have the authority to manage the Company in accordance with the provisions of this Operating Agreement.

1.23    Member. "Member" shall mean each owner of a Membership Interest who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become Members. If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be. In the case of a Member which is a revocable grantor trust, references herein to the Member shall include the grantor of such trust.

1.24    Membership Interest. "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent

3

AFM000004

to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement and the Act.

1.25    Membership Units. Ownership interests in the Company shall be represented by "Membership Units." The initial ownership of Membership Units shall be as set forth on attached Exhibit A. Each Membership Unit has equal governance rights with every other Membership Unit and in matters subject to a vote of the Members has one (1) vote. Subject to the provisions herein, each Membership Unit has equal rights with every other Membership Unit with respect to sharing of profits and losses and with respect to distributions. A Membership Unit may be diluted if the Company issues additional Membership Units.

1.26    Minimum Rate. "Minimum Rate" shall mean the minimum rate of interest which can be used without causing additional interest to be imputed pursuant to the Code.

1.27    Net Profits and Losses. "Net Profits" and "Net Losses" shall mean the net amount of all income, gain, loss, and deductions of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the method of accounting selected by the Manager at the close of each fiscal year on the Company's tax return filed for federal income tax purposes.

1.28    Operating Agreement. "Operating Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time. If a provision of this Operating Agreement differs from a provision of the Articles of Organization, then to the extent allowed by law this Operating Agreement shall govern.

1.29    Participating Percentage. "Participating Percentage" shall mean a Member's or Economic Interest Owner's right to allocations of Net Profits and Net Losses of the Company calculated as the Units owned by such Member or Economic Interest Owner divided by the total number of Units outstanding. The current Participating Percentages are set forth on Exhibit A attached hereto and made part hereof.

1.30    Permitted Transferee. "Permitted Transferee" when used herein shall mean:

(a)    another Member; or

(b)    any member of a Member; provided, however, that a Permitted Transferee shall not be a Permitted Transferee unless he, she, or it complies with the provisions of Section 7.6(d).

1.31    Person. "Person" shall mean an individual, partnership, limited partnership, limited liability company, trust, estate, association, corporation, or other entity.

1.32    Reserves. "Reserves" shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts deemed sufficient by the Manager for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

AFM000005

1.33     Sale Proceeds. "Sale Proceeds" "Sale Proceeds" shall mean (1) the proceeds to the Company from the sale of property of the Company, including interest on any deferred or installment payments and (2) the net proceeds to the Company from the refinancing of any property of the Company.

1.34     Sell. "Sell" shall mean to sell, assign, pledge, hypothecate or otherwise transfer for consideration all or any portion of a Membership Interest or Economic Interest.

1.35     Selling Member. "Selling Member" shall mean any Member or Economic Interest Owner which Sells all or any portion of its Membership Interest or Economic Interest.

1.36     Transfer. "Transfer" shall mean to Sell, gift or otherwise transfer, for or without consideration, all or any part of a Membership Interest or Economic Interest.

1.37     Transferee. "Transferee" shall mean the recipient of a Membership Interest or Economic Interest which has been Transferred.

1.38     Transferring Member. "Transferring Member" shall mean a Member who Transfers the Member's Membership Interest, or an Economic Interest Owner who Transfers the Economic Interest Owner's Economic Interest.

1.39     Treasury Regulations. "Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code.

1.40     Units. "Units" shall mean collectively Membership Units and Economic Interest Units.

## ARTICLE 2
## FORMATION OF COMPANY

2.1     Formation. The Company has been organized as a Delaware limited liability company by the execution and delivery of Certificate of Formation to the Delaware Secretary of State in accordance with and pursuant to the Act.

2.2     Name. The name of the Company is AFM MATTRESS COMPANY LLC, a Delaware limited liability company.

2.3     Principal Place of Business. The principal place of business of the Company shall be 1307 Schiferl Road, Bartlett, Illinois  60103. The Company may locate its places of business and registered office at any other place or places as the Manager may from time to time deem advisable.

2.4     Registered Office and Registered Agent. The Company's current registered office is at the office of its registered agent, CT Corporation, the address for which is on file with the Company. The registered office and registered agent may be changed by filing the address of the new registered office and/or the name of the new registered agent with the Delaware Secretary of State pursuant to the Act.

5

AFM000006

2.5    Term. The term of the Company shall be perpetual, unless the Company is dissolved in accordance with either the provisions of this Operating Agreement or the Act.

2.6    Business of Company. The business of the Company shall be to transact any and all lawful business for which a company may be organized under the Act.

## ARTICLE 3
## RIGHTS AND DUTIES OF MANAGER

3.1    Management. The business and affairs of the Company shall be directed, managed and controlled by its Manager. Except as otherwise expressly required by this Operating Agreement or by non-waivable provisions of the Act, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. Except as provided otherwise in this Agreement, at any time when there is more than one (1) Manager, the decision of a majority of all of the Managers shall be required for the Manager to take any action permitted to be taken under this Operating Agreement or the Act.

3.2    Number, Tenure. Designation and Qualifications. As of the date hereof, the Company shall have one (1) Manager: Eduardo E. Greco. Any successor manager shall be chosen by Eduardo E. Greco. It is acknowledged and agreed that the Members shall have no right or authority to terminate or replace the Manager.

3.3    Authority of Manager. Except as provided in Section 3.6, and without limiting the generality of Section 3.1, the Manager shall have power and authority, on behalf of the Company to:

        (a)    Acquire property from any Person as the Manager may determine, whether or not such Person is directly or indirectly affiliated or connected with any Manager or Member;

        (b)    Pledge, encumber, and allow or cause security interests to be placed on any and all assets of the Company;

        (c)    Hire or fire any and all employees, agents, or contractors for the Company;

        (d)    Enter into or terminate employment agreements or other compensation arrangements;

        (e)    Sell, exchange, or otherwise dispose of, finance or refinance all, or substantially all of the assets of the Company as part of a single transaction or plan and sell exchange or otherwise dispose of substantially all of the assets of the Company;

        (f)    Modify or make distributions to the Members;

AFM000007

(g)     Borrow money for the Company from banks, other lending institutions, the Manager, Members, or Affiliates of the Manager or Members or refinance any debts or obligations of the Company;

(h)     Hypothecate, encumber and grant any security interest in any of the assets of the Company to secure repayment of borrowed sums;

(i)     Purchase liability and other insurance to protect the Company's property and business or for any other reason the Manager in their sole discretion may determine;

(j)     Enter into or settle any litigation, arbitration or other similar proceeding involving the Company;

(k)     Make any decision related to the tax status of the Company, or any actions involving tax issues;

(l)     Hold and own Company real and personal properties in the name of the Company;

(m)     Invest Company funds in time deposits, short-term governmental obligations, commercial paper or other investments;

(n)     Open, as it deems necessary or convenient, from time to time such bank accounts in the name of the Company;

(o)     Execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; deeds; assignments; bills of sale; leases; and any other instruments or documents necessary to the business of the Company;

(p)     Employ accountants, legal counsel, managing agents or other experts to perform services for the Company;

(q)     Enter into any and all other agreements on behalf of the Company, in such forms as the Manager may approve; and

(r)     Do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

3.4    <u>Duties of Manager</u>. At the expense of the Company, the Manager shall be responsible for the following duties:

(a)     The Manager shall maintain records and accounts of the operations and expenditures of the Company, which shall at a minimum include the following records which the Manager shall keep at the principal place of business of the Company:

AFM000008

(i)     proper and complete records and books of account in which shall be entered fully and accurately all transactions relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company;

(ii)    a current list of the full name and last known address of each Member and Economic Interest Owner setting forth the amount of cash each Member and Economic Interest Owner has contributed, a description and statement of the agreed value of the other property or services each Member and Economic Interest Owner has contributed or has agreed to contribute in the future, and the date on which each became a Member or Economic Interest Owner;

(iii)   a copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(iv)    copies of the Company's federal, state, and local income tax returns and reports, if any, for the three (3) most recent years;

(v)     copies of the Company's currently effective written Operating Agreement;

(vi)    copies of any financial statements of the Company for the three (3) most recent years;

(vii)   any written consents obtained from Members for actions taken by Members without a meeting;

(viii)  other than as set forth in the Articles of Organization or herein, a writing prepared by the Manager setting out the following: (A) the times at which or events on the happening of which any additional contributions agreed to be made by each Member and Economic Interest Owner are to be made; (B) any right of a Member or Economic Interest Owner to receive distributions that include a return of all or any part of the Member or Economic Interest Owner's contributions; and (C) any power of a Member or Economic Interest Owner to grant the right to become an assignee of any part of the Member's or Economic Interest Owner's interest, and the terms and conditions of the power.

(b)     The Manager shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year upon a Member's written request. Subject to Section 3.6, all elections permitted to be made by the Company under federal or state laws shall be made by the Manager in its sole discretion.

8

3.5     Authority of Others.

(a)     Unless authorized to do so by this Operating Agreement, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

(b)     No Member acting as a Member shall have any power or authority to bind the Company unless the Member has been authorized by the Manager to act as an agent of the Company in accordance with the provision of Section 3.5(a).

(c)     No debt shall be contracted or liability incurred by or on behalf of the Company except by the Manager, or to the extent permitted under the Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Manager.

3.6     Limitation of Authority of Manager. Notwithstanding any other provision herein to the contrary, a vote of the Members holding two-thirds (2/3) of the Membership Units of all Members shall be required before any Manager shall:

(a)     Amend the Operating Agreement of the Company in any manner which would affect the contents of this Section 3.6;

(b)     Voluntarily dissolve the Company, unless all or substantially all of its non-cash assets have been sold.

3.7     Tax Matters Partner. Eduardo E. Greco is designated the "Tax Matters Partner" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

3.8     Liability for Certain Acts. Manager shall perform all duties as Manager in good faith, in a manner reasonably believed to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager.

3.9     Resignation. A Manager of the Company may resign at any time by giving written notice to the Members. The resignation of a Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a Dissociation.

AFM000010

3.10    Indemnification by Company. The Company shall indemnify the Manager for liability it may incur in its capacity as Manager of the Company.

3.11    No Exclusive Duty to Company. Except as otherwise agreed to between Company and Manager, a Manager shall not be required to manage the Company as the Manager's sole and exclusive function and a Manager may have other business interests and engage in activities in addition to those relating to the Company. A Manager and its Affiliates may engage in or possess any interests in other business ventures of any kind, independently or with others, including but not limited to engaging in other ventures having a purpose similar to that of the Company. The fact that the Manager or any Affiliate may encounter and take advantage of opportunities to do any of the foregoing themselves or on behalf of others in whom they may or may not have an interest shall not subject the Manager or any Affiliate to any liability to the Company or any of the Members or Manager on account of any lost opportunity. None of the Company, any Member, any Manager, or the holder of any interest in the Company shall have any right by virtue of this Operating Agreement or the relationship created hereby in or to any other such ventures or activities, or to the income or profits derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company shall not be deemed wrongful or improper.

3.12    Removal. At a meeting called expressly for that purpose, all or any lesser number of Managers may be removed at any time, with or without cause, by Members holding two- thirds (2/3) of the Membership Units of all Members. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a Dissociation.

3.13    Vacancies. Any vacancy occurring for any reason in the number of Manager of the Company may be filled by the affirmative vote of Members holding at least two- thirds (2/3) of the Membership Units.


ARTICLE 4
RIGHTS AND OBLIGATIONS OF MEMBERS

4.1    Limitation of Liability. Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law. A Member shall not be personally liable for any debts or losses of the Company beyond the Member's Capital Contribution or as otherwise provided herein or required by law.

4.2    Dissociation by Members.

(a)    Before the dissolution of the Company, any voluntary Dissociation by a Member without the prior written consent of the remaining Members holding two-thirds (2/3) of the remaining Membership Units shall be a wrongful Dissociation.

(b)    If a Member Dissociates before the dissolution of the Company, and the Dissociation results from volitional conduct of the Member that could reasonably be characterized as resignation, retirement, or withdrawal, then the Dissociating Member is liable to the Company for damages resulting from such wrongful Dissociation.

10

AFM000011

(c) Upon a Dissociation by a Member, such Member shall cease to be a Member and shall become an Economic Interest Owner whose Membership Interest may be purchased by the remaining Members or the Company pursuant to Article 7. The Company may offset any amounts or obligations owed by a Dissociated Member to the Company including damages arising from such wrongful Dissociation against any amounts due the Dissociating Member, regardless of the cause of a Member's Dissociation and regardless of whether the Member's Dissociation results in dissolution of the Company.

4.3     Expulsion of Members. Members may be expelled from the Company by the Company or the other Members only upon judicial determination that the Member engaged in wrongful conduct that adversely and materially affected the business of the Company, willfully or persistently committed a material breach of this Operating Agreement or of a duty owed to the Company or the other Members under the Act, or engaged in conduct relating to the business of the Company that makes it not reasonably practicable to carry on the business of the Company if such Member remains a Member.

4.4     Company Books. Upon reasonable written request, each Member and Economic Interest Owner shall have the right, at a time during ordinary business hours as reasonably determined by the Manager, to inspect and copy at the requesting Member's or Economic Interest Owner's expense, the books and records of the Company, including the records maintained pursuant to Section 3.4 herein, the Company documents identified in the Act, and such other documents which the Manager, in their discretion, deem appropriate.

4.5     Priority and Return of Capital. Except as may be expressly provided herein, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Section 4.5 shall not apply to loans which a Member has made to the Company.

4.6     Return of Distributions. A Member who receives a distribution or the return in whole or in part of the Member's Capital Contribution is liable to the Company only to the extent provided by the Act.

4.7     No Exclusive Duty to Company. Except as otherwise agreed to by Company and Member, a Member shall not be required to devote the Member's efforts to the Company as the Member's sole and exclusive function, and a Member may have other business interests and engage in activities in addition to those relating to the Company. A Member and the Member's Affiliates may engage in or possess any interests in other business ventures of any kind, independently or with others, including but not limited to engaging in other ventures having a purpose similar to that of the Company. The fact that the Member or any Affiliate may encounter and take advantage of opportunities to do any of the foregoing themselves or on behalf of others in whom they may or may not have an interest shall not subject the Member or any Affiliate to any liability to the Company or any of the Members or Manager on account of any lost opportunity. None of the Company, any Member, any Manager, or the holder of any interest in the Company shall have any right by virtue of this Operating Agreement or the relationship created hereby in or to any other such ventures or activities, or to the income or profits derived therefrom, and the pursuit of such

11

AFM000012

ventures, even if competitive with the business of the Company shall not be deemed wrongful or improper.

4.8     Limitations on Capital Expenditures. No Member (other than a Member who is acting in the capacity of a Manager) may in any capacity, including an employee or officer of the Company, shall make any single capital expenditure or series of related capital expenditures in excess of $2,000 without the prior written consent of the Manager.


## ARTICLE 5
## COMPANY CAPITAL

5.1     Initial Capital Contributions. Each Member who has made a Capital Contribution shall have such Capital Contribution credited to his Capital Account.

5.2     Additional Contributions. No Member shall be required to make additional Capital Contributions without such Member's consent. With the Member's consent, the Member shall make such additional Capital Contributions as shall be determined by the Manager. None of the terms, covenants, obligations or rights contained in this Section 5.2 is or shall be deemed to be for the benefit of any Person other than the Members and the Company, and no such third party shall under any circumstances have any right to compel any actions or payments by the Manager and/or the Members.

5.3     Capital Accounts. A separate Capital Account shall be maintained for each Member and, if applicable, each Economic Interest Owner, and subject to the provisions of Section 5.4, the following allocations shall be made to the Capital Accounts of the Members and Economic Interest Owners.

     (a)     Each Member's and Economic Interest Owner's Capital Account will be increased by:

          (i)     the amount of money contributed by such Member or Economic Interest Owner to the Company;

          (ii)     the fair market value of property contributed by such Member or Economic Interest Owner to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752);

          (iii)     allocations to such Member or Economic Interest Owner of Net Profits;

          (iv)     allocations to such Member or Economic Interest Owner of income described in Code Section 705 (a)(l)(B).

     (b)     Each Member's or Economic Interest Owner's Capital Account will be decreased by:

AFM000013

(i)     the amount of money distributed to such Member or Economic Interest Owner by the Company;

(ii)    the fair market value of property distributed to such Member or Economic Interest Owner by the Company (net of liabilities secured by such distributed property that such Member or Economic Interest Owner is considered to assume or take subject to under Code Section 752);

(iii)   allocations to such Member or Economic Interest Owner of expenditures described in Code Section 705(a)(2)(B); and

(iv)    allocations to the account of such Member or Economic Interest Owner of Net Losses and deduction as set forth in the Treasury Regulations promulgated under Code Section 704(b), taking into account adjustments to reflect book value.

(c)     The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder. If the Manager determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.3 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members and/or Economic Interest Owners as set forth in this Operating Agreement.

(d)     Upon liquidation of the Company, liquidating distributions will be made in accordance with the positive Capital Account balances of the Members and Economic Interest Owners, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation). The Company may offset damages for breach of this Operating Agreement by a Member or Economic Interest Owner whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member or Economic Interest Owner.

(e)     Except as otherwise required in the Act, no Member or Economic Interest Owner shall have any liability to restore all or any portion of a deficit balance in such Member's or Economic Interest Owner's Capital Account.

5.4     Special Allocations to Capital Accounts. Notwithstanding Section 5.3 hereof:

(a)     No allocations of loss, deduction and/or expenditures described in Code Section 705(a)(2)(B) shall be charged to the Capital Account of any Member or Economic Interest Owner if such allocation would cause such Member or Economic Interest Owner

AFM000014

to have a Deficit Capital Account. The amount of the loss, deduction and/or Code Section 705(a)(2)(B) expenditure which would have caused a Member or Economic Interest Owner to have a Deficit Capital Account shall instead be charged to the Capital Account of any Members or Economic Interest Owners which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Members or Economic Interest Owners exist, then to the Members and Economic Interest Owners in proportion to their respective interests in Company Net Profits pursuant to Section 6.1.

(b)     In the event any Member or Economic Interest Owner unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member or Economic Interest Owner, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of such Member or Economic Interest Owner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Section 5.4(b) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

5.5     Interest On and Return of Contributions. No Member or Economic Interest Owner shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution.

5.6     Accounting Principles. The profits and losses of the Company shall be determined in accordance with generally accepted accounting principles applied on a consistent basis using the method of accounting selected by the Manager.

5.7     Loans to Company. Nothing in this Operating Agreement shall prevent any Member or Economic Interest Owner from making secured or unsecured loans to the Company by agreement with the Company.

5.8     Accounting Period. The Company's accounting period shall be the Fiscal Year.

## ARTICLE 6
## ALLOCATIONS AND DISTRIBUTIONS

6.1     Allocations of Profits and Losses. Except as otherwise provided in this Agreement to the contrary or as determined by the Company's regularly employed accountant in accordance with the applicable law, Net Profits and Net Losses of the Company for each Fiscal Year will be allocated in proportion with the Participating Percentages of the Members and Economic Interest Owners.

6.2     Distributions.

(a)     Subject to the restrictions of Section 6.3, to the extent that the Company reports a Net Profit and said Net Profit is allocated to the Members, then the Company shall

AFM000015

be required to distribute to the Members an amount equal to the product of said sum and the sum of the highest federal and applicable state marginal income tax rates. In determining the highest applicable rate, the Company shall apply the rates of the state which taxes a Member at the highest income tax rates. All such distributions shall be made to Members pro rata, in proportion to the amount of profit allocated to each Member.

(b)     Subject to the restrictions of Section 6.3, the Manager, in its sole discretion, may authorize, and the Company may make, additional distributions to the Members and the Economic Interest Owners. The distribution of any Distributable Cash pursuant to this Section 6.2(c) shall be distributed in accordance with the following priority:

(i)     first, repayment of Members' and Economic Interest Owners' loans to the Company, plus any accrued interest.

(ii)     then, payments to the Members and Economic Interest Owners in proportion to their Participating Percentages.

(d)     All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members or Economic Interest Owners from the Company shall be treated as amounts distributed to the relevant Member or Economic Interest Owner pursuant to Section 6.2(c).

(e)     Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Member's Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

6.3     Limitation Upon Distributions.

(a)     For each fiscal year of the Company, unless otherwise determined by the Manager, no distributions shall be made until the Company's Reserves are equal to at least one hundred thousand dollars ($100,000), or such larger amount as may be determined by Manager from time to time in its sole and absolute discretion.

(b)     No distributions or return of Capital Contributions shall be made and paid if, after the distribution or return of Capital Contribution is made, the Company would be insolvent or the net assets of the Company would be less than zero. In addition, no Distributable Cash shall be distributed until all Company's debt is paid in full.

(c)     The Manager may base a determination that a distribution or return of Capital Contribution may not be made as a result of Section 6.3(a) or Section 6.3(b) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the Person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

AFM000016

(d)     No distributions or return of Capital Contributions shall be made or paid if, at the time of the distribution or return of Capital Contribution, the Company is party to an agreement or agreements with third party lenders which prohibit the making or payment of distributions or the return of Capital Contributions. If the Company is a party to an agreement with third party lenders which restricts the time or amount of distributions or return of Capital Contributions, any distributions or return of Capital Contributions shall not be approved, made or paid in excess or in violation of such restrictions.

6.4     Withdrawal or Reduction of Contributions.

(a)     A Member shall not receive out of the Company's property any part of the Member's Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

(b)     A Member, irrespective of the nature of the Member's Capital Contribution, has only the right to demand and receive cash in return for such Capital Contribution.

(c)     Upon a Dissociation of a Member, the purchase of a Membership Interest shall be governed by Article 7.

ARTICLE 7
MEMBERSHIP CERTIFICATES AND TRANSFERABILITY

7.1     Certificates for Membership Interest. The Company may issue, in such form as deemed appropriate, membership interest certificates to represent Membership Interests in the Company. Such membership certificates issued shall be signed by such Persons as are authorized by the Manager.

7.2     Restrictions on Transfer. Except as otherwise specifically provided in this Article 7, neither a Member nor an Economic Interest Owner shall have the right to Transfer all or any part of the Member's Membership Interest or the Economic Interest Owner's Economic Interest.

7.3     Transfers on Company Books. All Transfers of whatever nature of interests in the Company shall be made exclusively on the books of the Company in which such Transfers are regularly recorded, and such Transfers may only be made in compliance with the restrictions and requirements established by the Articles of Organization, this Operating Agreement, any agreement entered into by and between the Members, and any provision of the laws of the State of Delaware, as any such restrictions and requirements shall exist from time to time.

7.4     Intentionally Omitted.

7.5     Right of First Refusal.

(a)     If any Member or an Economic Interest Owner (a "Transferring Member") desires to Transfer all or any portion of the Transferring Member's Membership Interest or Economic Interest in the Company (the "Offered Interest") to a third party who is not a

16

AFM000017

Permitted Transferee, the Transferring Member shall first obtain from such third party a bona fide written offer to purchase such Offered Interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered therefor (the "Offer"). The Transferring Member shall give written notification to the remaining Members and the Company of the Transferring Member's intention to Transfer the Offered Interest, furnishing to the remaining Members a copy of the Offer (the "Transfer Notice").

(b)     Upon receipt of a Transfer Notice, the remaining Members, the Manager, and the Company shall have the option to purchase the Offered Interest as follows:

(i)     the Manager shall have the right to purchase all, or any portion, of the Offered Interest for the lower of: (A) the purchase price stated in the Offer; or (B) the Agreed Value. The Manager shall exercise its option by giving written notice to the Transferring Member within forty-five (45) days after receiving the Transfer Notice from the Transferring Member (the "Manager Response Period").

(ii)    if the Manager shall fail to exercise its right to purchase all of the Offered Interest, the Company shall have the right to purchase the remaining Offered Interest for the lower of: (A) the purchase price stated in the Offer; or (B) the Agreed Value. The Company shall exercise its option by giving written notice to the Transferring Member within fifteen (15) days after the end of the Manager Response Period (the "Company Response Period").

(iii)   if the Company shall fail to exercise its right to purchase all of the Offered Interest, then the remaining Members shall, on a basis pro rata to their Membership Units or upon such other basis as they shall mutually agree, have the right to purchase all, or any portion, of the Offered Interest for the lower of: (A) the purchase price stated in the Offer; or (B) the Agreed Value. The remaining Members shall exercise their option by giving written notice to the Transferring Member within forty-five (45) days after receiving the Transfer Notice from the Transferring Member (the "Remaining Members Response Period").

(iv)    the failure of the Manager, remaining Members and the Company to notify the Transferring Member of their desire to exercise their right to purchase all of the Offered Interest prior to the end of the Remaining Members Response Period shall result in the termination of the right of first refusal under this Section 7.5 and the Transferring Member shall be entitled to consummate the Transfer of the Offered Interest to the third party; provided, that the Transfer shall be consummated within thirty (30) days following the expiration of the Remaining Members Response Period. Any rights a Transferring Member may have as a Member shall terminate upon the consummation of such sale.

(c)     If the Manager, remaining Members and/or the Company shall give written notice to the Transferring Member, such parties shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within sixty (60) days after the last such parties have given written notification to the Transferring Member of

AFM000018

their respective elections to exercise their right of first refusal to purchase the Offered Interest under this Section 7.5.

(d)     In the event of a purchase of an Offered Interest to a third party pursuant to this Section 7.5, the purchase price shall be payable upon the terms set forth in the Offer.

7.6     Transferee Not Member in Absence of Consent.

(a)     Notwithstanding anything to the contrary contained herein if, immediately prior to the Transfer, the Members holding two-thirds (2/3) of the Membership Units of all Members who are not the Transferring Member do not approve, in writing, the proposed Transfer of an Economic Interest or Membership Interest to a non-Member Transferee, then the proposed Transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The Transferee shall be merely an Economic Interest Owner. No Transfer of a Member's interest in the Company shall be effective unless and until written notice (including the name and address of the proposed Transferee and the date of such Transfer) has been provided to the Company and the non-Transferring Member(s).

(b)     Upon and contemporaneously with any Transfer of a Transferring Member's Economic Interest in the Company which does not at the same time Transfer the balance of the rights associated with the Membership Interest of the Transferring Member (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), all remaining rights and interests which were owned by the Transferring Member immediately prior to such Transfer or which were associated with the Transferred Economic Interest shall immediately lapse until either: (i) the written reinstatement of the rights to the transferee Economic Interest Owner by unanimous consent of the remaining Members; or (ii) the written reinstatement of such rights to a successor or Transferee of such Economic Interest Owner by unanimous consent of the remaining Members.

(c)     The restrictions on Transfer contained in this Section 7.6 are intended to comply (and shall be interpreted consistently) with the restrictions on transfer as set forth in the Act.

(d)     As a condition to the recognition by the Company of the effectiveness of a Transfer of a Member's Membership Interest or Economic Interest Owner's Economic Interest in the Company, the Transferring Member, the proposed purchaser, donee or successor-in-interest, as the case may be, shall execute, acknowledge and deliver to the Company such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and shall perform all such other acts which the remaining Members may deem necessary or desirable to:

(i)     verify the Transfer;

(ii)     confirm that the Person desiring to acquire an Economic Interest in the Company, or to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of this

18

AFM000019

Operating Agreement, (whether such Person is to be admitted as a new Member or an Economic Interest Owner); and

(iii) assure compliance with any applicable state and federal laws including securities laws and regulations.

(e)     Any permitted Transfer of an Economic Interest or admission of a Member in compliance with this Article 7 shall be deemed effective as of the end of the calendar month in which the remaining Members' consent thereto was given, or, if no such consent was required, then on such date that the donee or successor in interest complies with the conditions set forth in Section 7.6(d). The Transferring Member agrees, upon request of the remaining Members, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the remaining Members from time to time in connection with the Transfer. The Transferring Member hereby agrees to indemnify the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any Transfer or purported Transfer in violation of this Article 7.

7.7     Intentionally Omitted.

7.8     Option Upon Involuntary Transfer.

(a)     If a Member's Membership Interest or Economic Interest is Transferred by operation of law (an "Involuntary Transfer") to any Person other than the Company or a Permitted Transferee (such as but not limited to a Member's trustee in bankruptcy, to a purchaser at any creditor's or court sale or to the guardian or conservator of an incompetent Member) (an "Involuntary Transferee"), the Manager, for sixty (60) days following the receipt of actual notice of the Transfer (the "Notice Period"), shall have an option to purchase all or any portion of the Membership Interest or Economic Interest subject to the Involuntary Transfer (the "Involuntarily Transferred Interest"). Such option shall be exercised by written notice to the Member and the Involuntary Transferee. The purchase price of such Involuntarily Transferred Interest by the remaining Members shall be the Agreed Value.

(b)     If the Manager fails to exercise its options to purchase all of the Involuntarily Transferred Interest, the Company shall have the right to purchase the remaining Involuntarily Transferred Interest, for the Agreed Value, by giving written notification to the Involuntary Transferee and the Member within thirty (30) days after the expiration of the Notice Period (the "Company Notice Period").

(c)     If the Company fails to exercise its options to purchase all of the Involuntarily Transferred Interest, the remaining Members on a basis pro rata to their Membership Units or upon such other basis they shall mutually agree shall have the right to purchase the remaining Involuntarily Transferred Interest, for the Agreed Value, by giving written notification to the Involuntary Transferee and the Member within thirty (30) days after the expiration of the Company Notice Period (the "Remaining Members Notice Period").

AFM000020

(d)     In the event of a purchase of a Membership Interest pursuant to this Section 7.8, a portion of the purchase price for such Membership Interest equal to twenty-five percent (25%) thereof shall be paid in cash at the closing of the transaction. The remaining portion of the purchase price shall be deferred and payable, together with interest on the unpaid balance from time to time at the Minimum Rate, in sixty (60) equal installments of principal and interest, the first installment being due and payable on the thirtieth day following the date of closing of the sale, and subsequent installments being due on the same day of each succeeding month until the remaining unpaid balance plus interest accrued thereon has been paid in full. The indebtedness of each purchaser shall be evidenced by his, her or its promissory note payable to the order of the selling party. Each such promissory note shall be in substantially the form set forth in Exhibit B attached hereto.

(e)     The failure of the Manager, remaining Members and the Company to notify the Involuntary Transferee of their desire to exercise their rights to purchase the Involuntarily Transferred Interest at or prior to the end of the Remaining Members Notice Period shall result in the termination of the right to purchase and the Involuntary Transferee may retain such Involuntarily Transferred Interest in the form of an Economic Interest, and shall have no right to participate in the management of the business or affairs of the Company or become a Member except as set forth in Section 7.5.

7.9     Options Upon Dissociation. A Member may not withdraw or dissociate from the Company, except as permitted herein. In the event of the Dissociation, for any reason ("Terminating Event"), of any Member (a "Dissociated Member"), the Manager, remaining Members and the Company shall have the option to acquire the Dissociated Member's Membership Interest, including the Economic Interest of each donee of the Dissociated Member as follows:

(a)     The Manager shall have the right to purchase all, or any portion, of the Membership Interest of the Dissociated Member by giving written notification to the Dissociated Member within ninety (90) days after the Terminating Event (the "Manager Dissociation Response Period").

(b)     If the Manager fails to exercise its option, then the Company shall have the right to purchase the remaining Membership Interest of the Dissociated Member by giving written notification to the Dissociated Member within thirty (30) days after the expiration of the Manager Dissociation Response Period (the "Company Dissociation Response Period").

(c)     If the Company fails to exercise its option, then the remaining Members on a basis pro rata to their Membership Units or upon such other basis they shall mutually agree shall have the right to purchase the remaining Membership Interest of the Dissociated Member by giving written notification to the Dissociated Member within thirty (30) days after the expiration of the Company Dissociation Response Period (the "Remaining Members Dissociation Response Period").

(d)     If the Manager, remaining Members and/or the Company shall give written notice to the Dissociated Member of their desire to exercise their right to purchase all of the Dissociated Member's Membership Interest, the Manager, remaining Members and/or

the Company shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within sixty (60) days after the last of the Manager, Members and/or the Company has given written notification to the Dissociated Member of the election to exercise their right to purchase or the end of the Remaining Members Dissociation Response Period, whichever is earlier.

(e)     The purchase price for the entire Membership Interest and/or Economic Interest of a Dissociated Member shall be the Agreed Value.

(f)     In the event of a purchase of a Membership Interest as a result of the Dissociation of a Dissociated Member, a portion of the purchase price for such Membership Interest equal to twenty-five percent (25%) thereof shall be paid in cash at the closing of the transaction. The remaining portion of the purchase price shall be deferred and payable, together with interest on the unpaid balance from time to time at the Minimum Rate, in sixty (60) equal installments of principal and interest, the first installment being due and payable on the thirtieth day following the date of closing of the sale, and subsequent installments being due on the same day of each succeeding month until the remaining unpaid balance plus interest accrued thereon has been paid in full. The indebtedness of each purchaser shall be evidenced by each purchaser's promissory note payable to the order of the selling party. Each such promissory note shall be in substantially the form set forth in Exhibit B attached hereto.

(g)     The failure of the Manager, remaining Members and the Company to notify the Dissociated Member of their desire to exercise their respective rights to purchase all of the Dissociated Member's Membership Interest prior to the end of the Remaining Members Dissociation Response Period shall result in the termination of the right to purchase and the Dissociated Member shall retain such Membership Interest, in the form of an Economic Interest, and shall have no right to participate in the management of the business or affairs of the Company or become a Member except as set forth in Section 7.5. The Company shall not be required to purchase the Membership Interest or Economic Interest of a Member in the case of the Dissociation of that Member.

7.10     Intentionally Omitted.

7.11     Agreed Value. The term "Agreed Value" shall mean a Member's proportionate share (determined on the basis of a Member's Participating Percentage of the fair market value of the Company). The fair market value of the Company shall be determined by using any one of the three following methods that results in the highest value: (i) sixty-five percent (65%) of the total Member's equity reflected on the books and records of the Company, (ii) 25% of the 5-year Average Profit (hereafter defined) of the Company, or (iii) the amount established by an independent certified public accountant pursuant to the methodology and formula, including discounts. For purposes hereof, the term "5-year Average Profit" means the average Net Profit for the five most recent years ending prior to the year in which an event described in this Article 7 has occurred.

AFM000022

# ARTICLE 8
## ADDITIONAL MEMBERS

From the date of the formation of the Company, upon consent of the Manager, a Person may become a Member in this Company either by the issuance by the Company of Membership Interests for such consideration as the Manager determines, or as a transferee of a Member's Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Manager may, at its option, at the time a Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Code Section 706(d) and the Treasury Regulations promulgated thereunder.

# ARTICLE 9
## DISSOLUTION AND TERMINATION

9.1     Dissolution.

(a)     The Company shall be dissolved upon the occurrence of any of the following events:

(i)     when the period fixed for the duration of the Company, if any, shall expire pursuant to Section 2.5 hereof;

(ii)    by the written agreement of Members holding two-thirds (2/3) of the Membership Units; or

(iii)   upon the occurrence of an event causing dissolution as specified in the Act.

(b)     The Dissociation of a Member shall not constitute a dissolution of the Company.

(c)     Unless otherwise approved by the Manager, a Member who resigns (a "Resigning Member") or whose Membership Interest is otherwise terminated by virtue of a Dissociation, shall not be entitled to receive any liquidating distributions in excess of those distributions to which such Member would have been entitled had such Resigning Member remained a Member. Except as otherwise expressly provided herein, a Resigning Member shall immediately become an Economic Interest Owner.

9.2     Dissolution and Liquidation of Assets.

(a)     Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

AFM000023

(b)     If the Company is dissolved and its affairs are to be wound up, the Manager shall:

        (i)     sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Manager may determine to distribute any assets to the Members in kind);

        (ii)     allocate any profit or loss resulting from such sales to the Members' and Economic Interest Owners' Capital Accounts in accordance with Article 5 hereof;

        (iii)     discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent claims or liabilities of the Company, provided that for purposes of determining the Capital Accounts of the Members and Economic Interest Owners, the amounts of such Reserves shall be deemed to be an expense of the Company.

(c)     If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Manager. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of Section 5.3 and Section 5.5 of this Operating Agreement to reflect such deemed sale.

(d)     The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Manager, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to Section 9.2(c). Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(e)     Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

AFM000024

(f)    The Manager shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

9.3    <u>Articles of Dissolution</u>. When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, articles of dissolution as required by the Act, shall be executed in duplicate and filed with the Delaware Secretary of State.

9.4    <u>Effect of Filing of Articles of Dissolution</u>. Upon the filing of Articles of Dissolution with the Delaware Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other Proceedings and appropriate action as provided in the Act. The Manager shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

9.5    <u>Assets Distributed on Dissolution</u>. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Member's Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one (1) or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

ARTICLE 10
MISCELLANEOUS

10.1    <u>Waiver of Conflict of Interest</u>. The law firm of Hamilton Thies & Lorch LLP hereby discloses to the parties its potential conflicts of interest arising from the negotiation of this Operating Agreement and all documents related thereto and arising from the organization and operation of the Company, which may include without limitation conflicts regarding management, voting, and distributions. Hamilton Thies & Lorch LLP represents the Manager with regard to all such matters, and Hamilton Thies & Lorch LLP has urged all Members to seek independent representation. The Members and the Company acknowledge that they have been advised of all conflicts of interest arising from the representation. The parties hereby waive any conflict of interest resulting from the past, current and future representation provided by Hamilton Thies & Lorch LLP to the Manager and the Company in both matters related and unrelated to this Operating Agreement.

10.2    <u>Notices</u>. Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if: (a) delivered personally to the party or to an officer of the party to whom the same is directed; or (b) sent by facsimile transmission, receipt of which is acknowledged by the recipient by customary fax receipt acknowledgment and by sending a copy of such notice, demand and communication by regular mail; or (c) sent by registered or certified mail, postage and charges prepaid; or (d) sent by recognized overnight delivery service (e.g., FedEx or UPS), charges prepaid, in any case addressed to the Member's and/or Company's address, as appropriate, which addresses are set forth in this Operating Agreement. Except as otherwise provided herein, any such notice shall be deemed to be given two (2) business days after the date on which the same

AFM000025

was deposited in the United States mail, or one (1) business day after the date on which the same was deposited with an overnight delivery service for next business day delivery, in either case addressed and sent as aforesaid or, if by telefax as above provided, then any such notice shall be deemed to be given at the time of the fax receipt acknowledgment.

10.3 <u>Application of Delaware Law</u>. This Operating Agreement and its interpretation shall be governed exclusively by its terms and by the laws of the State of Delaware, and specifically the Act.

10.4 <u>Arbitration/No Lawsuits</u>. Other than equitable relief, any controversy or claim arising out of, or relating to, this Operating Agreement, or its breach, shall be settled by arbitration. The panel of arbitrators shall be composed of three (3) Persons, one of whom shall be selected by each of the parties. Such selection of arbitrators shall be made within thirty (30) days after the date on which the parties agree that they will be unable to agree as to the settlement of the controversy or claim. The third arbitrator shall be Dominic Maduri or, in the event Dominic Maduri is unavailable, by an arbitrator appointed by the American Arbitration Association. The decision of a majority of the panel of arbitrators shall be final, conclusive and binding upon the parties hereto and not subject to judicial review and judgment on the decision rendered may be entered in any court having jurisdiction. Except as provided herein, the arbitration shall be governed in accordance with the rules of the American Arbitration Association. Except for claims to enforce a non-competition restriction, the parties to this Operating Agreement agree that they will not institute any lawsuit against any other party to this Operating Agreement relating to any controversy, claim, or alleged breach to this Operating Agreement.

10.5 <u>Equitable Relief</u>. As the rights and obligations of the parties are unique and damages cannot be readily measured, irreparable damage would result in the event this Operating Agreement is not specifically enforced. The rights and obligations of the parties shall be enforceable in a court of equity by a decree of specific performance, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedy and all other remedies provided for in this Operating Agreement shall, however, be cumulative and not exclusive and shall be available in addition to any other remedies which any party may have under this Operating Agreement or otherwise.

10.6 <u>Waiver of Action for Partition</u>. Each Member and Economic Interest Owner irrevocably waives during the term of the Company's existence any right that it may have to maintain any action for the partition with respect to the property of the Company.

10.7 <u>Attorney Fees</u>. In the event any party hereto commences litigation or arbitration for the judicial interpretation, enforcement, termination, cancellation or rescission of this Operating Agreement, or for damages for the breach hereof, then, in addition to any or all other relief awarded in such litigation or arbitration, the prevailing party therein shall be entitled to a judgment against the other for an amount equal to reasonable attorneys' fees, court costs, arbitration fees and expenses, and other costs incurred (including paralegal, legal assistant and computerized legal research fees). For purposes of this Section, "prevailing party" shall mean, in the case of the claimant, one who is successful in obtaining substantially all relief sought, and in the case of the defendant or respondent, one who is successful in denying substantially all of the relief sought by the claimant.

25

AFM000026

10.8 _Amendments_. This Operating Agreement may not be amended except in a writing signed by the holders of two-thirds (2/3) of the Membership Units.

10.9 _Execution of Additional Instruments_. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments as are necessary to comply with any laws, rules or regulations.

10.10 _Construction_. Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

10.11 _Headings_. The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

10.12 _Waivers_. The failure of any party to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a default, from having the effect of an original default.

10.13 _Rights and Remedies Cumulative_. The rights and remedies provided by this Operating Agreement are cumulative and the use of any individual right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have.

10.14 _Severability_. If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application of the provisions hereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

10.15 _Heirs, Successors and Assigns_. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

10.16 _Creditors_. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

10.17 _Incorporation of Recitals_. The Recitals contained herein are hereby incorporated and made a part of the terms and mutual covenants and agreements contained in this Operating Agreement.

10.18 _Counterparts_. This Operating Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

AFM000027

10.19  Entire Agreement. This Operating Agreement constitutes the entire agreement of the parties, and it merges and supersedes all prior discussions and agreements among them with respect to the subject matter hereof.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK
SIGNATURES ON FOLLOWING PAGE]

AFM000028

The parties have executed this Operating Agreement as of the date first above written.

COMPANY:

AFM MATTRESS COMPANY LLC, a Delaware limited liability company

By: _____
Name: Eduardo E. Greco
Its:    Manager

MEMBERS:

GSI FAMILY OFFICE LLC, a Delaware limited liability company

By: _____
Name: Eduardo E. Greco
Its:    Manager

GSI FINANCE COMPANY LLC, an Illinois liability company

By: _____
Name: Eduardo E. Greco
Its:    Manager

_____
Eduardo E. Greco, Manager

Signature Page

**EXHIBIT A**
**MEMBER INFORMATION**

| Member's Names | Membership Units | Participating Percentages |
|---|---|---|
| GSI FAMILY OFFICE LLC | 95 | 95% |
| GSI FINANCE COMPANY LLC | 5 | 5% |
| TOTAL | 100 | 100% |

AFM000030

# EXHIBIT B

## INSTALLMENT PROMISSORY NOTE

(insert closing date)

_____, 20_____

FOR VALUE RECEIVED, on or before _____ (insert final installment date) the undersigned promises to pay to the order of _____ (insert name of selling party) the principal sum of _____ ($_____) (insert amount of deferred portion of the purchase price), together with interest from the date hereof at the rate of _____ percent (____%) per annum on the principal balance from time to time unpaid. The said principal and interest shall be payable in installments as hereinafter provided.

(a) Commencing on _____, 20___ (insert date 30 days following closing or other agreed upon payment date), and on the day of each month thereafter for consecutive months to and including _____, 20___, the sum of _____ ($_____) shall be payable, said sum to be applied first to accrued and unpaid interest and thereafter to principal.

(b) The entire unpaid balance of principal together with accrued and unpaid interest thereon shall be payable on _____, 20___ (insert the month following the last monthly installment under (a)).

At the option of the undersigned, at any time or times during the term of this Note, all or any portion of the unpaid principal sum and accrued interest on this Note may be prepaid without premium or penalty, the amount of the prepayment to be applied first to accrued interest and the remainder to the unpaid principal. If the undersigned so designates in a written prepayment notice delivered to the holder of this Note concurrently with the making of the prepayment, the amount of the monthly installments shall be reduced by recomputing the monthly installment amount required to amortize the remaining principal balance together with interest as aforesaid over the period remaining to the original maturity date. If no such prepayment notice is so delivered, the same installment amounts stated above shall continue to be payable on the dates designated until such time as the entire principal sum, together with all accrued interest, is paid, at which time this Note shall be paid in full. In such case, the portion of each of the installment amounts attributable to principal shall be recomputed in order to adjust for the decreased interest payable on the reduced unpaid principal balance.

At the election of the holder or holders hereof, upon notice to the maker, the principal sum remaining unpaid hereon, together with accrued and unpaid interest thereon, shall become at once due and payable in the event of a default in the payment of any principal or interest when due in accordance with the terms hereof.

The maker hereby waives presentment for payment, notice of dishonor, protest and notice of protest.

_____
(Signature of Purchasing Party)

Exhibit B

# AMENDED AND RESTATED
# OPERATING AGREEMENT OF
# GSI FINANCE COMPANY LLC,
# AN ILLINOIS LIMITED LIABILITY COMPANY

AFM000033

# AMENDED AND RESTATED
# OPERATING AGREEMENT OF
# GSI FINANCE COMPANY LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT ("Operating Agreement") is made and entered into as of the 1st day of January, 2017, by GSI FINANCE COMPANY LLC, an Illinois limited liability company (the "Company"), the manager and the members set forth on attached Exhibit A.

WHEREAS, the Company was formed as an Illinois limited liability company on August 1, 2008;

WHEREAS, the parties have reached an understanding concerning various aspects of (i) their business relationship with each other and (ii) the organization and operation of the Company and its business;

WHEREAS, the parties intend for this Agreement to control, to the extent stated or fairly implied, the business and affairs of the Company, including the Company's governance structure and the Company's dissolution, winding up and termination, as well as the relations among the Company's Members; and

WHEREAS, this Agreement supersedes all prior operating agreements of the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings:

1.1     Act. The "Act" shall mean the Illinois Limited Liability Company Act, as it may be amended from time to time.

1.2     Affiliate. "Affiliate" shall mean: (1) any Person directly or indirectly controlling, controlled by or under common control with another Person; (2) a Person owning or controlling ten percent (10%) or more of the outstanding voting securities of such other Person; (3) any officer, director, partner, spouse, parent, or lineal descendant of such other Person; and (4) if such other Person is an officer, director or partner, any company or partnership for which such Person acts in any capacity.

1.3     Agreed Value. "Agreed Value" is defined in Section 7.11.

1.4     Articles of Organization. The "Articles of Organization" shall mean the Certificate of Formation as filed with the Secretary of State of Illinois, as amended from time to time

1.5     Capital Account. "Capital Account" shall mean as of any given date the account maintained for each Member pursuant to Article 5.

1.6     Capital Contribution. "Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

1.7     Capital Interest. "Capital Interest" shall mean as of any given date the proportion that a Member's positive Capital Account bears to the aggregate positive Capital Accounts of all Members whose Capital Accounts have positive balances as of such date.

1.8     Code. The "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue laws.

1.9     Company. The "Company" shall mean GSI FINANCE COMPANY LLC, an Illinois limited liability company.

1.10     Company Property or Property. "Company Property" or "Property" shall mean all properties, assets and rights of any type owned by the Company.

1.11     Deficit Capital Account. "Deficit Capital Account" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

        (a)     Credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704- 2(g)(l) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner for nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations); and

        (b)     Debit to such Capital Account the items described in Sections 1.704-I(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

        (c)     This definition of Deficit Capital Account is intended to comply with the provisions of Treasury Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and shall be interpreted consistently with those provisions.

1.12     Dissociating Member. "Dissociating Member" shall mean a Member for which an event of Dissociation has occurred.

1.13     Dissociation. "Dissociation" shall mean the notice by a Member to withdraw from the Company, a Transfer of all of a Member's Membership Interest, the expulsion of a Member,

2

AFM000035

the bankruptcy or insolvency of a Member, the dissolution of a Member, or such other events as set forth in Section 35-45 of the Act.

1.14     Distributable Cash. "Distributable Cash" shall mean all cash, revenues and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company: (a) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (b) all cash expenditures incurred in the normal operation of the Company's business; and (c) Reserves as the Manager deems reasonably necessary for working capital and to pay taxes, insurance, debt service and other costs or expenses incident to the ownership and operation of the business of the Company.

1.15     Economic Interest. "Economic Interest" shall mean a Member's or Economic Interest Owner's share of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not confer any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members or Manager.

1.16     Economic Interest Owner. "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.17     Economic Interest Units. "Economic Interest Units" shall mean ownership interests in the Company held by Economic Interest Owners. Economic Interest Units shall have an Economic Interest only. Subject to the provisions herein, each Economic Interest Unit has equal rights with every other Membership Unit and Economic Interest Unit with respect to sharing of profits and losses and with respect to distributions. An Economic Interest Unit may be diluted if the Company issues additional Units.

1.18     Entity. "Entity" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust or foreign business organization.

1.19     Fiscal Year. "Fiscal Year" shall mean the Company's fiscal year as determined by the Manager. The initial Fiscal Year shall be the calendar year.

1.20     Intentionally Omitted.

1.21     Majority Interest. "Majority Interest" shall mean the Members holding in the aggregate in excess of sixty-six and 67/100ths percent (66.67%) of all Membership Units outstanding at the time of any determination.

1.22     Manager. "Manager" or "Managers" shall mean one (1) or more managers who have the authority to manage the Company in accordance with the provisions of this Operating Agreement.

1.23     Member. "Member" shall mean each owner of a Membership Interest who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become Members. If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with

3

AFM000036

respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be. In the case of a Member which is a revocable grantor trust, references herein to the Member shall include the grantor of such trust.

1.24   Membership Interest. "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement and the Act.

1.25   Membership Units. Ownership interests in the Company shall be represented by "Membership Units." The initial ownership of Membership Units shall be as set forth on attached Exhibit A. Each Membership Unit has equal governance rights with every other Membership Unit and in matters subject to a vote of the Members has one (1) vote. Subject to the provisions herein, each Membership Unit has equal rights with every other Membership Unit with respect to sharing of profits and losses and with respect to distributions. A Membership Unit may be diluted if the Company issues additional Membership Units.

1.26   Minimum Rate. "Minimum Rate" shall mean the minimum rate of interest which can be used without causing additional interest to be imputed pursuant to the Code.

1.27   Net Profits and Losses. "Net Profits" and "Net Losses" shall mean the net amount of all income, gain, loss, and deductions of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the method of accounting selected by the Manager at the close of each fiscal year on the Company's tax return filed for federal income tax purposes.

1.28   Operating Agreement. "Operating Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time. If a provision of this Operating Agreement differs from a provision of the Articles of Organization, then to the extent allowed by law this Operating Agreement shall govern.

1.29   Participating Percentage. "Participating Percentage" shall mean a Member's or Economic Interest Owner's right to allocations of Net Profits and Net Losses of the Company calculated as the Units owned by such Member or Economic Interest Owner divided by the total number of Units outstanding. The current Participating Percentages are set forth on Exhibit A attached hereto and made part hereof.

1.30   Permitted Transferee. "Permitted Transferee" when used herein shall mean:

(a)   another Member; or

(b)   any member of a Member; provided, however, that a Permitted Transferee shall not be a Permitted Transferee unless he, she, or it complies with the provisions of Section 7.6(d).

1.31   Person. "Person" shall mean an individual, partnership, limited partnership, limited liability company, trust, estate, association, corporation, or other entity.

4

AFM000037

1.32     Reserves. "Reserves" shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts deemed sufficient by the Manager for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

1.33     Sale Proceeds. "Sale Proceeds" "Sale Proceeds" shall mean (1) the proceeds to the Company from the sale of property of the Company, including interest on any deferred or installment payments and (2) the net proceeds to the Company from the refinancing of any property of the Company.

1.34     Sell. "Sell" shall mean to sell, assign, pledge, hypothecate or otherwise transfer for consideration all or any portion of a Membership Interest or Economic Interest.

1.35     Selling Member. "Selling Member" shall mean any Member or Economic Interest Owner which Sells all or any portion of its Membership Interest or Economic Interest.

1.36     Transfer. "Transfer" shall mean to Sell, gift or otherwise transfer, for or without consideration, all or any part of a Membership Interest or Economic Interest.

1.37     Transferee. "Transferee" shall mean the recipient of a Membership Interest or Economic Interest which has been Transferred.

1.38     Transferring Member. "Transferring Member" shall mean a Member who Transfers the Member's Membership Interest, or an Economic Interest Owner who Transfers the Economic Interest Owner's Economic Interest.

1.39     Treasury Regulations. "Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code.

1.40     Units. "Units" shall mean collectively Membership Units and Economic Interest Units.

## ARTICLE 2
## FORMATION OF COMPANY

2.1     Formation. The Company has been organized as an Illinois limited liability company by the execution and delivery of Certificate of Formation to the Illinois Secretary of State in accordance with and pursuant to the Act.

2.2     Name. The name of the Company is GSI FINANCE COMPANY LLC, an Illinois limited liability company.

2.3     Principal Place of Business. The principal place of business of the Company shall be 1301 Schiferl Road, Bartlett, Illinois 60103. The Company may locate its places of business and registered office at any other place or places as the Manager may from time to time deem advisable.

AFM000038

2.4    Registered Office and Registered Agent. The Company's current registered office is at the office of its registered agent, Dominic S. Maduri, the address for which is on file with the Company. The registered office and registered agent may be changed by filing the address of the new registered office and/or the name of the new registered agent with the Illinois Secretary of State pursuant to the Act.

2.5    Term. The term of the Company shall be perpetual, unless the Company is dissolved in accordance with either the provisions of this Operating Agreement or the Act.

2.6    Business of Company. The business of the Company shall be to transact any and all lawful business for which a company may be organized under the Act.

ARTICLE 3
RIGHTS AND DUTIES OF MANAGER

3.1    Management. The business and affairs of the Company shall be directed, managed and controlled by its Manager. Except as otherwise expressly required by this Operating Agreement or by non-waivable provisions of the Act, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. Except as provided otherwise in this Agreement, at any time when there is more than one (1) Manager, the decision of a majority of all of the Managers shall be required for the Manager to take any action permitted to be taken under this Operating Agreement or the Act.

3.2    Number, Tenure. Designation and Qualifications. As of the date hereof, the Company shall have one (1) Manager: Eduardo E. Greco. Any successor manager shall be chosen by Eduardo E. Greco. It is acknowledged and agreed that the Members shall have no right or authority to terminate or replace the Manager.

3.3    Authority of Manager. Except as provided in Section 3.6, and without limiting the generality of Section 3.1, the Manager shall have power and authority, on behalf of the Company to:

(a)    Acquire property from any Person as the Manager may determine, whether or not such Person is directly or indirectly affiliated or connected with any Manager or Member;

(b)    Pledge, encumber, and allow or cause security interests to be placed on any and all assets of the Company;

(c)    Hire or fire any and all employees, agents, or contractors for the Company;

(d)    Enter into or terminate employment agreements or other compensation arrangements;

6

AFM000039

(e)     Sell, exchange, or otherwise dispose of, finance or refinance all, or substantially all of the assets of the Company as part of a single transaction or plan and sell exchange or otherwise dispose of substantially all of the assets of the Company;

(f)     Modify or make distributions to the Members;

(g)     Borrow money for the Company from banks, other lending institutions, the Manager, Members, or Affiliates of the Manager or Members or refinance any debts or obligations of the Company;

(h)     Hypothecate, encumber and grant any security interest in any of the assets of the Company to secure repayment of borrowed sums;

(i)     Purchase liability and other insurance to protect the Company's property and business or for any other reason the Manager in their sole discretion may determine;

(j)     Enter into or settle any litigation, arbitration or other similar proceeding involving the Company;

(k)     Make any decision related to the tax status of the Company, or any actions involving tax issues;

(l)     Hold and own Company real and personal properties in the name of the Company;

(m)     Invest Company funds in time deposits, short-term governmental obligations, commercial paper or other investments;

(n)     Open, as it deems necessary or convenient, from time to time such bank accounts in the name of the Company;

(o)     Execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; deeds; assignments; bills of sale; leases; and any other instruments or documents necessary to the business of the Company;

(p)     Employ accountants, legal counsel, managing agents or other experts to perform services for the Company;

(q)     Enter into any and all other agreements on behalf of the Company, in such forms as the Manager may approve; and

(r)     Do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

7

AFM000040

3.4 <u>Duties of Manager</u>. At the expense of the Company, the Manager shall be responsible for the following duties:

(a) The Manager shall maintain records and accounts of the operations and expenditures of the Company, which shall at a minimum include the following records which the Manager shall keep at the principal place of business of the Company:

(i) proper and complete records and books of account in which shall be entered fully and accurately all transactions relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company;

(ii) a current list of the full name and last known address of each Member and Economic Interest Owner setting forth the amount of cash each Member and Economic Interest Owner has contributed, a description and statement of the agreed value of the other property or services each Member and Economic Interest Owner has contributed or has agreed to contribute in the future, and the date on which each became a Member or Economic Interest Owner;

(iii) a copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(iv) copies of the Company's federal, state, and local income tax returns and reports, if any, for the three (3) most recent years;

(v) copies of the Company's currently effective written Operating Agreement;

(vi) copies of any financial statements of the Company for the three (3) most recent years;

(vii) any written consents obtained from Members for actions taken by Members without a meeting;

(viii) other than as set forth in the Articles of Organization or herein, a writing prepared by the Manager setting out the following: (A) the times at which or events on the happening of which any additional contributions agreed to be made by each Member and Economic Interest Owner are to be made; (B) any right of a Member or Economic Interest Owner to receive distributions that include a return of all or any part of the Member or Economic Interest Owner's contributions; and (C) any power of a Member or Economic Interest Owner to grant the right to become an assignee of any part of the Member's or Economic Interest Owner's interest, and the terms and conditions of the power.

(b) The Manager shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies

8

AFM000041

of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year upon a Member's written request. Subject to Section 3.6, all elections permitted to be made by the Company under federal or state laws shall be made by the Manager in its sole discretion.

3.5     Authority of Others.

(a)     Unless authorized to do so by this Operating Agreement, no attorney- in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

(b)     No Member acting as a Member shall have any power or authority to bind the Company unless the Member has been authorized by the Manager to act as an agent of the Company in accordance with the provision of Section 3.5(a).

(c)     No debt shall be contracted or liability incurred by or on behalf of the Company except by the Manager, or to the extent permitted under the Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Manager.

3.6     Limitation of Authority of Manager. Notwithstanding any other provision herein to the contrary, a vote of the Members holding two-thirds (2/3) of the Membership Units of all Members shall be required before any Manager shall:

(a)     Amend the Operating Agreement of the Company in any manner which would affect the contents of this Section 3.6;

(b)     Voluntarily dissolve the Company, unless all or substantially all of its non-cash assets have been sold.

3.7     Tax Matters Partner. Eduardo E. Greco is designated the "Tax Matters Partner" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

3.8     Liability for Certain Acts. Manager shall perform all duties as Manager in good faith, in a manner reasonably believed to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager.

3.9     Resignation. A Manager of the Company may resign at any time by giving written notice to the Members. The resignation of a Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance

AFM000042

of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a Dissociation.

3.10    Indemnification by Company. The Company shall indemnify the Manager for liability it may incur in its capacity as Manager of the Company.

3.11    No Exclusive Duty to Company. Except as otherwise agreed to between Company and Manager, a Manager shall not be required to manage the Company as the Manager's sole and exclusive function and a Manager may have other business interests and engage in activities in addition to those relating to the Company. A Manager and its Affiliates may engage in or possess any interests in other business ventures of any kind, independently or with others, including but not limited to engaging in other ventures having a purpose similar to that of the Company. The fact that the Manager or any Affiliate may encounter and take advantage of opportunities to do any of the foregoing themselves or on behalf of others in whom they may or may not have an interest shall not subject the Manager or any Affiliate to any liability to the Company or any of the Members or Manager on account of any lost opportunity. None of the Company, any Member, any Manager, or the holder of any interest in the Company shall have any right by virtue of this Operating Agreement or the relationship created hereby in or to any other such ventures or activities, or to the income or profits derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company shall not be deemed wrongful or improper.

3.12    Removal. At a meeting called expressly for that purpose, all or any lesser number of Managers may be removed at any time, with or without cause, by Members holding two- thirds (2/3) of the Membership Units of all Members. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a Dissociation.

3.13    Vacancies. Any vacancy occurring for any reason in the number of Manager of the Company may be filled by the affirmative vote of Members holding at least two- thirds (2/3) of the Membership Units.


ARTICLE 4
RIGHTS AND OBLIGATIONS OF MEMBERS

4.1    Limitation of Liability. Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law. A Member shall not be personally liable for any debts or losses of the Company beyond the Member's Capital Contribution or as otherwise provided herein or required by law.

4.2    Dissociation by Members.

(a)    Before the dissolution of the Company, any voluntary Dissociation by a Member without the prior written consent of the remaining Members holding two-thirds (2/3) of the remaining Membership Units shall be a wrongful Dissociation.

(b)    If a Member Dissociates before the dissolution of the Company, and the Dissociation results from volitional conduct of the Member that could reasonably be

AFM000043

characterized as resignation, retirement, or withdrawal, then the Dissociating Member is liable to the Company for damages resulting from such wrongful Dissociation.

(c)     Upon a Dissociation by a Member, such Member shall cease to be a Member and shall become an Economic Interest Owner whose Membership Interest may be purchased by the remaining Members or the Company pursuant to Article 7. The Company may offset any amounts or obligations owed by a Dissociated Member to the Company including damages arising from such wrongful Dissociation against any amounts due the Dissociating Member, regardless of the cause of a Member's Dissociation and regardless of whether the Member's Dissociation results in dissolution of the Company.

4.3     Expulsion of Members. Members may be expelled from the Company by the Company or the other Members only upon judicial determination that the Member engaged in wrongful conduct that adversely and materially affected the business of the Company, willfully or persistently committed a material breach of this Operating Agreement or of a duty owed to the Company or the other Members under the Act, or engaged in conduct relating to the business of the Company that makes it not reasonably practicable to carry on the business of the Company if such Member remains a Member.

4.4     Company Books. Upon reasonable written request, each Member and Economic Interest Owner shall have the right, at a time during ordinary business hours as reasonably determined by the Manager, to inspect and copy at the requesting Member's or Economic Interest Owner's expense, the books and records of the Company, including the records maintained pursuant to Section 3.4 herein, the Company documents identified in the Act, and such other documents which the Manager, in their discretion, deem appropriate.

4.5     Priority and Return of Capital. Except as may be expressly provided herein, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Section 4.5 shall not apply to loans which a Member has made to the Company.

4.6     Return of Distributions. A Member who receives a distribution or the return in whole or in part of the Member's Capital Contribution is liable to the Company only to the extent provided by the Act.

4.7     No Exclusive Duty to Company. Except as otherwise agreed to by Company and Member, a Member shall not be required to devote the Member's efforts to the Company as the Member's sole and exclusive function, and a Member may have other business interests and engage in activities in addition to those relating to the Company. A Member and the Member's Affiliates may engage in or possess any interests in other business ventures of any kind, independently or with others, including but not limited to engaging in other ventures having a purpose similar to that of the Company. The fact that the Member or any Affiliate may encounter and take advantage of opportunities to do any of the foregoing themselves or on behalf of others in whom they may or may not have an interest shall not subject the Member or any Affiliate to any liability to the Company or any of the Members or Manager on account of any lost opportunity. None of the Company, any Member, any Manager, or the holder of any interest in the Company shall have any

11

AFM000044

right by virtue of this Operating Agreement or the relationship created hereby in or to any other such ventures or activities, or to the income or profits derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company shall not be deemed wrongful or improper.

4.8     Limitations on Capital Expenditures. No Member (other than a Member who is acting in the capacity of a Manager) may in any capacity, including an employee or officer of the Company, shall make any single capital expenditure or series of related capital expenditures in excess of $2,000 without the prior written consent of the Manager.

ARTICLE 5
COMPANY CAPITAL

5.1     Initial Capital Contributions. Each Member who has made a Capital Contribution shall have such Capital Contribution credited to his Capital Account.

5.2     Additional Contributions. No Member shall be required to make additional Capital Contributions without such Member's consent. With the Member's consent, the Member shall make such additional Capital Contributions as shall be determined by the Manager. None of the terms, covenants, obligations or rights contained in this Section 5.2 is or shall be deemed to be for the benefit of any Person other than the Members and the Company, and no such third party shall under any circumstances have any right to compel any actions or payments by the Manager and/or the Members.

5.3     Capital Accounts. A separate Capital Account shall be maintained for each Member and, if applicable, each Economic Interest Owner, and subject to the provisions of Section 5.4, the following allocations shall be made to the Capital Accounts of the Members and Economic Interest Owners.

(a)     Each Member's and Economic Interest Owner's Capital Account will be increased by:

(i)     the amount of money contributed by such Member or Economic Interest Owner to the Company;

(ii)     the fair market value of property contributed by such Member or Economic Interest Owner to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752);

(iii)     allocations to such Member or Economic Interest Owner of Net Profits;

(iv)     allocations to such Member or Economic Interest Owner of income described in Code Section 705 (a)(l)(B).

12

AFM000045

(b)     Each Member's or Economic Interest Owner's Capital Account will be decreased by:

(i)     the amount of money distributed to such Member or Economic Interest Owner by the Company;

(ii)     the fair market value of property distributed to such Member or Economic Interest Owner by the Company (net of liabilities secured by such distributed property that such Member or Economic Interest Owner is considered to assume or take subject to under Code Section 752);

(iii)     allocations to such Member or Economic Interest Owner of expenditures described in Code Section 705(a)(2)(B); and

(iv)     allocations to the account of such Member or Economic Interest Owner of Net Losses and deduction as set forth in the Treasury Regulations promulgated under Code Section 704(b), taking into account adjustments to reflect book value.

(c)     The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder. If the Manager determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.3 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members and/or Economic Interest Owners as set forth in this Operating Agreement.

(d)     Upon liquidation of the Company, liquidating distributions will be made in accordance with the positive Capital Account balances of the Members and Economic Interest Owners, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation). The Company may offset damages for breach of this Operating Agreement by a Member or Economic Interest Owner whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member or Economic Interest Owner.

(e)     Except as otherwise required in the Act, no Member or Economic Interest Owner shall have any liability to restore all or any portion of a deficit balance in such Member's or Economic Interest Owner's Capital Account.

5.4     <u>Special Allocations to Capital Accounts</u>. Notwithstanding Section 5.3 hereof:

AFM000046

(a)    No allocations of loss, deduction and/or expenditures described in Code Section 705(a)(2)(B) shall be charged to the Capital Account of any Member or Economic Interest Owner if such allocation would cause such Member or Economic Interest Owner to have a Deficit Capital Account. The amount of the loss, deduction and/or Code Section 705(a)(2)(B) expenditure which would have caused a Member or Economic Interest Owner to have a Deficit Capital Account shall instead be charged to the Capital Account of any Members or Economic Interest Owners which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Members or Economic Interest Owners exist, then to the Members and Economic Interest Owners in proportion to their respective interests in Company Net Profits pursuant to Section 6.1.

(b)    In the event any Member or Economic Interest Owner unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member or Economic Interest Owner, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of such Member or Economic Interest Owner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Section 5.4(b) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

5.5    Interest On and Return of Contributions. No Member or Economic Interest Owner shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution.

5.6    Accounting Principles. The profits and losses of the Company shall be determined in accordance with generally accepted accounting principles applied on a consistent basis using the method of accounting selected by the Manager.

5.7    Loans to Company. Nothing in this Operating Agreement shall prevent any Member or Economic Interest Owner from making secured or unsecured loans to the Company by agreement with the Company.

5.8    Accounting Period. The Company's accounting period shall be the Fiscal Year.


## ARTICLE 6
## ALLOCATIONS AND DISTRIBUTIONS

6.1    Allocations of Profits and Losses. Except as otherwise provided in this Agreement to the contrary or as determined by the Company's regularly employed accountant in accordance with the applicable law, Net Profits and Net Losses of the Company for each Fiscal Year will be allocated in proportion with the Participating Percentages of the Members and Economic Interest Owners.

AFM000047

6.2    Distributions.

(a)    Subject to the restrictions of Section 6.3, to the extent that the Company reports a Net Profit and said Net Profit is allocated to the Members, then the Company shall be required to distribute to the Members an amount equal to the product of said sum and the sum of the highest federal and applicable state marginal income tax rates. In determining the highest applicable rate, the Company shall apply the rates of the state which taxes a Member at the highest income tax rates. All such distributions shall be made to Members pro rata, in proportion to the amount of profit allocated to each Member.

(b)    Subject to the restrictions of Section 6.3, the Manager, in its sole discretion, may authorize, and the Company may make, additional distributions to the Members and the Economic Interest Owners. The distribution of any Distributable Cash pursuant to this Section 6.2(c) shall be distributed in accordance with the following priority:

(i)    first, repayment of Members' and Economic Interest Owners' loans to the Company, plus any accrued interest.

(ii)    then, payments to the Members and Economic Interest Owners in proportion to their Participating Percentages.

(d)    All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members or Economic Interest Owners from the Company shall be treated as amounts distributed to the relevant Member or Economic Interest Owner pursuant to Section 6.2(c).

(e)    Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Member's Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

6.3    Limitation Upon Distributions.

(a)    For each fiscal year of the Company, unless otherwise determined by the Manager, no distributions shall be made until the Company's Reserves are equal to at least one hundred thousand dollars ($100,000), or such larger amount as may be determined by Manager from time to time in its sole and absolute discretion.

(b)    No distributions or return of Capital Contributions shall be made and paid if, after the distribution or return of Capital Contribution is made, the Company would be insolvent or the net assets of the Company would be less than zero. In addition, no Distributable Cash shall be distributed until all Company's debt is paid in full.

(c)    The Manager may base a determination that a distribution or return of Capital Contribution may not be made as a result of Section 6.3(a) or Section 6.3(b) in good faith reliance upon a balance sheet and profit and loss statement of the Company

AFM000048

represented to be correct by the Person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

(d)      No distributions or return of Capital Contributions shall be made or paid if, at the time of the distribution or return of Capital Contribution, the Company is party to an agreement or agreements with third party lenders which prohibit the making or payment of distributions or the return of Capital Contributions. If the Company is a party to an agreement with third party lenders which restricts the time or amount of distributions or return of Capital Contributions, any distributions or return of Capital Contributions shall not be approved, made or paid in excess or in violation of such restrictions.

6.4     Withdrawal or Reduction of Contributions.

(a)      A Member shall not receive out of the Company's property any part of the Member's Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

(b)      A Member, irrespective of the nature of the Member's Capital Contribution, has only the right to demand and receive cash in return for such Capital Contribution.

(c)      Upon a Dissociation of a Member, the purchase of a Membership Interest shall be governed by Article 7.

ARTICLE 7
MEMBERSHIP CERTIFICATES AND TRANSFERABILITY

7.1     Certificates for Membership Interest. The Company may issue, in such form as deemed appropriate, membership interest certificates to represent Membership Interests in the Company. Such membership certificates issued shall be signed by such Persons as are authorized by the Manager.

7.2     Restrictions on Transfer. Except as otherwise specifically provided in this Article 7, neither a Member nor an Economic Interest Owner shall have the right to Transfer all or any part of the Member's Membership Interest or the Economic Interest Owner's Economic Interest.

7.3     Transfers on Company Books. All Transfers of whatever nature of interests in the Company shall be made exclusively on the books of the Company in which such Transfers are regularly recorded, and such Transfers may only be made in compliance with the restrictions and requirements established by the Articles of Organization, this Operating Agreement, any agreement entered into by and between the Members, and any provision of the laws of the State of Illinois, as any such restrictions and requirements shall exist from time to time.

7.4     Intentionally Omitted.

7.5     Right of First Refusal.

AFM000049

(a) If any Member or an Economic Interest Owner (a "Transferring Member") desires to Transfer all or any portion of the Transferring Member's Membership Interest or Economic Interest in the Company (the "Offered Interest") to a third party who is not a Permitted Transferee, the Transferring Member shall first obtain from such third party a bona fide written offer to purchase such Offered Interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered therefor (the "Offer"). The Transferring Member shall give written notification to the remaining Members and the Company of the Transferring Member's intention to Transfer the Offered Interest, furnishing to the remaining Members a copy of the Offer (the "Transfer Notice").

(b) Upon receipt of a Transfer Notice, the remaining Members, the Manager, and the Company shall have the option to purchase the Offered Interest as follows:

(i) the Manager shall have the right to purchase all, or any portion, of the Offered Interest for the lower of: (A) the purchase price stated in the Offer; or (B) the Agreed Value. The Manager shall exercise its option by giving written notice to the Transferring Member within forty-five (45) days after receiving the Transfer Notice from the Transferring Member (the "Manager Response Period").

(ii) if the Manager shall fail to exercise its right to purchase all of the Offered Interest, the Company shall have the right to purchase the remaining Offered Interest for the lower of: (A) the purchase price stated in the Offer; or (B) the Agreed Value. The Company shall exercise its option by giving written notice to the Transferring Member within fifteen (15) days after the end of the Manager Response Period (the "Company Response Period").

(iii) if the Company shall fail to exercise its right to purchase all of the Offered Interest, then the remaining Members shall, on a basis pro rata to their Membership Units or upon such other basis as they shall mutually agree, have the right to purchase all, or any portion, of the Offered Interest for the lower of: (A) the purchase price stated in the Offer; or (B) the Agreed Value. The remaining Members shall exercise their option by giving written notice to the Transferring Member within forty-five (45) days after receiving the Transfer Notice from the Transferring Member (the "Remaining Members Response Period").

(iv) the failure of the Manager, remaining Members and the Company to notify the Transferring Member of their desire to exercise their right to purchase all of the Offered Interest prior to the end of the Remaining Members Response Period shall result in the termination of the right of first refusal under this Section 7.5 and the Transferring Member shall be entitled to consummate the Transfer of the Offered Interest to the third party; provided, that the Transfer shall be consummated within thirty (30) days following the expiration of the Remaining Members Response Period. Any rights a Transferring Member may have as a Member shall terminate upon the consummation of such sale.

(c) If the Manager, remaining Members and/or the Company shall give written notice to the Transferring Member, such parties shall have the right to designate the time,

AFM000050

date and place of closing, provided that the date of closing shall be within sixty (60) days after the last such parties have given written notification to the Transferring Member of their respective elections to exercise their right of first refusal to purchase the Offered Interest under this Section 7.5.

(d)     In the event of a purchase of an Offered Interest to a third party pursuant to this Section 7.5, the purchase price shall be payable upon the terms set forth in the Offer.

7.6     <u>Transferee Not Member in Absence of Consent.</u>

(a)     Notwithstanding anything to the contrary contained herein if, immediately prior to the Transfer, the Members holding two-thirds (2/3) of the Membership Units of all Members who are not the Transferring Member do not approve, in writing, the proposed Transfer of an Economic Interest or Membership Interest to a non-Member Transferee, then the proposed Transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The Transferee shall be merely an Economic Interest Owner. No Transfer of a Member's interest in the Company shall be effective unless and until written notice (including the name and address of the proposed Transferee and the date of such Transfer) has been provided to the Company and the non-Transferring Member(s).

(b)     Upon and contemporaneously with any Transfer of a Transferring Member's Economic Interest in the Company which does not at the same time Transfer the balance of the rights associated with the Membership Interest of the Transferring Member (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), all remaining rights and interests which were owned by the Transferring Member immediately prior to such Transfer or which were associated with the Transferred Economic Interest shall immediately lapse until either: (i) the written reinstatement of the rights to the transferee Economic Interest Owner by unanimous consent of the remaining Members; or (ii) the written reinstatement of such rights to a successor or Transferee of such Economic Interest Owner by unanimous consent of the remaining Members.

(c)     The restrictions on Transfer contained in this Section 7.6 are intended to comply (and shall be interpreted consistently) with the restrictions on transfer as set forth in the Act.

(d)     As a condition to the recognition by the Company of the effectiveness of a Transfer of a Member's Membership Interest or Economic Interest Owner's Economic Interest in the Company, the Transferring Member, the proposed purchaser, donee or successor-in-interest, as the case may be, shall execute, acknowledge and deliver to the Company such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and shall perform all such other acts which the remaining Members may deem necessary or desirable to:

(i)     verify the Transfer;

36898708.1

AFM000051

(ii)     confirm that the Person desiring to acquire an Economic Interest in the Company, or to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of this Operating Agreement, (whether such Person is to be admitted as a new Member or an Economic Interest Owner); and

(iii) assure compliance with any applicable state and federal laws including securities laws and regulations.

(e)     Any permitted Transfer of an Economic Interest or admission of a Member in compliance with this Article 7 shall be deemed effective as of the end of the calendar month in which the remaining Members' consent thereto was given, or, if no such consent was required, then on such date that the donee or successor in interest complies with the conditions set forth in Section 7.6(d). The Transferring Member agrees, upon request of the remaining Members, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the remaining Members from time to time in connection with the Transfer. The Transferring Member hereby agrees to indemnify the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any Transfer or purported Transfer in violation of this Article 7.

7.7     Intentionally Omitted.

7.8     Option Upon Involuntary Transfer.

(a)     If a Member's Membership Interest or Economic Interest is Transferred by operation of law (an "Involuntary Transfer") to any Person other than the Company or a Permitted Transferee (such as but not limited to a Member's trustee in bankruptcy, to a purchaser at any creditor's or court sale or to the guardian or conservator of an incompetent Member) (an "Involuntary Transferee"), the Manager, for sixty (60) days following the receipt of actual notice of the Transfer (the "Notice Period"), shall have an option to purchase all or any portion of the Membership Interest or Economic Interest subject to the Involuntary Transfer (the "Involuntarily Transferred Interest"). Such option shall be exercised by written notice to the Member and the Involuntary Transferee. The purchase price of such Involuntarily Transferred Interest by the remaining Members shall be the Agreed Value.

(b)     If the Manager fails to exercise its options to purchase all of the Involuntarily Transferred Interest, the Company shall have the right to purchase the remaining Involuntarily Transferred Interest, for the Agreed Value, by giving written notification to the Involuntary Transferee and the Member within thirty (30) days after the expiration of the Notice Period (the "Company Notice Period").

(c)     If the Company fails to exercise its options to purchase all of the Involuntarily Transferred Interest, the remaining Members on a basis pro rata to their Membership Units or upon such other basis they shall mutually agree shall have the right to purchase the remaining Involuntarily Transferred Interest, for the Agreed Value, by

AFM000052

giving written notification to the Involuntary Transferee and the Member within thirty (30) days after the expiration of the Company Notice Period (the "Remaining Members Notice Period").

(d)     In the event of a purchase of a Membership Interest pursuant to this Section 7.8, a portion of the purchase price for such Membership Interest equal to twenty-five percent (25%) thereof shall be paid in cash at the closing of the transaction. The remaining portion of the purchase price shall be deferred and payable, together with interest on the unpaid balance from time to time at the Minimum Rate, in sixty (60) equal installments of principal and interest, the first installment being due and payable on the thirtieth day following the date of closing of the sale, and subsequent installments being due on the same day of each succeeding month until the remaining unpaid balance plus interest accrued thereon has been paid in full. The indebtedness of each purchaser shall be evidenced by his, her or its promissory note payable to the order of the selling party. Each such promissory note shall be in substantially the form set forth in Exhibit B attached hereto.

(e)     The failure of the Manager, remaining Members and the Company to notify the Involuntary Transferee of their desire to exercise their rights to purchase the Involuntarily Transferred Interest at or prior to the end of the Remaining Members Notice Period shall result in the termination of the right to purchase and the Involuntary Transferee may retain such Involuntarily Transferred Interest in the form of an Economic Interest, and shall have no right to participate in the management of the business or affairs of the Company or become a Member except as set forth in Section 7.5.

7.9     Options Upon Dissociation. A Member may not withdraw or dissociate from the Company, except as permitted herein. In the event of the Dissociation, for any reason ("Terminating Event"), of any Member (a "Dissociated Member"), the Manager, remaining Members and the Company shall have the option to acquire the Dissociated Member's Membership Interest, including the Economic Interest of each donee of the Dissociated Member as follows:

(a)     The Manager shall have the right to purchase all, or any portion, of the Membership Interest of the Dissociated Member by giving written notification to the Dissociated Member within ninety (90) days after the Terminating Event (the "Manager Dissociation Response Period").

(b)     If the Manager fails to exercise its option, then the Company shall have the right to purchase the remaining Membership Interest of the Dissociated Member by giving written notification to the Dissociated Member within thirty (30) days after the expiration of the Manager Dissociation Response Period (the "Company Dissociation Response Period").

(c)     If the Company fails to exercise its option, then the remaining Members on a basis pro rata to their Membership Units or upon such other basis they shall mutually agree shall have the right to purchase the remaining Membership Interest of the Dissociated Member by giving written notification to the Dissociated Member within thirty (30) days after the expiration of the Company Dissociation Response Period (the "Remaining Members Dissociation Response Period").

36898708.1

AFM000053

(d)     If the Manager, remaining Members and/or the Company shall give written notice to the Dissociated Member of their desire to exercise their right to purchase all of the Dissociated Member's Membership Interest, the Manager, remaining Members and/or the Company shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within sixty (60) days after the last of the Manager, Members and/or the Company has given written notification to the Dissociated Member of the election to exercise their right to purchase or the end of the Remaining Members Dissociation Response Period, whichever is earlier.

(e)     The purchase price for the entire Membership Interest and/or Economic Interest of a Dissociated Member shall be the Agreed Value.

(f)     In the event of a purchase of a Membership Interest as a result of the Dissociation of a Dissociated Member, a portion of the purchase price for such Membership Interest equal to twenty-five percent (25%) thereof shall be paid in cash at the closing of the transaction. The remaining portion of the purchase price shall be deferred and payable, together with interest on the unpaid balance from time to time at the Minimum Rate, in sixty (60) equal installments of principal and interest, the first installment being due and payable on the thirtieth day following the date of closing of the sale, and subsequent installments being due on the same day of each succeeding month until the remaining unpaid balance plus interest accrued thereon has been paid in full. The indebtedness of each purchaser shall be evidenced by each purchaser's promissory note payable to the order of the selling party. Each such promissory note shall be in substantially the form set forth in Exhibit B attached hereto.

(g)     The failure of the Manager, remaining Members and the Company to notify the Dissociated Member of their desire to exercise their respective rights to purchase all of the Dissociated Member's Membership Interest prior to the end of the Remaining Members Dissociation Response Period shall result in the termination of the right to purchase and the Dissociated Member shall retain such Membership Interest, in the form of an Economic Interest, and shall have no right to participate in the management of the business or affairs of the Company or become a Member except as set forth in Section 7.5. The Company shall not be required to purchase the Membership Interest or Economic Interest of a Member in the case of the Dissociation of that Member.

7.10     Intentionally Omitted.

7.11     Agreed Value. The term "Agreed Value" shall mean a Member's proportionate share (determined on the basis of a Member's Participating Percentage of the fair market value of the Company). The fair market value of the Company shall be determined by using any one of the three following methods that results in the highest value: (i) sixty-five percent (65%) of the total Member's equity reflected on the books and records of the Company, (ii) 25% of the 5-year Average Profit (hereafter defined) of the Company, or (iii) the amount established by an independent certified public accountant pursuant to the methodology and formula, including discounts. For purposes hereof, the term "5-year Average Profit" means the average Net Profit for the five most recent years ending prior to the year in which an event described in this Article 7 has occurred.

AFM000054

## ARTICLE 8
## ADDITIONAL MEMBERS

From the date of the formation of the Company, upon consent of the Manager, a Person may become a Member in this Company either by the issuance by the Company of Membership Interests for such consideration as the Manager determines, or as a transferee of a Member's Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Manager may, at its option, at the time a Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Code Section 706(d) and the Treasury Regulations promulgated thereunder.

## ARTICLE 9
## DISSOLUTION AND TERMINATION

9.1     Dissolution.

(a)     The Company shall be dissolved upon the occurrence of any of the following events:

(i)     when the period fixed for the duration of the Company, if any, shall expire pursuant to Section 2.5 hereof;

(ii)     by the written agreement of Members holding two-thirds (2/3) of the Membership Units; or

(iii)     upon the occurrence of an event causing dissolution as specified in the Act.

(b)     The Dissociation of a Member shall not constitute a dissolution of the Company.

(c)     Unless otherwise approved by the Manager, a Member who resigns (a "Resigning Member") or whose Membership Interest is otherwise terminated by virtue of a Dissociation, shall not be entitled to receive any liquidating distributions in excess of those distributions to which such Member would have been entitled had such Resigning Member remained a Member. Except as otherwise expressly provided herein, a Resigning Member shall immediately become an Economic Interest Owner.

9.2     Dissolution and Liquidation of Assets.

(a)     Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

AFM000055

(b)     If the Company is dissolved and its affairs are to be wound up, the Manager shall:

(i)     sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Manager may determine to distribute any assets to the Members in kind);

(ii)    allocate any profit or loss resulting from such sales to the Members' and Economic Interest Owners' Capital Accounts in accordance with Article 5 hereof;

(iii)   discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent claims or liabilities of the Company, provided that for purposes of determining the Capital Accounts of the Members and Economic Interest Owners, the amounts of such Reserves shall be deemed to be an expense of the Company.

(c)     If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Manager. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of Section 5.3 and Section 5.5 of this Operating Agreement to reflect such deemed sale.

(d)     The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Manager, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to Section 9.2(c). Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(e)     Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

23

AFM000056

(f) The Manager shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

9.3 _Articles of Dissolution_. When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, articles of dissolution as required by the Act, shall be executed in duplicate and filed with the Illinois Secretary of State.

9.4 _Effect of Filing of Articles of Dissolution_. Upon the filing of Articles of Dissolution with the Illinois Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other Proceedings and appropriate action as provided in the Act. The Manager shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

9.5 _Assets Distributed on Dissolution_. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Member's Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one (1) or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

ARTICLE 10
MISCELLANEOUS

10.1 _Waiver of Conflict of Interest_. The law firm of Hamilton Thies & Lorch LLP hereby discloses to the parties its potential conflicts of interest arising from the negotiation of this Operating Agreement and all documents related thereto and arising from the organization and operation of the Company, which may include without limitation conflicts regarding management, voting, and distributions. Hamilton Thies & Lorch LLP represents the Manager with regard to all such matters, and Hamilton Thies & Lorch LLP has urged all Members to seek independent representation. The Members and the Company acknowledge that they have been advised of all conflicts of interest arising from the representation. The parties hereby waive any conflict of interest resulting from the past, current and future representation provided by Hamilton Thies & Lorch LLP to the Manager and the Company in both matters related and unrelated to this Operating Agreement.

10.2 _Notices_. Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if: (a) delivered personally to the party or to an officer of the party to whom the same is directed; or (b) sent by facsimile transmission, receipt of which is acknowledged by the recipient by customary fax receipt acknowledgment and by sending a copy of such notice, demand and communication by regular mail; or (c) sent by registered or certified mail, postage and charges prepaid; or (d) sent by recognized overnight delivery service (e.g., FedEx or UPS), charges prepaid, in any case addressed to the Member's and/or Company's address, as appropriate, which addresses are set forth in this Operating Agreement. Except as otherwise provided herein, any such notice shall be deemed to be given two (2) business days after the date on which the same

24

AFM000057

was deposited in the United States mail, or one (1) business day after the date on which the same was deposited with an overnight delivery service for next business day delivery, in either case addressed and sent as aforesaid or, if by telefax as above provided, then any such notice shall be deemed to be given at the time of the fax receipt acknowledgment.

10.3   Application of Illinois Law.  This Operating Agreement and its interpretation shall be governed exclusively by its terms and by the laws of the State of Illinois, and specifically the Act.

10.4   Arbitration/No Lawsuits.  Other than equitable relief, any controversy or claim arising out of, or relating to, this Operating Agreement, or its breach, shall be settled by arbitration. The panel of arbitrators shall be composed of three (3) Persons, one of whom shall be selected by each of the parties. Such selection of arbitrators shall be made within thirty (30) days after the date on which the parties agree that they will be unable to agree as to the settlement of the controversy or claim. The third arbitrator shall be Dominic Maduri or, in the event Dominic Maduri is unavailable, by an arbitrator appointed by the American Arbitration Association. The decision of a majority of the panel of arbitrators shall be final, conclusive and binding upon the parties hereto and not subject to judicial review and judgment on the decision rendered may be entered in any court having jurisdiction. Except as provided herein, the arbitration shall be governed in accordance with the rules of the American Arbitration Association. Except for claims to enforce a non-competition restriction, the parties to this Operating Agreement agree that they will not institute any lawsuit against any other party to this Operating Agreement relating to any controversy, claim, or alleged breach to this Operating Agreement.

10.5   Equitable Relief.  As the rights and obligations of the parties are unique and damages cannot be readily measured, irreparable damage would result in the event this Operating Agreement is not specifically enforced. The rights and obligations of the parties shall be enforceable in a court of equity by a decree of specific performance, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedy and all other remedies provided for in this Operating Agreement shall, however, be cumulative and not exclusive and shall be available in addition to any other remedies which any party may have under this Operating Agreement or otherwise.

10.6   Waiver of Action for Partition.  Each Member and Economic Interest Owner irrevocably waives during the term of the Company's existence any right that it may have to maintain any action for the partition with respect to the property of the Company.

10.7   Attorney Fees.  In the event any party hereto commences litigation or arbitration for the judicial interpretation, enforcement, termination, cancellation or rescission of this Operating Agreement, or for damages for the breach hereof, then, in addition to any or all other relief awarded in such litigation or arbitration, the prevailing party therein shall be entitled to a judgment against the other for an amount equal to reasonable attorneys' fees, court costs, arbitration fees and expenses, and other costs incurred (including paralegal, legal assistant and computerized legal research fees). For purposes of this Section, "prevailing party" shall mean, in the case of the claimant, one who is successful in obtaining substantially all relief sought, and in the case of the defendant or respondent, one who is successful in denying substantially all of the relief sought by the claimant.

36898708.1

AFM000058

10.8    Amendments. This Operating Agreement may not be amended except in a writing signed by the holders of two-thirds (2/3) of the Membership Units.

10.9    Execution of Additional Instruments. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments as are necessary to comply with any laws, rules or regulations.

10.10    Construction. Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

10.11    Headings. The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

10.12    Waivers. The failure of any party to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a default, from having the effect of an original default.

10.13    Rights and Remedies Cumulative. The rights and remedies provided by this Operating Agreement are cumulative and the use of any individual right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have.

10.14    Severability. If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application of the provisions hereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

10.15    Heirs, Successors and Assigns. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

10.16    Creditors. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

10.17    Incorporation of Recitals. The Recitals contained herein are hereby incorporated and made a part of the terms and mutual covenants and agreements contained in this Operating Agreement.

10.18    Counterparts. This Operating Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

36898708.1

AFM000059

10.19 <u>Entire Agreement</u>. This Operating Agreement constitutes the entire agreement of the parties, and it merges and supersedes all prior discussions and agreements among them with respect to the subject matter hereof.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK
SIGNATURES ON FOLLOWING PAGE]

36898708.1

AFM000060

The parties have executed this Operating Agreement as of the date first above written.

COMPANY:

GSI FINANCE COMPANY LLC, an Illinois limited liability company

By: _____
Name: Eduardo E. Greco
Its:     Manager

MEMBERS:

GRECO FAMILY HOLDINGS LLC, an Illinois limited liability company

By: _____
Name: Eduardo E. Greco
Its:     Manager

GRECO PG FIVE LLC, an Illinois liability company

By: _____
Name: Eduardo E. Greco
Its:     Manager

GRECO EG THREE LLC, an Illinois limited liability company

By: _____
Name: Eduardo E. Greco
Its:     Manager

Signature Page

AFM000061

**EXHIBIT A**
**MEMBER INFORMATION**

| Member's Names | Membership Units | Participating Percentages |
|---|---|---|
| GRECO FAMILY HOLDINGS LLC | 46.89 | 46.89% |
| GRECO PG FIVE LLC | 42.49 | 42.49% |
| GRECO EG THREE LLC | 10.62 | 10.62% |
| TOTAL | 100 | 100% |

# EXHIBIT B

## INSTALLMENT PROMISSORY NOTE

(insert closing date)

_____, 20_____

FOR VALUE RECEIVED, on or before _____ (insert final installment date) the undersigned promises to pay to the order of _____ (insert name of selling party) the principal sum of _____ ($_____) (insert amount of deferred portion of the purchase price), together with interest from the date hereof at the rate of _____ percent (____%) per annum on the principal balance from time to time unpaid. The said principal and interest shall be payable in installments as hereinafter provided.

(a)     Commencing on _____, 20___ (insert date 30 days following closing or other agreed upon payment date), and on the day of each month thereafter for consecutive months to and including _____, 20___, the sum of _____ ($_____) shall be payable, said sum to be applied first to accrued and unpaid interest and thereafter to principal.

(b)     The entire unpaid balance of principal together with accrued and unpaid interest thereon shall be payable on _____, 20___ (insert the month following the last monthly installment under (a)).

At the option of the undersigned, at any time or times during the term of this Note, all or any portion of the unpaid principal sum and accrued interest on this Note may be prepaid without premium or penalty, the amount of the prepayment to be applied first to accrued interest and the remainder to the unpaid principal. If the undersigned so designates in a written prepayment notice delivered to the holder of this Note concurrently with the making of the prepayment, the amount of the monthly installments shall be reduced by recomputing the monthly installment amount required to amortize the remaining principal balance together with interest as aforesaid over the period remaining to the original maturity date. If no such prepayment notice is so delivered, the same installment amounts stated above shall continue to be payable on the dates designated until such time as the entire principal sum, together with all accrued interest, is paid, at which time this Note shall be paid in full. In such case, the portion of each of the installment amounts attributable to principal shall be recomputed in order to adjust for the decreased interest payable on the reduced unpaid principal balance.

At the election of the holder or holders hereof, upon notice to the maker, the principal sum remaining unpaid hereon, together with accrued and unpaid interest thereon, shall become at once due and payable in the event of a default in the payment of any principal or interest when due in accordance with the terms hereof.

Exhibit B

The maker hereby waives presentment for payment, notice of dishonor, protest and notice of protest.

_____
(Signature of Purchasing Party)

Exhibit B

# OPERATING AGREEMENT

## OF

## GRECO FAMILY HOLDINGS LLC

## AN ILLINOIS LIMITED LIABILITY COMPANY

AFM000065

# Table of Contents

**Page**

ARTICLE 1 - DEFINITIONS .................................................................................................. 1

1.1    Act ................................................................................................................................ 1

1.2    Affiliate ........................................................................................................................ 1

1.3    Agreed Value ............................................................................................................... 1

1.4    Capital Account ........................................................................................................... 1

1.5    Capital Contribution .................................................................................................... 1

1.6    Capital Interest ............................................................................................................ 1

1.7    Articles of Organization .............................................................................................. 1

1.8    Code ............................................................................................................................. 2

1.9    Company ...................................................................................................................... 2

1.10    Company Property or Property ..................................................................................... 2

1.11    Deficit Capital Account ............................................................................................... 2

1.12    Dissociating Member ................................................................................................... 2

1.13    Dissociation ................................................................................................................. 2

1.14    Distributable Cash ....................................................................................................... 2

1.15    Economic Interest ........................................................................................................ 2

1.16    Economic Interest Owner ............................................................................................ 3

1.17    Economic Interest Units .............................................................................................. 3

1.18    Entity ........................................................................................................................... 3

1.19    Fiscal Year ................................................................................................................... 3

1.20    Majority Interest .......................................................................................................... 3

1.21    Manager ....................................................................................................................... 3

1.22    Member ........................................................................................................................ 3

1.23    Membership Interest .................................................................................................... 3

1.24    Membership Units ....................................................................................................... 3

1.25    Minimum Rate ............................................................................................................. 4

1.26    Net Profits and Losses ................................................................................................. 4

1.27    Operating Agreement .................................................................................................. 4

1.28    Participating Percentage .............................................................................................. 4

1.29    Permitted Transferee ................................................................................................... 4

i

| | | |
|---|---|---|
| 1.30 | Person | 4 |
| 1.31 | Reserves | 4 |
| 1.32 | Sale Proceeds | 4 |
| 1.33 | Sell | 4 |
| 1.34 | Selling Member | 4 |
| 1.35 | Transfer | 4 |
| 1.36 | Transferee | 5 |
| 1.37 | Transferring Member | 5 |
| 1.38 | Treasury Regulations | 5 |
| 1.39 | Units | 5 |
| ARTICLE 2 - FORMATION OF COMPANY | | 5 |
| 2.1 | Formation | 5 |
| 2.2 | Name | 5 |
| 2.3 | Principal Place of Business | 5 |
| 2.4 | Registered Office and Registered Agent | 5 |
| 2.5 | Term | 5 |
| 2.6 | Business of Company | 5 |
| ARTICLE 3 - RIGHTS AND DUTIES OF MANAGER | | 5 |
| 3.1 | Management | 5 |
| 3.2 | Number, Tenure, Designation and Qualifications | 6 |
| 3.3 | Authority of Manager | 6 |
| 3.4 | Duties of Manager | 7 |
| 3.5 | Authority of Others | 8 |
| 3.6 | Limitation of Authority of Manager | 8 |
| 3.7 | Tax Matters Partner | 9 |
| 3.8 | Liability for Certain Acts | 9 |
| 3.9 | Resignation | 9 |
| 3.10 | Indemnification by Company | 9 |
| 3.11 | No Exclusive Duty to Company | 9 |
| 3.12 | Removal | 10 |
| 3.13 | Vacancies | 10 |
| 3.14 | Salaries | 10 |
| 3.15 | Other Agreements | 10 |
| ARTICLE 4 - RIGHTS AND OBLIGATIONS OF MEMBERS | | 10 |

AFM000067

| | | | |
|---|---|---|---|
| 4.1 | Limitation of Liability | | 10 |
| 4.2 | Dissociation by Members | | 10 |
| 4.3 | Expulsion of Members | | 11 |
| 4.4 | Company Books | | 11 |
| 4.5 | Priority and Return of Capital | | 11 |
| 4.6 | Return of Distributions | | 11 |
| 4.7 | No Exclusive Duty to Company | | 11 |

ARTICLE 5 - COMPANY CAPITAL ........................................................................ 11

| | | |
|---|---|---|
| 5.1 | Capital Contributions | 11 |
| 5.2 | Additional Contributions | 12 |
| 5.3 | Capital Accounts | 12 |
| 5.4 | Special Allocations to Capital Accounts | 13 |
| 5.5 | Interest On and Return of Contributions | 14 |
| 5.6 | Accounting Principles | 14 |
| 5.7 | Loans to Company | 14 |
| 5.8 | Accounting Period | 14 |

ARTICLE 6 - ALLOCATIONS AND DISTRIBUTIONS ........................................ 14

| | | |
|---|---|---|
| 6.1 | Allocations of Profits and Losses | 14 |
| 6.2 | Distributions | 14 |
| 6.3 | Limitation Upon Distributions | 15 |
| 6.4 | Withdrawal or Reduction of Contributions | 15 |

ARTICLE 7 - MEMBERSHIP CERTIFICATES AND TRANSFERABILITY ........ 16

| | | |
|---|---|---|
| 7.1 | Certificates for Membership Interest | 16 |
| 7.2 | Restrictions on Transfer | 16 |
| 7.3 | Transfers on Company Books | 16 |
| 7.4 | Right of First Refusal | 16 |
| 7.5 | Transferee Not Member in Absence of Consent | 18 |
| 7.6 | Option Upon Involuntary Transfer | 19 |
| 7.7 | Options Upon Dissociation | 20 |
| 7.8 | Agreed Value | 21 |

ARTICLE 8 - ADDITIONAL MEMBERS ............................................................... 21

ARTICLE 9 - DISSOLUTION AND TERMINATION ......................................... 22

| | | |
|---|---|---|
| 9.1 | Dissolution | 22 |
| 9.2 | Dissolution and Liquidation of Assets | 22 |

AFM000068

9.3   Articles of Dissolution ................................................................................................ 23

9.4   Effect of Filing of Articles of Dissolution ................................................................ 23

9.5   Assets Distributed on Dissolution ............................................................................ 24

ARTICLE 10 - MISCELLANEOUS ....................................................................................... 24

10.1   Waiver of Conflict of Interest ................................................................................ 24

10.2   Notices .................................................................................................................... 24

10.3   Application of Illinois Law .................................................................................... 24

10.4   Arbitration/No Lawsuits ........................................................................................ 24

10.5   Equitable Relief ..................................................................................................... 25

10.6   Waiver of Action for Partition ............................................................................... 25

10.7   Attorney Fees ......................................................................................................... 25

10.8   Amendments ........................................................................................................... 25

10.9   Execution of Additional Instruments ..................................................................... 25

10.10   Construction ......................................................................................................... 25

10.11   Headings ............................................................................................................... 25

10.12   Waivers ................................................................................................................. 25

10.13   Rights and Remedies Cumulative ........................................................................ 26

10.14   Severability .......................................................................................................... 26

10.15   Heirs, Successors and Assigns ............................................................................ 26

10.16   Creditors ............................................................................................................... 26

10.17   Incorporation of Recitals ..................................................................................... 26

10.18   Counterparts ......................................................................................................... 26

10.19   Entire Agreement ................................................................................................. 26

36898056.1

AFM000069

# GRECO FAMILY HOLDINGS LLC
# OPERATING AGREEMENT

THIS OPERATING AGREEMENT ("Operating Agreement") is made and entered into as of the 27th day of October, 2015, by and among GRECO FAMILY HOLDINGS LLC, an Illinois limited liability company (the "Company"), the manager and the members set forth on attached Exhibit A.

WHEREAS, the Company was formed as an Illinois limited Liability Company on October 27, 2015;

WHEREAS, the parties hereto desire to enter into this Operating Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1 - DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings:

1.1     Act. The "Act" shall mean the Illinois Limited Liability Company Act, as it may be amended from time to time.

1.2     Affiliate. "Affiliate" shall mean: (1) any Person directly or indirectly controlling, controlled by or under common control with another Person; (2) a Person owning or controlling ten percent (10%) or more of the outstanding voting securities of such other Person; (3) any officer, director, partner, spouse, parent, or lineal descendant of such other Person; and (4) if such other Person is an officer, director or partner, any company or partnership for which such Person acts in any capacity.

1.3     Agreed Value. "Agreed Value" is defined in Section 7.11.

1.4     Capital Account. "Capital Account" shall mean as of any given date the account maintained for each Member pursuant to Article 5.

1.5     Capital Contribution. "Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

1.6     Capital Interest. "Capital Interest" shall mean as of any given date the proportion that a Member's positive Capital Account bears to the aggregate positive Capital Accounts of all Members whose Capital Accounts have positive balances as of such date.

1.7     Articles of Organization. The "Articles of Organization" shall mean the Articles of Organization as filed with the Secretary of State of Illinois, as amended from time to time.

AFM000070

1.8 <u>Code</u>. The "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue laws.

1.9 <u>Company</u>. The "Company" shall mean GRECO FAMILY HOLDINGS LLC, an Illinois limited liability company.

1.10 <u>Company Property or Property</u>. "Company Property" or "Property" shall mean all properties, assets and rights of any type owned by the Company.

1.11 <u>Deficit Capital Account</u>. "Deficit Capital Account" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(a) Credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2(g)(1) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner for nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations); and

(b) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

(c) This definition of Deficit Capital Account is intended to comply with the provisions of Treasury Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and shall be interpreted consistently with those provisions.

1.12 <u>Dissociating Member</u>. "Dissociating Member" shall mean a Member for which an event of Dissociation has occurred.

1.13 <u>Dissociation</u>. "Dissociation" shall mean the notice by a Member to withdraw from the Company, a Transfer of all of a Member's Membership Interest, the expulsion of a Member, the bankruptcy or insolvency of a Member, the dissolution of a Member, or such other events as set forth in the Act.

1.14 <u>Distributable Cash</u>. "Distributable Cash" shall mean all cash, revenues and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company: (a) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (b) all cash expenditures incurred in the normal operation of the Company's business; and (c) Reserves as the Manager deems reasonably necessary for working capital and to pay taxes, insurance, debt service and other costs or expenses incident to the ownership and operation of the business of the Company.

1.15 <u>Economic Interest</u>. "Economic Interest" shall mean a Member's or Economic Interest Owner's share of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not confer any right

2

AFM000071

to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members or Manager.

1.16     Economic Interest Owner. "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.17     Economic Interest Units. "Economic Interest Units" shall mean ownership interests in the Company held by Economic Interest Owners. Economic Interest Units shall have an Economic Interest only. Subject to the provisions herein, each Economic Interest Unit has equal rights with every other Membership Unit and Economic Interest Unit with respect to sharing of profits and losses and with respect to distributions. An Economic Interest Unit may be diluted if the Company issues additional Units.

1.18     Entity. "Entity" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust or foreign business organization.

1.19     Fiscal Year. "Fiscal Year" shall mean the Company's fiscal year as determined by the Manager. The initial Fiscal Year shall be the calendar year.

1.20     Majority Interest. "Majority Interest" shall mean the Members holding in the aggregate in excess of fifty percent (50%) of all Membership Units outstanding at the time of any determination.

1.21     Manager. "Manager" or "Managers" shall mean one (1) or more managers who have the authority to manage the Company in accordance with the provisions of this Operating Agreement.

1.22     Member. "Member" shall mean each owner of a Membership Interest who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become Members. If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be. In the case of a Member which is a revocable grantor trust, references herein to the Member shall include the grantor of such trust.

1.23     Membership Interest. "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement and the Act.

1.24     Membership Units. Ownership interests in the Company shall be represented by "Membership Units." The initial ownership of Membership Units shall be as set forth on attached Exhibit A. Each Membership Unit has equal governance rights with every other Membership Unit and in matters subject to a vote of the Members has one (1) vote. Subject to the provisions herein, each Membership Unit has equal rights with every other Membership Unit with respect to sharing

3

AFM000072

of profits and losses and with respect to distributions. A Membership Unit may be diluted if the Company issues additional Membership Units.

1.25    Minimum Rate. "Minimum Rate" shall mean the minimum rate of interest which can be used without causing additional interest to be imputed pursuant to the Code.

1.26    Net Profits and Losses. "Net Profits" and "Net Losses" shall mean the net amount of all income, gain, loss, and deductions of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the method of accounting selected by the Manager at the close of each fiscal year on the Company's tax return filed for federal income tax purposes.

1.27    Operating Agreement. "Operating Agreement" shall mean this Amended and Restated Operating Agreement as originally executed and as amended from time to time. If a provision of this Operating Agreement differs from a provision of the Articles of Organization, then to the extent allowed by law this Operating Agreement shall govern.

1.28    Participating Percentage. "Participating Percentage" shall mean a Member's or Economic Interest Owner's right to allocations of Net Profits and Net Losses of the Company calculated as the Units owned by such Member or Economic Interest Owner divided by the total number of Units outstanding. The Initial Participating Percentages are set forth on Exhibit A attached hereto and made part hereof.

1.29    Permitted Transferee. "'Permitted Transferee" when used herein shall mean another Member; provided, however, that a Permitted Transferee shall not be a Permitted Transferee unless he, she, or it complies with the provisions of Section 7.5(d).

1.30    Person. "Person" shall mean an individual, partnership, limited partnership, limited liability company, trust, estate, association, corporation, or other entity.

1.31    Reserves. "Reserves" shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts deemed sufficient by the Manager for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

1.32    Sale Proceeds. "Sale Proceeds" "Sale Proceeds" shall mean (1) the proceeds to the Company from the sale of property of the Company, including interest on any deferred or installment payments and (2) the net proceeds to the Company from the refinancing of any property of the Company.

1.33    Sell. "Sell" shall mean to sell, assign, pledge, hypothecate or otherwise transfer for consideration all or any portion of a Membership Interest or Economic Interest.

1.34    Selling Member. "Selling Member" shall mean any Member or Economic Interest Owner which Sells all or any portion of its Membership Interest or Economic Interest.

1.35    Transfer. "Transfer" shall mean to Sell, gift or otherwise transfer, for or without consideration, all or any part of a Membership Interest or Economic Interest.

AFM000073

1.36    Transferee. "Transferee" shall mean the recipient of a Membership Interest or Economic Interest which has been Transferred.

1.37    Transferring Member. "Transferring Member" shall mean a Member who Transfers the Member's Membership Interest, or an Economic Interest Owner who Transfers the Economic Interest Owner's Economic Interest.

1.38    Treasury Regulations. "Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code.

1.39    Units. "Units" shall mean collectively Membership Units and Economic Interest Units.

## ARTICLE 2 - FORMATION OF COMPANY

2.1    Formation. The Company has been organized as an Illinois limited liability company by the execution and delivery of Articles of Organization to the Illinois Secretary of State in accordance with and pursuant to the Act.

2.2    Name. The name of the Company is GRECO FAMILY HOLDINGS LLC, an Illinois limited liability company.

2.3    Principal Place of Business. The principal place of business of the Company shall be 1301 Schiferl, Bartlett, Illinois 60103. The Company may locate its places of business and registered office at any other place or places as the Manager may from time to time deem advisable.

2.4    Registered Office and Registered Agent. The Company's current registered office is at the office of its registered agent, Dominic S. Maduri, 785 Wall Street, O'Fallon, Illinois 62269. The registered office and registered agent may be changed by filing the address of the new registered office and/or the name of the new registered agent with the Illinois Secretary of State pursuant to the Act.

2.5    Term. The term of the Company shall be perpetual, unless the Company is dissolved in accordance with either the provisions of this Operating Agreement or the Act.

2.6    Business of Company. The business of the Company shall be to transact any and all lawful business for which a company may be organized under the Act.

## ARTICLE 3 - RIGHTS AND DUTIES OF MANAGER

3.1    Management. The business and affairs of the Company shall be directed, managed and controlled by its Manager. Except as otherwise expressly required by this Operating Agreement or by non-waivable provisions of the Act, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. Except as provided otherwise in this Agreement, at any time when there is more than one (1) Manager, the decision

AFM000074

of a majority of all of the Managers shall be required for the Manager to take any action permitted to be taken under this Operating Agreement or the Act.

3.2  Number, Tenure, Designation and Qualifications. As of the date hereof, the Company shall have one (1) Manager: Eduardo Greco. The Manager shall hold office until its resignation, removal from office or inability to serve. The Manager may be replaced by the Members holding at least two-thirds (2/3) of the Membership Units. Managers need not be Members of the Company.

3.3  Authority of Manager. Except as provided in Section 3.6, and without limiting the generality of Section 3.1, the Manager shall have power and authority, on behalf of the Company to:

(a)  Acquire property from any Person as the Manager may determine, whether or not such Person is directly or indirectly affiliated or connected with any Manager or Member;

(b)  Pledge, encumber, and allow or cause security interests to be placed on any and all assets of the Company;

(c)  Hire or fire any and all employees, agents, or contractors for the Company;

(d)  Enter into or terminate employment agreements or other compensation arrangements;

(e)  Modify or make distributions to the Members;

(f)  Borrow money for the Company from banks, other lending institutions, the Manager, Members, or Affiliates of the Manager or Members or refinance any debts or obligations of the Company;

(g)  Hypothecate, encumber and grant any security interest in any of the assets of the Company to secure repayment of borrowed sums;

(h)  Purchase liability and other insurance to protect the Company's property and business or for any other reason the Manager in their sole discretion may determine;

(i)  Enter into or settle any litigation, arbitration or other similar proceeding involving the Company;

(j)  Make any decision related to the tax status of the Company, or any actions involving tax issues;

(k)  Hold and own Company real and personal properties in the name of the Company;

(l)  Invest Company funds in time deposits, short-term governmental obligations, commercial paper or other investments;

6

(m)     Open, as it deems necessary or convenient, from time to time such bank accounts in the name of the Company;

(n)     Execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; deeds; assignments; bills of sale; leases; and any other instruments or documents necessary to the business of the Company;

(o)     Employ accountants, legal counsel, managing agents or other experts to perform services for the Company;

(p)     Enter into any and all other agreements on behalf of the Company, in such forms as the Manager may approve; and

(q)     Do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

3.4     <u>Duties of Manager</u>. At the expense of the Company, the Manager shall be responsible for the following duties:

(a)     The Manager shall maintain records and accounts of the operations and expenditures of the Company, which shall at a minimum include the following records which the Manager shall keep at the principal place of business of the Company:

(i)     proper and complete records and books of account in which shall be entered fully and accurately all transactions relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company;

(ii)     a current list of the full name and last known address of each Member and Economic Interest Owner setting forth the amount of cash each Member and Economic Interest Owner has contributed, a description and statement of the agreed value of the other property or services each Member and Economic Interest Owner has contributed or has agreed to contribute in the future, and the date on which each became a Member or Economic Interest Owner;

(iii)     a copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(iv)     copies of the Company's federal, state, and local income tax returns and reports, if any, for the three (3) most recent years;

(v)     copies of the Company's currently effective written Operating Agreement;

7

AFM000076

(vi)     copies of any financial statements of the Company for the three (3) most recent years;

(vii)     any written consents obtained from Members for actions taken by Members without a meeting;

(viii)     other than as set forth in the Articles of Organization or herein, a writing prepared by the Manager setting out the following: (A) the times at which or events on the happening of which any additional contributions agreed to be made by each Member and Economic Interest Owner are to be made; (B) any right of a Member or Economic Interest Owner to receive distributions that include a return of all or any part of the Member or Economic Interest Owner's contributions; and any power of a Member or Economic Interest Owner to grant the right to become an assignee of any part of the Member's or Economic Interest Owner's interest, and the terms and conditions of the power.

(b)     The Manager shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year upon a Member's written request. Subject to Section 3.6, all elections permitted to be made by the Company under federal or state laws shall be made by the Manager in their sole discretion, provided that the Manager shall make any tax election permitted by law which is requested by the holders of a Majority Interest.

3.5     Authority of Others.

(a)     Unless authorized to do so by this Operating Agreement, no attorney- in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

(b)     No Member acting as a Member shall have any power or authority to bind the Company unless the Member has been authorized by the Manager to act as an agent of the Company in accordance with the provision of Section 3.5(a).

(c)     No debt shall be contracted or liability incurred by or on behalf of the Company except by the Manager, or to the extent permitted under the Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Manager.

3.6     Limitation of Authority of Manager. Notwithstanding any other provision herein to the contrary, a vote of the Members holding two-thirds (2/3) of the Membership Units of all Members shall be required before any Manager shall:

(a)     Admit a new Member to the Company or redeem any Member's interest in the Company;

36898056.1

AFM000077

(b)     Require an additional Capital Contribution from any Member without its consent;

(c)     Amend the Operating Agreement of the Company in any manner which would affect the contents of this <u>Section 3.6</u>;

(d)     Sell, exchange, or otherwise dispose of, finance or refinance all, or substantially all of the assets of the Company as part of a single transaction or plan and sell exchange or otherwise dispose of substantially all of the assets of the Company;

(e)     Voluntarily dissolve the Company, unless all or substantially all of its non-cash assets have been sold.

3.7     <u>Tax Matters Partner</u>. Eduardo Greco is designated the Tax Matters Partner"(as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

3.8     <u>Liability for Certain Acts</u>. Manager shall perform all duties as Manager in good faith, in a manner reasonably believed to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager.

3.9     <u>Resignation</u>. A Manager of the Company may resign at any time by giving written notice to the Members. The resignation of a Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a Dissociation.

3.10     <u>Indemnification by Company</u>. The Company shall indemnify the Manager for liability it may incur in its capacity as Manager of the Company.

3.11     <u>No Exclusive Duty to Company</u>. Except as otherwise agreed to between Company and Manager, a Manager shall not be required to manage the Company as the Manager's sole and exclusive function and a Manager may have other business interests and engage in activities in addition to those relating to the Company. A Manager and its Affiliates may engage in or possess any interests in other business ventures of any kind, independently or with others, including but not limited to engaging in other ventures having a purpose similar to that of the Company. The fact that the Manager or any Affiliate may encounter and take advantage of opportunities to do any of the foregoing themselves or on behalf of others in whom they may or may not have an interest shall not subject the Manager or any Affiliate to any liability to the Company or any of the Members or Manager on account of any lost opportunity. None of the Company, any Member, any

36898056.1

AFM000078

Manager, or the holder of any interest in the Company shall have any right by virtue of this Operating Agreement or the relationship created hereby in or to any other such ventures or activities, or to the income or profits derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company shall not be deemed wrongful or improper.

3.12    Removal. At a meeting called expressly for that purpose, all or any lesser number of Managers may be removed at any time, with or without cause, by Members holding two- thirds (2/3) of the Membership Units of all Members. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a Dissociation.

3.13    Vacancies. Any vacancy occurring for any reason in the number of Manager of the Company may be filled by the affirmative vote of Members holding at least two-thirds (2/3) of the Membership Units.

3.14    Salaries. The salaries and other compensation of the Manager shall be fixed from time to time by an affirmative vote of the Members holding a Majority Interest, and no Manager shall be prevented from receiving such salary because the Manager is also a Member of the Company.

3.15    Other Agreements. None.

## ARTICLE 4 - RIGHTS AND OBLIGATIONS OF MEMBERS

4.1    Limitation of Liability. Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law. A Member shall not be personally liable for any debts or losses of the Company beyond the Member's Capital Contribution or as otherwise provided herein or required by law.

4.2    Dissociation by Members.

(a)    Before the dissolution of the Company, any voluntary Dissociation by a Member without the prior written consent of the remaining Members holding two- thirds (2/3) of the remaining Membership Units shall be a wrongful Dissociation.

(b)    If a Member Dissociates before the dissolution of the Company, and the Dissociation results from volitional conduct of the Member that could reasonably be characterized as resignation, retirement, or withdrawal, then the Dissociating Member is liable to the Company for damages resulting from such wrongful Dissociation.

(c)    Upon a Dissociation by a Member, such Member shall cease to be a Member and shall become an Economic Interest Owner whose Membership Interest may be purchased by the remaining Members or the Company pursuant to Article 7. The Company may offset any amounts or obligations owed by a Dissociated Member to the Company including damages arising from such wrongful Dissociation against any amounts due the Dissociating Member, regardless of the cause of a Member's Dissociation and regardless of whether the Member's Dissociation results in dissolution of the Company.

10

AFM000079

4.3     Expulsion of Members. Members may be expelled from the Company by the Company or the other Members only upon judicial determination that the Member engaged in wrongful conduct that adversely and materially affected the business of the Company, willfully or persistently committed a material breach of this Operating Agreement or of a duty owed to the Company or the other Members under the Act, or engaged in conduct relating to the business of the Company that makes it not reasonably practicable to carry on the business of the Company if such Member remains a Member.

4.4     Company Books. Upon reasonable written request, each Member and Economic Interest Owner shall have the right, at a time during ordinary business hours as reasonably determined by the Manager, to inspect and copy at the requesting Member's or Economic Interest Owner's expense, the books and records of the Company, including the records maintained pursuant to Section 3.4 herein, the Company documents identified in the Act, and such other documents which the Manager, in their discretion, deem appropriate.

4.5     Priority and Return of Capital. Except as may be expressly provided herein, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Section 4.5 shall not apply to loans which a Member has made to the Company.

4.6     Return of Distributions. A Member who receives a distribution or the return in whole or in part of the Member's Capital Contribution is liable to the Company only to the extent provided by the Act.

4.7     No Exclusive Duty to Company. Except as otherwise agreed to by Company and Member, a Member shall not be required to devote the Member's efforts to the Company as the Member's sole and exclusive function, and a Member may have other business interests and engage in activities in addition to those relating to the Company. A Member and the Member's Affiliates may engage in or possess any interests in other business ventures of any kind, independently or with others, including but not limited to engaging in other ventures having a purpose similar to that of the Company. The fact that the Member or any Affiliate may encounter and take advantage of opportunities to do any of the foregoing themselves or on behalf of others in whom they may or may not have an interest shall not subject the Member or any Affiliate to any liability to the Company or any of the Members or Manager on account of any lost opportunity. None of the Company, any Member, any Manager, or the holder of any interest in the Company shall have any right by virtue of this Operating Agreement or the relationship created hereby in or to any other such ventures or activities, or to the income or profits derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company shall not be deemed wrongful or improper.

## ARTICLE 5 - COMPANY CAPITAL

5.1     Capital Contributions. Each Member who has made a Capital Contribution shall have such Capital Contribution credited to his Capital Account.

36898056.1

AFM000080

5.2     Additional Contributions. No Member shall be required to make additional Capital Contributions without such Member's consent. With the Member's consent, the Member shall make such additional Capital Contributions as shall be determined by the Manager. None of the terms, covenants, obligations or rights contained in this Section 5.2 is or shall be deemed to be for the benefit of any Person other than the Members and the Company, and no such third party shall under any circumstances have any right to compel any actions or payments by the Manager and/or the Members.

5.3     Capital Accounts. A separate Capital Account shall be maintained for each Member and, if applicable, each Economic Interest Owner, and subject to the provisions of Section 5.4, the following allocations shall be made to the Capital Accounts of the Members and Economic Interest Owners.

(a)     Each Member's and Economic Interest Owner's Capital Account will be increased by:

(i)     the amount of money contributed by such Member or Economic Interest Owner to the Company;

(ii)     the fair market value of property contributed by such Member or Economic Interest Owner to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752);

(iii)     allocations to such Member or Economic Interest Owner of Net Profits;

(iv)     allocations to such Member or Economic Interest Owner of income described in Code Section 705 (a)(1)(B).

(b)     Each Member's or Economic Interest Owner's Capital Account will be decreased by:

(i)     the amount of money distributed to such Member or Economic Interest Owner by the Company;

(ii)     the fair market value of property distributed to such Member or Economic Interest Owner by the Company (net of liabilities secured by such distributed property that such Member or Economic Interest Owner is considered to assume or take subject to under Code Section 752);

(iii)     allocations to such Member or Economic Interest Owner of expenditures described in Code Section 705(a)(2)(B); and

(iv)     allocations to the account of such Member or Economic Interest Owner of Net Losses and deduction as set forth in the Treasury Regulations promulgated under Code Section 704(b), taking into account adjustments to reflect book value.

AFM000081

(c)     The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder. If the Manager determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.3 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members and/or Economic Interest Owners as set forth in this Operating Agreement.

(d)     Upon liquidation of the Company, liquidating distributions will be made in accordance with the positive Capital Account balances of the Members and Economic Interest Owners, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation). The Company may offset damages for breach of this Operating Agreement by a Member or Economic Interest Owner whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member or Economic Interest Owner.

(e)     Except as otherwise required in the Act, no Member or Economic Interest Owner shall have any liability to restore all or any portion of a deficit balance in such Member's or Economic Interest Owner's Capital Account.

5.4     Special Allocations to Capital Accounts. Notwithstanding Section 5.3 hereof:

(a)     No allocations of loss, deduction and/or expenditures described in Code Section 705(a)(2)(B) shall be charged to the Capital Account of any Member or Economic Interest Owner if such allocation would cause such Member or Economic Interest Owner to have a Deficit Capital Account. The amount of the loss, deduction and/or Code Section 705(a)(2)(B) expenditure which would have caused a Member or Economic Interest Owner to have a Deficit Capital Account shall instead be charged to the Capital Account of any Members or Economic Interest Owners which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Members or Economic Interest Owners exist, then to the Members and Economic Interest Owners in proportion to their respective interests in Company Net Profits pursuant to Section 6.1.

(b)     In the event any Member or Economic Interest Owner unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member or Economic Interest Owner, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years)

AFM000082

shall be specially credited to the Capital Account of such Member or Economic Interest Owner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Section 5.4(b) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

5.5     Interest On and Return of Contributions. No Member or Economic Interest Owner shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution.

5.6     Accounting Principles. The profits and losses of the Company shall be determined in accordance with generally accepted accounting principles applied on a consistent basis using the method of accounting selected by the Manager.

5.7     Loans to Company. Nothing in this Operating Agreement shall prevent any Member or Economic Interest Owner from making secured or unsecured loans to the Company by agreement with the Company.

5.8     Accounting Period. The Company's accounting period shall be the Fiscal Year.

ARTICLE 6 - ALLOCATIONS AND DISTRIBUTIONS

6.1     Allocations of Profits and Losses. Except as otherwise provided in this Agreement to the contrary or as determined by the Company's regularly employed accountant in accordance with the applicable law, Net Profits and Net Losses of the Company for each Fiscal Year will be allocated in proportion with the Participating Percentages of the Members and Economic Interest Owners.

6.2     Distributions.

(a)     Subject to the restrictions of Section 6.3, to the extent that the Company reports a Net Profit and said Net Profit is allocated to the Members, then the Company shall be required to distribute to the Members an amount equal to the product of said sum and the sum of the highest federal and applicable state marginal income tax rates. In determining the highest applicable rate, the Company shall apply the rates of the state which taxes a Member at the highest income tax rates. All such distributions shall be made to Members pro rata, in proportion to the amount of profit allocated to each Member.

(b)     Subject to the restrictions of Section 6.3, the Manager, in its sole discretion, may authorize, and the Company may make, additional distributions to the Members and the Economic Interest Owners. The distribution of any Distributable Cash pursuant to this Section 6.2(b) shall be distributed in accordance with the following priority:

(i)     first, repayment of Members' and Economic Interest Owners' loans to the Company, plus any accrued interest.

(ii)     then, payments to the Members and Economic Interest Owners in proportion to their Participating Percentages.

14

AFM000083

(c)     All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members or Economic Interest Owners from the Company shall be treated as amounts distributed to the relevant Member or Economic Interest Owner pursuant to Section 6.2(b).

(d)     Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Member's Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

6.3     Limitation Upon Distributions.

(a)     No distributions or return of Capital Contributions shall be made and paid if, after the distribution or return of Capital Contribution is made, the Company would be insolvent or the net assets of the Company would be less than zero. In addition, no Distributable Cash shall be distributed until all Company's debt is paid in full.

(b)     The Manager may base a determination that a distribution or return of Capital Contribution may not be made as a result of Section 6.3(a) or Section 6.3(b) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the Person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

(c)     No distributions or return of Capital Contributions shall be made or paid if, at the time of the distribution or return of Capital Contribution, the Company is party to an agreement or agreements with third party lenders which prohibit the making or payment of distributions or the return of Capital Contributions. If the Company is a party to an agreement with third party lenders which restricts the time or amount of distributions or return of Capital Contributions, any distributions or return of Capital Contributions shall not be approved, made or paid in excess or in violation of such restrictions.

6.4     Withdrawal or Reduction of Contributions.

(a)     A Member shall not receive out of the Company's property any part of the Member's Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

(b)     A Member, irrespective of the nature of the Member's Capital Contribution, has only the right to demand and receive cash in return for such Capital Contribution.

(c)     Upon a Dissociation of a Member, the purchase of a Membership Interest shall be governed by Article 7.

36898056.1

AFM000084

## ARTICLE 7 - MEMBERSHIP CERTIFICATES AND TRANSFERABILITY

7.1     Certificates for Membership Interest. The Company may issue, in such form as deemed appropriate, membership interest certificates to represent Membership Interests in the Company. Such membership certificates issued shall be signed by such Persons as are authorized by the Manager.

7.2     Restrictions on Transfer. Except as otherwise specifically provided in this Article 7, neither a Member nor an Economic Interest Owner shall have the right to Transfer all or any part of the Member's Membership Interest or the Economic Interest Owner's Economic Interest.

7.3     Transfers on Company Books. All Transfers of whatever nature of interests in the Company shall be made exclusively on the books of the Company in which such Transfers are regularly recorded, and such Transfers may only be made in compliance with the restrictions and requirements established by the Articles of Organization, this Operating Agreement, any agreement entered into by and between the Members, and any provision of the laws of the State of Illinois, as any such restrictions and requirements shall exist from time to time.

7.4     Right of First Refusal.

(a)     If any Member or an Economic Interest Owner (a "Transferring Member") desires to Transfer all or any portion of the Transferring Member's Membership Interest or Economic Interest in the Company (the "Offered Interest") to a third party who is not a Permitted Transferee, the Transferring Member shall first obtain from such third party a bona fide written offer to purchase such Offered Interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered therefor (the "Offer"). The Transferring Member shall give written notification to the remaining Members and the Company of the Transferring Member's intention to Transfer the Offered Interest, furnishing to the remaining Members a copy of the Offer (the "Transfer Notice").

(b)     Upon receipt of a Transfer Notice, the remaining Members, the Manager, and the Company shall have the option to purchase the Offered Interest as follows:

(i)     the Company shall have the right to purchase the Offered Interest for the lower of: (A) the purchase price stated in the Offer; or (B) the Agreed Value. The Company shall exercise its option by giving written notice to the Transferring Member within fifteen (15) days after the end of the Response Period (the "Company Response Period").

(ii)     if the Company shall fail to exercise its right to purchase all of the Offered Interest, then the remaining Members shall, on a basis pro rata to their Membership Units or upon such other basis as they shall mutually agree, have the right to purchase all, or any portion, of the Offered Interest for the lower of: (A) the purchase price stated in the Offer; or (B) the Agreed Value. The remaining Members shall exercise their option by giving written notice to the Transferring Member within forty-five (45) days after receiving the Transfer Notice from the Transferring Member (the "Remaining Members Response Period").

16

(iii)    the failure of the remaining Members and the Company to notify the Transferring Member of their desire to exercise their right to purchase all of the Offered Interest prior to the end of the Remaining Members Response Period shall result in the termination of the right of first refusal under this Section 7.4 and the Transferring Member shall be entitled to consummate the Transfer of the Offered Interest to the third party; provided, that the Transfer shall be consummated within thirty (30) days following the expiration of the Remaining Members Response Period. Any rights a Transferring Member may have as a Member shall terminate upon the consummation of such sale.

(c)    If the remaining Members and/or the Company shall give written notice to the Transferring Member as set forth herein, such parties shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within sixty (60) days after the last such parties have given written notification to the Transferring Member of their respective elections to exercise their right of first refusal to purchase the Offered Interest under this Section 7.4.

(d)    In the event of a purchase of an Offered Interest pursuant to this Section 7.4, the purchase price shall be payable upon the terms set forth in the Offer.

(e)    Notwithstanding any provision in this Section 7.4 to the contrary,

(i)    In the event that, within three (3) years after one or more Members and/or the Company purchases all of the Offered Interest pursuant to this Section 7.4, the remaining Members and Economic Interest Owners sell all or substantially all of their Membership Interests and Economic Interests to a third party for a purchase price in excess of the purchase price paid pursuant to this Section 7.4, after deducting the expenses of sale, at the closing of such sale the Transferring Member shall be paid an amount equal to the difference between (i) the price per Unit at which the Transferring Member sold the Offered Interest to the remaining Members and/or the Company and (ii) the price per Unit paid by the third party for the purchase of all or substantially all of the Units, including all compensation amounts for employment, consulting and non-competition agreements paid to the remaining Members and/or the Company; provided, however, such amount otherwise payable to the Transferring Member hereunder shall be reduced by an amount equal to ten percent (10%) for each year (and a proportionate amount for any period of less than a year) between the closing of the purchase of the Offered Interest and the closing of the purchase by the third party.

(ii)    In the event that, within three (3) years after one or more Members and/or the Company purchases all of the Offered Interest, the Company sells substantially all of the assets of the Company to a third party for a purchase price in excess of the price paid pursuant to this Section 7.4 on a per Unit basis, after deducting the expenses of sale, at the closing of such sale, the Transferring Member shall be paid an amount equal to the difference between (i) the price per Unit at which the Transferring Member sold the Offered Interest to the remaining Members and/or the Company and (ii) the asset purchase price paid by the third party,

17

AFM000086

including all compensation amounts for employment, consulting and non-competition agreements paid to the remaining Members and/or the Company, divided by the number of Units issued and outstanding immediately prior to the sale of the Offered Interest to the remaining Members and/or the Company.

7.5     Transferee Not Member in Absence of Consent.

(a)     Notwithstanding anything to the contrary contained herein if, immediately prior to the Transfer, the Members holding two-thirds (2/3) of the Membership Units of all Members who are not the Transferring Member do not approve, in writing, the proposed Transfer of an Economic Interest or Membership Interest to a non-Member Transferee, then the proposed Transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The Transferee shall be merely an Economic Interest Owner. No Transfer of a Member's interest in the Company shall be effective unless and until written notice (including the name and address of the proposed Transferee and the date of such Transfer) has been provided to the Company and the non-Transferring Member(s).

(b)     Upon and contemporaneously with any Transfer of a Transferring Member's Economic Interest in the Company which does not at the same time Transfer the balance of the rights associated with the Membership Interest of the Transferring Member (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), all remaining rights and interests which were owned by the Transferring Member immediately prior to such Transfer or which were associated with the Transferred Economic Interest shall immediately lapse until either: (i) the written reinstatement of the rights to the transferee Economic Interest Owner by unanimous consent of the remaining Members; or (ii) the written reinstatement of such rights to a successor or Transferee of such Economic Interest Owner by unanimous consent of the remaining Members.

(c)     The restrictions on Transfer contained in this Section 7.5 are intended to comply (and shall be interpreted consistently) with the restrictions on transfer as set forth in the Act.

(d)     As a condition to the recognition by the Company of the effectiveness of a Transfer of a Member's Membership Interest or Economic Interest Owner's Economic Interest in the Company, the Transferring Member, the proposed purchaser, donee or successor-in-interest, as the case may be, shall execute, acknowledge and deliver to the Company such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and shall perform all such other acts which the remaining Members may deem necessary or desirable to:

(i)     verify the Transfer;

(ii)     confirm that the Person desiring to acquire an Economic Interest in the Company, or to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of this

AFM000087

Operating Agreement, (whether such Person is to be admitted as a new Member or an Economic Interest Owner); and

(iii)    assure compliance with any applicable state and federal laws including securities laws and regulations.

(e)    Any permitted Transfer of an Economic Interest or admission of a Member in compliance with this Article 7 shall be deemed effective as of the end of the calendar month in which the remaining Members' consent thereto was given, or, if no such consent was required, then on such date that the donee or successor in interest complies with the conditions set forth in Section 7.5(d). The Transferring Member agrees, upon request of the remaining Members, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the remaining Members from time to time in connection with the Transfer. The Transferring Member hereby agrees to indemnify the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any Transfer or purported Transfer in violation of this Article 7.

7.6    Option Upon Involuntary Transfer.

(a)    If a Member's Membership Interest or Economic Interest is Transferred by operation of law (an "Involuntary Transfer") to any Person other than the Company or a Permitted Transferee (such as but not limited to a Member's trustee in bankruptcy or to a purchaser at any creditor's or court sale) (an "Involuntary Transferee"), the Company, for sixty (60) days following the receipt of actual notice of the Transfer (the "Notice Period"), shall have an option to purchase all or any portion of the Membership Interest or Economic Interest subject to the Involuntary Transfer (the "Involuntarily Transferred Interest"). Such option shall be exercised by written notice to the Member and the Involuntary Transferee. The purchase price of such Involuntarily Transferred Interest by the remaining Members shall be the Agreed Value.

(b)    If the Company fails to exercise its options to purchase all of the Involuntarily Transferred Interest, the remaining Members on a basis pro rata to their Membership Units or upon such other basis they shall mutually agree shall have the right to purchase the remaining Involuntarily Transferred Interest, for the Agreed Value, by giving written notification to the Involuntary Transferee and the Member within thirty (30) days after the expiration of the Notice Period (the "Remaining Members Notice Period").

(c)    In the event of a purchase of a Membership Interest pursuant to this Section 7.6, a portion of the purchase price for such Membership Interest equal to twenty-five percent (25%) thereof shall be paid in cash at the closing of the transaction. The remaining portion of the purchase price shall be deferred and payable, together with interest on the unpaid balance from time to time at the Minimum Rate, in sixty (60) equal installments of principal and interest, the first installment being due and payable on the thirtieth day following the date of closing of the sale, and subsequent installments being due on the same day of each succeeding month until the remaining unpaid balance plus interest accrued thereon has been paid in full. The indebtedness of each purchaser shall be evidenced by

19

AFM000088

his, her or its promissory note payable to the order of the selling party. Each such promissory note shall be in substantially the form set forth in Exhibit B attached hereto.

(d)     The failure of the remaining Members and the Company to notify the Involuntary Transferee of their desire to exercise their rights to purchase the Involuntarily Transferred Interest at or prior to the end of the Remaining Members Notice Period shall result in the termination of the right to purchase and the Involuntary Transferee may retain such Involuntarily Transferred Interest in the form of an Economic Interest, and shall have no right to participate in the management of the business or affairs of the Company or become a Member except as set forth in Section 7.4.

7.7     Options Upon Dissociation. A Member may not withdraw or dissociate from the Company, except as permitted herein. In the event of the Dissociation, for any reason ("Terminating Event"), of any Member (a "Dissociated Member"), the Manager, remaining Members and the Company shall have the option to acquire the Dissociated Member's Membership Interest, including the Economic Interest of each donee of the Dissociated Member as follows:

(a)     The Company shall have the right of first refusal to purchase all, or any portion, of the Membership Interest of the Dissociated Member by giving written notification to the Dissociated Member within ninety (90) days after the Terminating Event (the "Company Response Period").

(b)     If the Company fails to exercise its option, then the remaining Members on a basis pro rata to their Membership Units or upon such other basis they shall mutually agree shall have the right to purchase the remaining Membership Interest of the Dissociated Member by giving written notification to the Dissociated Member within thirty (30) days after the expiration of the Company Response Period (the "Remaining Members Response Period").

(c)     If the remaining Members and/or the Company shall give written notice to the Dissociated Member of their desire to exercise their right to purchase all of the Dissociated Member's Membership Interest, the remaining Members and/or the Company shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within sixty (60) days after the last of the Members and/or the Company has given written notification to the Dissociated Member of the election to exercise their right to purchase or the end of the Remaining Members Response Period, whichever is earlier.

(d)     The purchase price for the entire Membership Interest and/or Economic Interest of a Dissociated Member shall be the Agreed Value.

(e)     In the event of a purchase of a Membership Interest as a result of the Dissociation of a Dissociated Member, a portion of the purchase price for such Membership Interest equal to twenty-five percent (25%) thereof shall be paid in cash at the closing of the transaction. The remaining portion of the purchase price shall be deferred and payable, together with interest on the unpaid balance from time to time at the Minimum Rate, in sixty (60) equal installments of principal and interest, the first installment being

20

AFM000089

due and payable on the thirtieth day following the date of closing of the sale, and subsequent installments being due on the same day of each succeeding month until the remaining unpaid balance plus interest accrued thereon has been paid in full. The indebtedness of each purchaser shall be evidenced by each purchaser's promissory note payable to the order of the selling party. Each such promissory note shall be in substantially the form set forth in Exhibit B attached hereto.

(f) The failure of the remaining Members and the Company to notify the Dissociated Member of their desire to exercise their respective rights to purchase all of the Dissociated Member's Membership Interest prior to the end of the Remaining Members Response Period shall result in the termination of the right to purchase and the Dissociated Member shall retain such Membership Interest, in the form of an Economic Interest, and shall have no right to participate in the management of the business or affairs of the Company or become a Member except as set forth in Section 7.5. The Company shall not be required to purchase the Membership Interest or Economic Interest of a Member in the case of the Dissociation of that Member.

7.8 Agreed Value. The term "Agreed Value" shall mean a Member's proportionate share (determined on the basis of a Member's Participating Percentage of the fair market value of the Company. As of September 30, 2010, the fair market value of the Company was the amount established by the independent valuation performed Clifton Gunderson LLP. This amount shall continue to be the fair market value of the Company until December 31, 2012. Thereafter, the fair market value of the Company shall be determined by using any one of the three following methods that results in the highest value: (i) sixty-five percent (65%) of the total Member's equity reflected on the books and records of the Company, (ii) 25% of the 5-year Average Profit (hereafter defined) of the Company, or (iii) the amount established by an independent certified public accountant pursuant to the methodology and formula, including discounts referenced therein, utilized in the valuation referenced in this Section 7.8. For purposes hereof, the term "5-year Average Profit means the average Net Profit for the five most recent years ending prior to the year in which an event described in this Article 7 has occurred.

## ARTICLE 8 - ADDITIONAL MEMBERS

From the date of the formation of the Company, upon consent of the Manager, a Person may become a Member in this Company either by the issuance by the Company of Membership Interests for such consideration as the Manager determines, or as a transferee of a Member's Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Manager may, at its option, at the time a Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Code Section 706(d) and the Treasury Regulations promulgated thereunder.

36898056.1

AFM000090

## ARTICLE 9 - DISSOLUTION AND TERMINATION

9.1     Dissolution.

(a)     The Company shall be dissolved upon the occurrence of any of the following events:

(i)     when the period fixed for the duration of the Company, if any, shall expire pursuant to Section 2.5 hereof;

(ii)     by the written agreement of Members holding two- thirds (2/3) of the Membership Units; or

(iii)     upon the occurrence of an event causing dissolution as specified in the Act.

(b)     The Dissociation of a Member shall not constitute a dissolution of the Company.

(c)     Unless otherwise approved by Members owning a Majority Interest, a Member who resigns (a "Resigning Member") or whose Membership Interest is otherwise terminated by virtue of a Dissociation, shall not be entitled to receive any liquidating distributions in excess of those distributions to which such Member would have been entitled had such Resigning Member remained a Member. Except as otherwise expressly provided herein, a Resigning Member shall immediately become an Economic Interest Owner.

9.2     Dissolution and Liquidation of Assets.

(a)     Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

(b)     If the Company is dissolved and its affairs are to be wound up, the Manager shall:

(i)     sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Manager may determine to distribute any assets to the Members in kind);

(ii)     allocate any profit or loss resulting from such sales to the Members' and Economic Interest Owners' Capital Accounts in accordance with Article 5 hereof;

(iii)     discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners

22

AFM000091

for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent claims or liabilities of the Company, provided that for purposes of determining the Capital Accounts of the Members and Economic Interest Owners, the amounts of such Reserves shall be deemed to be an expense of the Company.

(c)     If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the holders of a Majority Interest. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of <u>Section 5.3</u> and <u>Section 5.5</u> of this Operating Agreement to reflect such deemed sale.

(d)     The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Manager, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to <u>Section 9.2(c)</u>. Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(e)     Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(f)     The Manager shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

9.3     <u>Articles of Dissolution</u>. When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, articles of dissolution as required by the Act, shall be executed in duplicate and filed with the Illinois Secretary of State.

9.4     <u>Effect of Filing of Articles of Dissolution</u>. Upon the filing of Articles of Dissolution with the Illinois Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other Proceedings and appropriate action as provided in the Act. The Manager shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

36898056.1

AFM000092

9.5    Assets Distributed on Dissolution. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Member's Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one (1) or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

## ARTICLE 10 - MISCELLANEOUS

10.1    Waiver of Conflict of Interest. The law firm of Hamilton Thies Lorch LLP hereby discloses to the parties its potential conflicts of interest arising from the negotiation of this Operating Agreement and all documents related thereto and arising from the organization and operation of the Company, which may include without limitation conflicts regarding management, voting, and distributions. Hamilton Thies Lorch LLP represents the Company with regard to all such matters, and Hamilton Thies Lorch LLP has urged all other Members to seek independent representation. The Members and the Company acknowledge that they have been advised of all conflicts of interest arising from the representation. The parties hereby waive any conflict of interest resulting from the past, current and future representation provided by Hamilton Thies Lorch LLP to the Company in both matters related and unrelated to this Operating Agreement.

10.2    Notices. Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if: (a) delivered personally to the party or to an officer of the party to whom the same is directed; or (b) sent by facsimile transmission, receipt of which is acknowledged by the recipient by customary fax receipt acknowledgment and by sending a copy of such notice, demand and communication by regular mail; or (c) sent by registered or certified mail, postage and charges prepaid; or (d) sent by recognized overnight delivery service (e.g., FedEx or UPS), charges prepaid, in any case addressed to the Member's and/or Company's address, as appropriate, which addresses are set forth in this Operating Agreement. Except as otherwise provided herein, any such notice shall be deemed to be given two (2) business days after the date on which the same was deposited in the United States mail, or one (1) business day after the date on which the same was deposited with an overnight delivery service for next business day delivery, in either case addressed and sent as aforesaid or, if by telefax as above provided, then any such notice shall be deemed to be given at the time of the fax receipt acknowledgment.

10.3    Application of Illinois Law. This Operating Agreement and its interpretation shall be governed exclusively by its terms and by the laws of the State of Illinois, and specifically the Act.

10.4    Arbitration/No Lawsuits. Other than equitable relief, any controversy or claim arising out of, or relating to, this Operating Agreement, or its breach, shall be settled by arbitration. The panel of arbitrators shall be composed of three (3) Persons, one of whom shall be selected by each of the parties. Such selection of arbitrators shall be made within thirty (30) days after the date on which the parties agree that they will be unable to agree as to the settlement of the controversy or claim. The third arbitrator shall be Dominic Maduri or, in the event Dominic Maduri is unavailable, by an arbitrator appointed by the American Arbitration Association. The decision of a majority of the panel of arbitrators shall be final, conclusive and binding upon the parties hereto

36898056.1

AFM000093

and not subject to judicial review and judgment on the decision rendered may be entered in any court having jurisdiction. Except as provided herein, the arbitration shall be governed in accordance with the rules of the American Arbitration Association. Except for claims to enforce a non-competition restriction, the parties to this Operating Agreement agree that they will not institute any lawsuit against any other party to this Operating Agreement relating to any controversy, claim, or alleged breach to this Operating Agreement.

10.5    Equitable Relief. As the rights and obligations of the parties are unique and damages cannot be readily measured, irreparable damage would result in the event this Operating Agreement is not specifically enforced. The rights and obligations of the parties shall be enforceable in a court of equity by a decree of specific performance, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedy and all other remedies provided for in this Operating Agreement shall, however, be cumulative and not exclusive and shall be available in addition to any other remedies which any party may have under this Operating Agreement or otherwise.

10.6    Waiver of Action for Partition. Each Member and Economic Interest Owner irrevocably waives during the term of the Company's existence any right that it may have to maintain any action for the partition with respect to the property of the Company.

10.7    Attorney Fees. In the event any party hereto commences litigation or arbitration for the judicial interpretation, enforcement, termination, cancellation or rescission of this Operating Agreement, or for damages for the breach hereof, then, in addition to any or all other relief awarded in such litigation or arbitration, the prevailing party therein shall be entitled to a judgment against the other for an amount equal to reasonable attorneys' fees, court costs, arbitration fees and expenses, and other costs incurred (including paralegal, legal assistant and computerized legal research fees). For purposes of this Section, "prevailing party" shall mean, in the case of the claimant, one who is successful in obtaining substantially all relief sought, and in the case of the defendant or respondent, one who is successful in denying substantially all of the relief sought by the claimant.

10.8    Amendments. This Operating Agreement may not be amended except in a writing signed by the holders of two-thirds (2/3) of the Membership Units.

10.9    Execution of Additional Instruments. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments as are necessary to comply with any laws, rules or regulations.

10.10   Construction. Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

10.11   Headings. The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

10.12   Waivers. The failure of any party to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a

AFM000094

subsequent act, which would have originally constituted a default, from having the effect of an original default.

10.13 <u>Rights and Remedies Cumulative</u>. The rights and remedies provided by this Operating Agreement are cumulative and the use of any individual right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have.

10.14 <u>Severability</u>. If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application of the provisions hereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

10.15 <u>Heirs, Successors and Assigns</u>. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

10.16 <u>Creditors.</u> None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

10.17 <u>Incorporation of Recitals</u>. The Recitals contained herein are hereby incorporated and made a part of the terms and mutual covenants and agreements contained in this Operating Agreement.

10.18 <u>Counterparts</u>. This Operating Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

10.19 <u>Entire Agreement</u>. This Operating Agreement constitutes the entire agreement of the parties, and it merges and supersedes all prior discussions and agreements among them with respect to the subject matter hereof.

36898056.1

AFM000095

The parties have executed this Operating Agreement as of the date first above written.

**COMPANY:**

GRECO FAMILY HOLDINGS LLC,
an Illinois limited liability company

By: _____
Name: Eduardo E. Greco
Its:    Manager

Signature Page

AFM000096

**MEMBERS:**

Eduardo E. Greco, Trustee of the Eduardo E.
Greco Revocable Trust u/a/d 11/14/96

Pasquale F. Greco (aka Pasquale F. Greco II),
Trustee of the Pasquale F. Greco Trust u/a/d
September 29, 2003

Gian Greco, Trustee of the Gian Greco Trust u/a/d
September 25, 2003

Roberto Greco, Trustee of the Roberto Greco
Trust u/a/d September 25, 2003

Francesca C.M. Greco-Jaffe, Co-Trustee of the
Francesca C.M. Greco-Jaffe GSI Irrevocable
Trust dated 12/18/02

Dominic S. Maduri, Co-Trustee of the Francesca
C.M. Greco-Jaffe GSI Irrevocable Trust dated
12/18/02

Gian F. Greco, Co-Trustee of the Pasquale P.
Greco GSI Irrevocable Trust u/a/d 12/18/02

Dominic S. Maduri, Co-Trustee of the Pasquale P.
Greco GSI Irrevocable Trust u/a/d 12/18/02

Gian F. Greco, Co-Trustee of the Gina V. Greco
GSI Irrevocable Trust u/a/d 12/18/02

Dominic S. Maduri, Co-Trustee of the Gina V.
Greco GSI Irrevocable Trust u/a/d 12/18/02

Signature Page

AFM000097

Gian F. Greco, Co-Trustee of the Eduardo E.
Greco, Jr. GSI Irrevocable Trust u/a/d 12/18/02

Dominic S. Maduri, Co-Trustee of the Eduardo E.
Greco, Jr. GSI Irrevocable Trust u/a/d 12/18/02

Gian F. Greco, Co-Trustee of the Roberto Greco
Irrevocable Trust II u/a/d 12/16/98

Dominic S. Maduri, Co-Trustee of the Roberto
Greco Irrevocable Trust II u/a/d 12/16/98

Gian F. Greco, Co-Trustee of the Pasquale F.
Greco Irrevocable Trust II u/a/d 12/16/98

Dominic S. Maduri, Co-Trustee of the Pasquale F.
Greco Irrevocable Trust II u/a/d 12/16/98

Gian F. Greco, Co-Trustee of the Eduardo E. Greco
Irrevocable Trust II u/a/d 12/16/98

Dominic S. Maduri, Co-Trustee of the Eduardo E.
Greco Irrevocable Trust II u/a/d 12/16/98

Pasquale F. Greco II, Co-Trustee of the Gian F.
Greco Irrevocable Trust II u/a/d 12/16/98

Dominic S. Maduri, Co-Trustee of the Gian F.
Greco Irrevocable Trust II u/a/d 12/16/98

Pasquale F. Greco II, Co-Trustee of the Francesca
C.M. Greco-Jaffe Irrevocable Trust II u/a/d
12/16/98

Dominic S. Maduri, Co-Trustee of the Francesca
C.M. Greco-Jaffe Irrevocable Trust II u/a/d
12/16/98

Signature Page

AFM000098

## EXHIBIT A
## MEMBER INFORMATION

| Member's Names | Membership Units | Participating Percentage |
|---|---|---|
| Eduardo E. Greco, Trustee of the Eduardo E. Greco Revocable Trust u/a/d 11/14/96 | 35 | 35% |
| Pasquale F. Greco (aka Pasquale F. Greco II), Trustee of the Pasquale F. Greco Trust u/a/d 9/29/03 | 10 | 10% |
| Gian Greco, Trustee of the Gian Greco Trust u/a/d 9/25/03 | 10 | 10% |
| Roberto Greco, Trustee of the Roberto Greco Trust u/a/d 9/25/03 | 10 | 10% |
| Francesca C.M. Greco-Jaffe and Dominic S. Maduri, Co-Trustees of the Francesca C.M. Greco-Jaffe GSI Irrevocable Trust dated 12/18/02 | 10 | 10% |
| Gian F. Greco and Dominic S. Maduri, Co-Trustees of the Pasquale P. Greco GSI Irrevocable Trust u/a/d 12/18/02 | 5 | 5% |
| Gian F. Greco and Dominic S. Maduri, Co-Trustees of the Gina V. Greco GSI Irrevocable Trust u/a/d 12/18/02 | 5 | 5% |
| Gian F. Greco and Dominic S. Maduri, Co-Trustees of the Eduardo E. Greco, Jr. GSI Irrevocable Trust u/a/d 12/18/02 | 5 | 5% |
| Gian F. Greco and Dominic S. Maduri, Co-Trustees of the Roberto Greco Irrevocable Trust II u/a/d 12/16/98 | 2 | 2% |
| Gian F. Greco and Dominic S. Maduri, Co-Trustees of the Pasquale F. Greco Irrevocable Trust II u/a/d 12/16/98 | 2 | 2% |
| Gian F. Greco and Dominic S. Maduri, Co-Trustees of the Eduardo E. Greco Irrevocable Trust II u/a/d 12/16/98 | 2 | 2% |

Exhibit A

AFM000099

| | | |
|---|---|---|
| Pasquale F. Greco II and Dominic S. Maduri, Co-Trustees of the Gian F. Greco Irrevocable Trust II u/a/d 12/16/98 | 2 | 2% |
| Pasquale F. Greco II and Dominic S. Maduri, Co-Trustees of the Francesca C.M. Greco-Jaffe Irrevocable Trust II u/a/d 12/16/98 | 2 | 2% |

Exhibit A

AFM000100

# EXHIBIT B

## INSTALLMENT PROMISSORY NOTE

(insert closing date)

_____, 20____

     FOR VALUE RECEIVED, on or before _____ *(insert final installment date)* the undersigned promises to pay to the order of _____ *(insert name of selling party)* the principal sum of _____ ($_____ *(insert amount of deferred portion of the purchase price)*, together with interest from the date hereof at the rate of _____ percent (_____%) per annum on the principal balance from time to time unpaid. The said principal and interest shall be payable in installments as hereinafter provided.

     (a)    Commencing on _____, 20___ (insert date 30 days following closing or other agreed upon payment date), and on the day of each month thereafter for consecutive months to and including _____, 20___, the sum of _____ ($_____ shall be payable, said sum to be applied first to accrued and unpaid interest and thereafter to principal.

     (b)    The entire unpaid balance of principal together with accrued and unpaid interest thereon shall be payable on _____, 20___ *(insert the month following the last monthly installment under (a))*.

     At the option of the undersigned, at any time or times during the term of this Note, all or any portion of the unpaid principal sum and accrued interest on this Note may be prepaid without premium or penalty, the amount of the prepayment to be applied first to accrued interest and the remainder to the unpaid principal. If the undersigned so designates in a written prepayment notice delivered to the holder of this Note concurrently with the making of the prepayment, the amount of the monthly installments shall be reduced by recomputing the monthly installment amount required to amortize the remaining principal balance together with interest as aforesaid over the period remaining to the original maturity date. If no such prepayment notice is so delivered, the same installment amounts stated above shall continue to be payable on the dates designated until such time as the entire principal sum, together with all accrued interest, is paid, at which time this Note shall be paid in full. In such case, the portion of each of the installment amounts attributable to principal shall be recomputed in order to adjust for the decreased interest payable on the reduced unpaid principal balance.

     At the election of the holder or holders hereof, upon notice to the maker, the principal sum remaining unpaid hereon, together with accrued and unpaid interest thereon, shall become at once due and owing.

     The maker hereby waives presentment for payment, notice of dishonor protest and notice of protest.

_____

*(Signature of Purchasing Party)*

Exhibit B

# OPERATING AGREEMENT
## OF
## GRECO PG FIVE LLC

This Agreement is made and entered into as of the 16th day of December, 1998 (the "Effective Date"), by and among Eduardo E. Greco, (the "Manager"), and the persons whose names are set forth on the signature page of this Agreement and designated thereon as "Members" (the Members are sometimes referred to herein collectively as the "Members" or the "parties" or individually as a "Member" or a "party").

## WITNESSETH:

WHEREAS, the parties hereto are desirous of creating a limited liability company under the laws of the State of Illinois;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties, the parties agree as follows:

## ARTICLE I
## Formation of Company

**1.1 Statutory Authority.** The parties by these presents do hereby agree to form a limited liability company (the "Company") under and pursuant to the provisions of the Illinois Limited Liability Company Act, as amended from time to time (805 ILCS 180/1-1 et seq.) (the "Act"). The rights and obligations of the Company and the Members shall, except as otherwise provided herein, be governed by the Act.

**1.2 Filings.** Concurrently with the execution of this Agreement, the Manager shall execute and file Articles of Organization conforming to the requirements of the Act in the Office of the Secretary of State of the State of Illinois (the "Office of the Secretary of State"), and the Manager shall make such other filings and recordings and do such other acts and things conforming thereto as shall constitute compliance with all requirements for the formation of a limited liability company under the Act and the laws of such other states in which the Company elects to do business.

## ARTICLE II
## Name

The name of the Company shall be the name set forth in the heading of this Agreement. The affairs of the Company shall be conducted under the Company name or such other name as the Manager may, in its discretion, select in accordance with the Act. The Manager shall execute and file with the proper offices any and all certificates required by the fictitious name or assumed name statutes of the states in which the Company elects to do business. The Company shall have the exclusive ownership of and

right to use the Company name (and any name under which the Company shall elect to conduct its affairs) as long as the Company continues.

## ARTICLE III
### Character of the Business

The purpose of the Company shall be to carry on the business of making, protecting, enhancing and otherwise dealing, directly or indirectly, with investments of any type, including securities of all types, acquiring, owning, leasing, operating and selling businesses and/or property, real and personal and wheresoever located, and to engage in any one or more enterprises, ventures, undertakings and businesses permitted under the Act. The Company shall have the power to do all acts and things necessary or useful in connection with the foregoing.

## ARTICLE IV
### Offices, Records and Agents

**4.1 Principal Office of the Company.** The principal office of the Company shall be located at 280 Westgate, Carol Stream, Illinois, 60187, or at such other place within or outside Illinois as the Manager may from time to time designate. The Company may have subsidiary offices in such other place or places as may be selected from time to time by the Manager.

**4.2 Records to be Maintained.** The Manager shall at all times keep at the Company's principal office such information and records as are specified in the Act.

**4.3 Registered Office and Registered Agent.** The Company's registered office in Illinois shall be located at 4440 West Lincoln Highway, Suite 301, Matteson, Illinois 60443, and the name of the registered agent for service of process at such office shall be Joseph A. Zarlengo. The Manager may from time to time in accordance with the Act change the Company's registered office and/or registered agent. The Manager shall select and designate a registered office and registered agent for the Company in each state in which the Company is required to maintain or appoint one.

## ARTICLE V
### Term of Existence and Termination of the Company

**5.1 Term of Existence of the Company.** The term of existence of the Company shall commence upon the filing of the Articles of Organization of the Company with the Office of the Secretary of State and shall, subject to Section 5.2, continue until December 31, 2048.

**5.2 Termination.** The Company shall terminate prior to the time set forth in Section 5.1:

AFM000103

(a) Upon the sale or other disposition of all or substantially all of the Company's non-cash assets; provided, however, that this Agreement generally and Article XII in particular shall govern the conduct of the parties during the winding up of the Company.

(b) By unanimous consent of all the Members holding a 100% of the Percentage Interests executing an instrument (or counterpart thereof) so stating; provided, however, that this Agreement generally and Article XII in particular shall govern the conduct of the parties during the winding up of the Company.

(c) On the 90th day after notice by the Manager to each Member of the Manager's intent to terminate; provided that the Company shall not so terminate if Members holding not less than 100 percent of the Percentage Interests have within 30 days of such notice given the Manager written notice of their objections.

## ARTICLE VI
## Contributions to Capital

**6.1 Capital Contributions**. On or before the Effective Date, each Member shall contribute to the capital of the Company the amount of money or property set forth or described under the heading "Capital Contribution" opposite that Member's signature hereto.

**6.2 Additional Capital Contributions**. Except as set forth in this Section 6.2 or as required by the Act, no Member shall be assessed for additional capital contributions.

(a) The Members may, by unanimous agreement, at any time or from time to time, make additional capital contributions to the Company.

(b) The respective capital accounts of the Members shall be adjusted in proportion to additional capital contributions.

**6.3 Defaulting Members**. The Company shall be entitled to enforce the obligations of each Member to make the contributions specified in this Article VI, and the Company acting at the direction of the Manager shall have all remedies available at law or in equity in the event any such contribution is not so made. The Company shall be entitled to recover the reasonable attorneys' fees and other costs of enforcing the Members' obligations under this Article VI, and shall also be entitled to recover interest on any unpaid contributions at the highest rate permitted by law.

## ARTICLE VII
## Allocations and Distributions

**7.1 Books of Account.**
(a) At all times during the continuance of the Company, the Manager shall cause proper and true books of account to be maintained in conformity with generally

3

AFM000104

accepted accounting principles consistently applied wherein there shall be entered particulars of all transactions, matters and things relating to the business of the Company as are usually entered in books of account kept by persons engaged in a business of like kind and character.

(b) The books of account shall be closed promptly after the end of each calendar year (which shall be the Company's "Fiscal Year") and an annual review shall be performed at the expense of the Company by a certified public accountant selected by the Manager. Promptly thereafter, a written report shall be given to each Member, which shall include a balance sheet of the Company as of the end of such Fiscal Year, a statement of income and expenses for such Fiscal Year, a statement of changes in Members Capital Accounts and such statements with respect to the status of the Company and the allocation of profits and losses as shall be necessary to advise all Members properly about their investment in the Company.

(c) Promptly after the close of the Fiscal Year, the certified public accountant engaged to conduct the Company's annual review shall prepare such income tax and other returns required under applicable law and regulation, including any and all statements necessary to advise all Members promptly about their investment in the Company for Federal income tax reporting purposes. The Manager shall be responsible for the prompt filing and delivery of all such returns and statements. All elections and options available to the Company for tax purposes shall be taken or rejected by the Company in the sole discretion of the Manager, except that in the case of a distribution of property made in the manner provided in Section 734 of the Internal Revenue Code of 1986, as amended (the "Code"), or in the case of a transfer of any interest in the Company permitted by this Agreement made in the manner provided in Code Section 743, the Company shall upon the request of any Member (including the Manager) file an election under Code Section 754 in accordance with the procedures set forth in the applicable Treasury Regulations.

**7.2 Capital Accounts.** As part of the Company's books of account, an individual "Capital Account" shall be maintained for each Member at all times in accordance with generally accepted accounting principles, consistently applied.

**7.3 Percentage Interests.**

(a) The Percentage Interest of each Member is set forth opposite its signature hereto.

(b) In the event of any changes in any Member's Percentage Interest during the Fiscal Year, the Manager shall take into account the requirements of Code Section 706(d) and shall have the right to select any method of determining the varying interests of the Members during the Fiscal Year which satisfies Code Section 706(d).

**7.4 Profit and Loss Allocations.** The net profit or net loss of the Company, determined on an annual basis in accordance with generally accepted accounting principles, shall be allocated in accordance with the Members' Percentage Interests.

4

AFM000105

**7.5 Tax Allocations.** Except as otherwise required by the Code or the Treasury Regulations promulgated thereunder, income, gain, loss, deduction, credit and other items, as computed for Federal income tax purposes, shall be allocated among the Members in the same manner as the corresponding book items are allocated pursuant to Section 7.4.

**7.6 Distributions of Cash Flow.** Unless otherwise agreed to by unanimous vote of the Members, the Manager shall cause the Company to distribute its net Cash Flow to the Members from time to time, first to the Members who contributed capital to the Company, in proportion to the respective amounts contributed by each, and second, after the capital contribution has been returned to each Member as aforesaid, then to all of the Members in proportion to the Members' respective Membership Interest. The "cash flow" of the Company for any Fiscal Year shall consist of all cash received by the Company during that Fiscal Year from any source (other than proceeds from the sale, exchange or other disposition of all or substantially all of the non-cash assets of the Company, which shall be distributed in accordance with Article XII), less cash expended for the debts and expenses of the Company, principal payments on any indebtedness of the Company, capital expenditures and reasonable reserves otherwise required for the Company business as determined by the Manager.

### ARTICLE VIII
### Rights, Duties, Liabilities and
### Restrictions of the Manager

**8.1 Responsibility of the Manager.** The Members do hereby elect «Manager» as · Eduardo E. Greco
Manager of the Company. The Manager shall serve until his resignation, removal from office or inability to serve. The Manager shall have the sole and exclusive right to manage, control and conduct the affairs of the Company and to do any and all acts on behalf of the Company. The Manager shall make all decisions affecting the affairs and business of the Company to the best of its ability and shall use its best efforts to carry out the purposes of the Company as set forth herein.

**8.2 Authority of Manager.** Except as herein expressly restricted, the Manager shall have all the rights and powers permitted under the applicable provisions of the Act. The Manager has the absolute authority to sell, exchange, mortgage, pledge or otherwise transfer or encumber all or substantially all of the Company's assets, including in a transaction that is not in the ordinary course of business. Nothing herein contained shall impose any obligation on any person or firm doing business with the Company to inquire as to whether or not the Manager has exceeded its authority in executing any contract, lease, mortgage, security agreement, deed or other instrument on behalf of the Company, and any such third person shall be fully protected in relying upon such authority.

**8.3 Bank Accounts.** All funds of the Company shall be deposited in the Company name in such bank account or accounts as shall be designated by the Manager from time

5

AFM000106

to time. All withdrawals therefrom shall be made upon the signature of such person or persons as the Manager may designate.

**8.4 Proscriptions.** Without the written consent or ratification of all of the Members, the Manager shall have no authority to expend or use Company money or property other than on the account and for the benefit of the Company or to pledge any of the Company's credit or property for other than Company purposes.

**8.5 Management Fees.** During the term of the Company, the Manager shall be entitled, in addition to the share of profits, distributions and reimbursements provided elsewhere in this Agreement, to a reasonable management fee.

**8.6 Expenditures by Manager.** The Company shall reimburse the Manager for any costs that may be properly expended by the Manager on behalf of the Company. The Company shall pay compensation for accounting, administrative, legal, technical and management services rendered to the Company. All of the aforesaid expenditures shall be made on behalf of the Company and each Member, including the Manager, shall be entitled to reimbursement by the Company for any expenditures incurred by such Member on behalf of the Company which is made other than out of funds of the Company.

**8.7 Potential Conflicts.** The Manager shall cause so much time to be devoted to the business of the Company as, in its judgment, the conduct of the Company's business shall reasonably require. Any Member (including the Manager) may engage in business ventures of any nature and description independently or with others, including, but not limited to, business of the character described in Article III (or any part thereof), and neither the Company nor any of the Members shall have any rights in or to such independent ventures or the income or profits derived therefrom. Nothing in this Agreement shall obviate any state law fiduciary duties by which the Manager is otherwise bound.

**8.8 Liability of Manager.** The Manager (which for purposes of this Section 8.8 and Section 8.9 shall include its partners, officers, directors, shareholders, members, managers, employees, agents and affiliates) shall not be liable to a Member or the Company for honest mistakes of judgment, or for action or inaction, taken reasonably and in good faith for a purpose that was reasonably believed to be in the best interests of the Company, or for losses due to such mistakes, action or inaction, or for the negligence, dishonesty or bad faith of any employee, broker or other agent of the Company, provided that such employee, broker or agent was selected, engaged or retained and supervised with reasonable care. The Manager may consult with counsel and accountants in respect of Company affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, provided that they shall have been selected with reasonable care. The Members shall look solely to the assets of the Company for the return of their capital and, if the assets of the Company remaining after payment or discharge of the debts and liabilities of the Company are

6

AFM000107

insufficient to return such capital, they shall have no recourse against the Manager for such purpose.

Notwithstanding any of the foregoing to the contrary, the provisions of this Section shall not be construed to relieve (or attempt to relieve) any person of any liability by reason of gross negligence, recklessness or intentional wrongdoing or to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Section to the fullest extent permitted by law.

### 8.9 Resignation and Removal of Managers.

(a) A Manager may resign at any time by giving written notice to the Company in care of the remaining Managers (or if there are no remaining Managers to the Members). The resignation shall be effective upon receipt unless a future effective date is set forth in the notice of registration. The pending vacancy may be filled before the effective date, but the successor shall not take office until the effective date.

(b) Vacancies created by the resignation or death of a Manager may be filled by the vote of the Members holding a majority of the Percentage Interests of the Company.

(c) Any Manager or Managers may be removed from office, with or without cause, by the written consent of the Members holding two-thirds of the Percentage Interests in the Company.

(d) If any Manager or Managers are removed, new Managers may be elected at the same meeting of the Members for the unexpired term of the Manager or Managers removed.

**8.10 Indemnification.** The Company shall indemnify every person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding (other than an action by or in the right of the Company), whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a manager, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, officer, manager, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with the action, suit or proceeding, if the person acted in good faith and in a manner the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner that the person reasonably believed to be in, or not opposed to, the

7

AFM000108

best interests of the Company or, with respect to any criminal action or proceeding, that the person had reasonable cause to believe that the person's conduct was unlawful.

**8.11    Tax Matters Partner.**  The Manager shall be the Company's Tax Matters Partner as defined in Code Section 6231(a)(7).

**ARTICLE IX**
**Liability of Members**

**9.1 No Control by the Members.**  Except for the Manager, the Members shall take no part in the control or management of the affairs of the Company, nor shall a Member have any authority to act for or on behalf of the Company or to sign for or bind the Company.

**9.2 Liability.**  No Member shall be personally liable for any of the debts of the Company or any of the losses thereof beyond the amount contributed or required to be contributed by it to the Company under this Agreement and as otherwise specified in the Act.

**9.3 Trustee Liability.**

(a)  When this Agreement is executed by the trustee of any trust, such execution is by the trustee, not individually, but solely as trustee in the exercise and under the power of authority conferred upon and vested in such trustee, and it is expressly understood and agreed that nothing herein contained shall be construed as creating any liability on the part of any such trustee personally to pay any amounts required to be paid hereunder, or to perform any covenant, either express or implied, contained herein, all such liability, if any, being expressly waived by the parties hereto by their execution hereof.  Any liability of any Member which is a trust to the Company or to any third person shall be only that of such trust to the full extent of its trust estate and shall not be a personal liability of any trustee, grantor or beneficiary thereof.

(b)  Any successor trustee or trustees of any trust which is a Member herein shall be entitled to exercise the same rights and privileges and be subject to the same duties and obligations as his predecessor trustee.  As used in this Agreement, the term "trustee" shall include any or all such successor trustees.

**ARTICLE X**
**Admission of Additional Members; Assignment Provisions**

**10.1    Admission of Additional Members.**

(a) The Manager may admit one or more additional Members or sell additional Member interests to current Members upon executing an appropriate amendment hereto.

(b) Upon the admission of one or more additional Members, the Manager is authorized to adjust the Percentage Interests of the Members to reflect the dilution

8

AFM000109

required to admit such additional Members. Any such dilution shall be in proportion to the Members' Percentage Interests. The Percentage Interest to be granted to a newly admitted Member shall take due account of the value of the additional Member's capital contribution and commitment in relation to the value of Company property upon admission.

(c) Additional Members shall be entitled to all of the rights and privileges of the original Members hereunder and shall be subject to all of the obligations and restrictions hereunder, and in all other respects their admission shall be subject to all of the terms and provisions hereof; provided, however, that allocations to the additional Members for the Fiscal Year of their admission to the Company shall be determined in accordance with Section 7.3(b).

**10.2  Transfers by the Manager.**
(a)  The Manager's interest in the Company is that of an agent of the Company and is not susceptible of being sold, assigned, pledged, mortgaged or otherwise disposed of or transferred. Insofar as the Manager may also be a Member, Section 10.3 shall govern the transfer of the Manager's membership interest.

**10.3  Transfers by Members.**
(a)  The death, retirement, resignation, expulsion, bankruptcy (under the Federal Bankruptcy Code of 1978, as amended), court declaration of incompetency with respect to, dissolution or liquidation of a Member (other than the Manager, in which case Section 5.2(b) shall apply) shall not dissolve the Company, but it shall be continued with the successor or legal representative of the Member who died, became incapaci-tated, bankrupt, insolvent, dissolved or liquidated; such person shall, to the extent of the interest acquired, be entitled only to the predecessor Member's rights, if any, in the capital, profits and losses and distributions of the Company, and no such person shall have any right to participate in the management of the affairs of the Company or vote on any Company matter without the consent of the Manager.

(b) Except as provided in paragraphs (c) and (d), no Member shall sell, assign, pledge, mortgage or otherwise dispose of or transfer its interest in the Company without the prior written consent of the Manager.

(c) Notwithstanding anything set forth herein to the contrary, a Member may transfer all or part of his interest in the Company to his spouse, siblings or lineal descendants (collectively his "Family Members") or to one or more trusts or other entities created for the benefit of a Member or his Family members; provided, that such transfer will not constitute a default under any mortgage, lease or other material agreement to which the company is party.

(d) (i) If any Member shall receive a bona fide written offer (the "Offer") to sell for cash all (but not less than all) of its interest in the Company (the "Offered Interest"), and such Member desires to sell the Offered Interest, such Member (the

9

"Selling Member") shall promptly furnish the Manager and each Member with notice thereof (the "Option Notice"), as well as a copy of the Offer.

(ii)  The Company shall have the right and option (the "Primary Option") to purchase all or any portion of the Offered Interest upon the express terms and conditions and at the purchase price set forth in the Offer, said Primary Option being exercised by notice to the Selling Member given within 20 days of the Manager's receipt of the Option Notice.  If the Company does not elect to purchase all of the Offered Interest by notice to the Selling Member within said 20 day period, the Manager shall so advise all of the other Members and the Members shall thereupon have the right and option (the "Secondary Option"), and each Member may elect, by written notice to the Manager and the Selling Member on or before the 45th day following receipt of the Option Notice, to purchase that portion of the Offered Interest which the Company has not elected to acquire pursuant to the Primary Option upon the express terms and conditions and at the purchase price set forth in the Offer (the "Secondary Option").  Said notice from a Member to the Manager and the Selling Member shall specify the maximum amount of the remaining Offered Interest which the Member would like to acquire.  The portion of the remaining Offered Interest which may be acquired by each Member shall be determined by the Manager ratably according to the relative maximum amounts that the Members propose to acquire in their notices to the Manager and the Selling Member.  No Member, however, shall be required to acquire more than the maximum portion of the remaining Offered Interest that it proposed to acquire.  If pursuant to the foregoing sentences the Members do not elect to acquire all of the remaining Offered Interest, the Company shall have a further option, which shall continue through the closing date hereafter specified, to acquire such portion of the remaining Offered Interest which is not acquired by the Members.

(iii)  If the Company and/or any one or more or all of the Members elect to exercise their respective options to acquire the entire Offered Interest, the Selling Member shall sell and assign the Offered Interest to the Company and/or the Members, in the proportions described above, which sale and assignment shall be closed at the Company's principal office at any time on or before the 60th day following the Manager's receipt of the Option Notice or on such later date certain for closing contained in the Offer, as the Manager may select.

(iv)  In the event that the Company and Members do not in the aggregate purchase all of the Offered Interest as described above, the right of first refusal options provided to the Company and the Members in this paragraph shall be deemed to have lapsed and expired.  Thereupon the Selling Member shall be entitled to sell and assign the Offered Interest to the offeror, provided such sale or assignment (A) would not (i) result in a termination of the Company for Federal income tax purposes, (ii) result in the Company not qualifying for an exemption from the registration requirements of any applicable Federal or state securities laws, (iii) result in any violation of any applicable Federal or state securities laws, (iv) result in a default under or the acceleration of any indebtedness of, or secured by assets of, the Company, (v) result

10

AFM000111

in the Company having to register as an investment company under the Investment Company Act of 1940, as amended, or (vi) require the Company, the Manager or any affiliate to register as an investment advisor under the Investment Advisers Act of 1940, as amended, (B) is consummated pursuant to all of the terms and conditions set forth in the Offer, including but not limited to the purchase price and terms of payment for the Offered Interest, or on terms and conditions not more favorable to the offeror purchaser, and (C) is closed within 65 days of the date the Offer was originally received by the offeree Member or on such later date certain for closing contained in the Offer. The purchaser of the Offered Interest shall, to the extent of the interest acquired, be entitled only to the predecessor Member's rights, if any, in the capital, profits and losses and distributions of the Company, and no such person shall have any right to participate in the management of the affairs of the Company or vote on any Company matter without the consent of the Manager.

**10.4    General Provisions.**  The following rules shall apply to transfers of Company interests and the admission of additional persons to the Company:

(a)  No person shall be admitted as an additional Member hereunder unless and until (i) in the case of an assignment of an interest in the Company permitted hereby, the assignment is made in writing, signed by the assignor and accepted in writing by the assignee, and a duplicate original of the assignment is delivered to and accepted by the Manager, (ii) the prospective Member executes and delivers to the Company a written agreement, in form and substance satisfactory to the Manager, pursuant to which said person agrees to be bound by and confirms the covenants, representations and warranties contained herein and (iii) an appropriate amendment hereto is executed and, if required, filed of record.

(b)  Any person acquiring or claiming an interest in the Company, in any manner whatsoever, shall be subject to and bound by all terms, conditions and obligations hereof to which its predecessor in interest, if any, was subject or bound, without regard to whether such person has executed a counterpart hereof or any other document contemplated hereby.  Notwithstanding anything else contained in this Agreement, an assignee of an interest in the Company shall only be entitled to a share of the Company's profits, losses and distributions, and shall acquire the rights of a Member, until the requirements of this Section 10.4 are satisfied.  No person, including the legal representatives, heirs or legatees of a deceased Member, shall have any rights or obligations greater than those set forth herein and no person shall acquire an interest in the Company or become a Member except as permitted hereby.

(c)  The effective date of such assignment or admission shall be not earlier than the date that the documents specified in paragraph (a), above, are delivered to and accepted by the Manager.

11

AFM000112

# ARTICLE XI
## Withdrawals, Priorities and Loans

**11.1  Withdrawals.**  No Member (including the Manager) shall be entitled to receive any money or property from the Company except (a) by way of distributions upon the winding up of the Company pursuant to Article XII, (b) as provided in Section 7.6, (c) in respect of any bona fide loans to the Company then due and owing and (d) as expressly provided elsewhere in this Agreement.

**11.2  Priorities.**  Except as expressly provided in this Agreement to the contrary, no Members shall have a priority right as to withdrawals, distributions or the return of contributions.

**11.3  Interest.**  During the term of the Company, no interest shall be allowed to any Member upon the amount of its Capital Account.  In the event that the Company shall borrow any funds from any Member above and beyond such Member's Capital Account, such Member shall be paid such interest as shall then be agreed and such loan shall be accounted for as a liability of the Company.

# ARTICLE XII
## Winding Up

**12.1  Liquidation Procedures.**  Upon termination of the Company pursuant to Article V, the affairs of the Company shall be wound up and the Company shall be dissolved, unless the Members elect to continue the Company in accordance with Section 5.2(c).  As part of the winding up of the Company, a proper accounting shall be made of the profit or loss of the Company from the date of the last previous accounting to the date of termination, and the Capital Account of each Member shall be appropriately adjusted.

**12.2  Distribution on Winding Up.**  In the event of the winding up of the Company for any reason, the proceeds of liquidation shall be applied by the end of the taxable year in which the liquidation occurs or, if later, within 90 days after the date of such liquidation, in the following rank and order:

(a) To the creditors of the Company, including Members who are creditors, in satisfaction of liabilities of the Company, all in the order of priority and to the extent provided by law.

(b) To each Member, the amount of its positive Capital Account (after all Capital Account adjustments for the Fiscal Year during which the liquidation occurs).

**12.3  Partition.**  No Member shall have the right to partition any property of the Company during the term of this Agreement, nor shall any Member make application to any court of authority having jurisdiction in the matter or commence or prosecute any action or proceeding for such partition and the sale thereof, and upon any breach of the provisions of this Section by any Member, the other Members, in addition to all of the

AFM000113

rights and remedies in law and in equity that they may have, shall be entitled to a decree or order restraining and enjoining such application, action or proceeding.

## ARTICLE XIII
### Amendments

Amendments to this Agreement and/or the Articles of Organization shall be made only upon the unanimous written consent of all of the Members.

## ARTICLE XIV
### Notices

All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given or made upon personal delivery or on the third business day following mailing from within the United States by first class United States mail, postage prepaid, certified mail return receipt requested, and addressed to the address of the Company set forth in Section 4.1, if to the Company, and to the address beneath a Member's name on the signature pages hereto, if to a Member. Any Member may change its address by giving 15 days advance written notice stating its new address to the Company. Commencing with the giving of such notice, such newly designated address shall be such Member's address for purposes of all notices or other communications required or permitted to be given pursuant to this Agreement.

## ARTICLE XV
### General Provisions

**15.1 Further Assurances.** Each of the Members shall here-after execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

**15.2 Successors.** This Agreement and all the terms and provisions hereof shall be binding upon and shall inure to the benefit of all Members and their legal representatives, heirs, successors and permitted assigns, except as expressly herein otherwise provided.

**15.3 Governing Law.** This Agreement shall be construed in conformity with the laws of the State of Illinois, as applied to agreements among Illinois residents made and to be performed entirely within Illinois. The Company and each Member agree that any dispute among or between them concerning the Company or this Agreement shall be litigated either in the United States District Court for the Northern District of Illinois or in the Circuit Court of Cook County, Illinois. In any such proceeding, the Company and each Member shall be deemed to have waived its right to a trial by jury.

**15.4 Counterparts.** This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

13

AFM000114

**15.5 Pronouns and Headings.** As used herein, all pronouns shall include the masculine, feminine, neuter, singular and plural thereof wherever the context and facts require such construction. The headings, titles and subtitles herein are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

**15.6 Members Not Agents.** Nothing contained herein shall be construed to constitute any Member the agent of another Member, except as specifically provided herein, or in any manner to limit the Members in the carrying on of their own respective businesses or activities.

**15.7 Entire Understanding.** This Agreement constitutes the entire understanding among the Members and supersedes any prior understanding and/or written or oral agreements among them with respect to the Company.

**15.8 Severability.** If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid by a court of competent jurisdiction, the remainder of this Agreement, or the application of such provision to persons or circumstances other then those to which it is held invalid by such court, shall not be affected thereby.

**15.9 Construction.** Whenever there shall be more than one Manager, the term "Manager" shall be understood as referring to all of the Managers, acting unanimously.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

| MEMBERS | PERCENTAGE INTEREST | CAPITAL CONTRIBUTION |
|---|---|---|
| Allan J. Gabriele, Trustee of the Eduardo E. Greco Irrevocable Trust II, dated 12/16/98 | 20% | $5,000.00 |
| Allan J. Gabriele, Trustee of the Francesca C.M. Greco-Jaffe Irrevocable Trust II, dated 12/16/98 | 20% | $5,000.00 |

14

AFM000115

_____      20%                 $5,000.00
Allan J. Gabriele,
Trustee of the Pasquale F. Greco
Irrevocable Trust II, dated 12/16/98

_____      20%                 $5,000.00
Allan J. Gabriele,
Trustee of the Gian F. Greco
Irrevocable Trust II, dated 12/16/98

_____      20%                 $5,000.00
Allan J. Gabriele,
Trustee of the Roberto Greco
Irrevocable Trust II, dated 12/16/98

15

AFM000116

# AMENDED AND RESTATED
# OPERATING AGREEMENT
# OF
# GRECO EG THREE LLC

This Agreement is made and entered into as of the 1st day of January, 2019 (the "Effective Date"), by and among Eduardo E. Greco, (the "Manager"), and the persons whose names are set forth on the signature page of this Agreement and designated thereon as "Members" (the Members are sometimes referred to herein collectively as the "Members" or the "parties" or individually as a "Member" or a "party").

## WITNESSETH:

WHEREAS, the parties hereto entered into an Operating Agreement dated December 16, 1998 (the "Original Operating Agreement"), which Original Operating Agreement is being amended and restated in its entirety solely for the purpose of updating the signatures of the Members set forth herein; and

WHEREAS, the parties hereto are desirous of creating a limited liability company under the laws of the State of Illinois;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties, the parties agree as follows:

## ARTICLE I
## Formation of Company

**1.1 Statutory Authority.** The parties by these presents do hereby agree to form a limited liability company (the "Company") under and pursuant to the provisions of the Illinois Limited Liability Company Act, as amended from time to time (805 ILCS 180/11 et seq.) (the "Act"). The rights and obligations of the Company and the Members shall, except as otherwise provided herein, be governed by the Act.

**1.2 Filings.** Concurrently with the execution of this Agreement, the Manager shall execute and file Articles of Organization conforming to the requirements of the Act in the Office of the Secretary of State of the State of Illinois (the "Office of the Secretary of State"), and the Manager shall make such other filings and recordings and do such other acts and things conforming thereto as shall constitute compliance with all requirements for the formation of a limited liability company under the Act and the laws of such other states in which the Company elects to do business.

## ARTICLE II
## Name

The name of the Company shall be the name set forth in the heading of this Agreement. The affairs of the Company shall be conducted under the Company name or such other name as the Manager may, in its discretion, select in accordance with the Act. The Manager shall execute and file with the proper offices any and all certificates

required by the fictitious name or assumed name statutes of the states in which the Company elects to do business. The Company shall have the exclusive ownership of and right to use the Company name (and any name under which the Company shall elect to conduct its affairs) as long as the Company continues.

## ARTICLE III
### Character of the Business

The purpose of the Company shall be to carry on the business of making, protecting, enhancing and otherwise dealing, directly or indirectly, with investments of any type, including securities of all types, acquiring, owning, leasing, operating and selling businesses and/or property, real and personal and wheresoever located, and to engage in any one or more enterprises, ventures, undertakings and businesses permitted under the Act. The Company shall have the power to do all acts and things necessary or useful in connection with the foregoing.

## ARTICLE IV
### Offices, Records and Agents

**4.1 Principal Office of the Company.** The principal office of the Company shall be located at 240 Westgate, Carol Stream, Illinois, or at such other place within or outside Illinois as the Manager may from time to time designate. The Company may have subsidiary offices in such other place or places as may be selected from time to time by the Manager.

**4.2 Records to be Maintained.** The Manager shall at all times keep at the Company's principal office such information and records as are specified in the Act.

**4.3 Registered Office and Registered Agent.** The Company's registered office in Illinois shall be located at 4440 West Lincoln Highway, Suite 301, Matteson, Illinois 60443, and the name of the registered agent for service of process at such office shall be Joseph A. Zarlengo. The Manager may from time to time in accordance with the Act change the Company's registered office and/or registered agent. The Manager shall select and designate a registered office and registered agent for the Company in each state in which the Company is required to maintain or appoint one.

## ARTICLE V
### Term of Existence and Termination of the Company

**5.1 Term of Existence of the Company.** The term of existence of the Company shall commence upon the filing of the Articles of Organization of the Company with the Office of the Secretary of State and shall, subject to Section 5.2, continue until December 31, 2048.

**5.2 Termination.** The Company shall terminate prior to the time set forth in Section 5.1:

2

AFM000118

(a) Upon the sale or other disposition of all or substantially all of the Company's non-cash assets; provided, however, that this Agreement generally and Article XII in particular shall govern the conduct of the parties during the winding up of the Company.

(b) By unanimous consent of all the Members holding a 100% of the Percentage Interests executing an instrument (or counterpart thereof) so stating; provided, however, that this Agreement generally and Article XII in particular shall govern the conduct of the parties during the winding up of the Company.

(c) On the 90th day after notice by the Manager to each Member of the Manager's intent to terminate; provided that the Company shall not so terminate if Members holding not less than 100 percent of the Percentage Interests have within 30 days of such notice given the Manager written notice of their objections.

## ARTICLE VI
## Contributions to Capital

**6.1 Capital Contributions.** On or before the Effective Date, each Member shall contribute to the capital of the Company the amount of money or property set forth or described under the heading "Capital Contribution" opposite that Member's signature hereto.

**6.2 Additional Capital Contributions.** Except as set forth in this Section 6.2 or as required by the Act, no Member shall be assessed for additional capital contributions.

(d) The Members may, by unanimous agreement, at any time or from time to time, make additional capital contributions to the Company.

(e) The respective capital accounts of the Members shall be adjusted in proportion to additional capital contributions.

**6.3 Defaulting Members.** The Company shall be entitled to enforce the obligations of each Member to make the contributions specified in this Article VI, and the Company acting at the direction of the Manager shall have all remedies available at law or in equity in the event any such contribution is not so made. The Company shall be entitled to recover the reasonable attorneys' fees and other costs of enforcing the Members' obligations under this Article VI, and shall also be entitled to recover interest on any unpaid contributions at the highest rate permitted by law.

## ARTICLE VII
## Allocations and Distributions

**7.1 Books of Account.**
(a) At all times during the continuance of the Company, the Manager shall cause proper and true books of account to be maintained in conformity with generally

AFM000119

accepted accounting principles consistently applied wherein there shall be entered particulars of all transactions, matters and things relating to the business of the Company as are usually entered in books of account kept by persons engaged in a business of like kind and character.

(b) The books of account shall be closed promptly after the end of each calendar year (which shall be the Company's "Fiscal Year") and an annual review shall be performed at the expense of the Company by a certified public accountant selected by the Manager. Promptly thereafter, a written report shall be given to each Member, which shall include a balance sheet of the Company as of the end of such Fiscal Year, a statement of income and expenses for such Fiscal Year, a statement of changes in Members Capital Accounts and such statements with respect to the status of the Company and the allocation of profits and losses as shall be necessary to advise all Members properly about their investment in the Company.

(f) Promptly after the close of the Fiscal Year, the certified public accountant engaged to conduct the Company's annual review shall prepare such income tax and other returns required under applicable law and regulation, including any and all statements necessary to advise all Members promptly about their investment in the Company for Federal income tax reporting purposes. The Manager shall be responsible for the prompt filing and delivery of all such returns and statements. All elections and options available to the Company for tax purposes shall be taken or rejected by the Company in the sole discretion of the Manager, except that in the case of a distribution of property made in the manner provided in Section 734 of the Internal Revenue Code of 1986, as amended (the "Code"), or in the case of a transfer of any interest in the Company permitted by this Agreement made in the manner provided in Code Section 743, the Company shall upon the request of any Member (including the Manager) file an election under Code Section 754 in accordance with the procedures set forth in the applicable Treasury Regulations.

**7.2 Capital Accounts.** As part of the Company's books of account, an individual "Capital Account" shall be maintained for each Member at all times in accordance with generally accepted accounting principles, consistently applied.

**7.3 Percentage Interests.**
(g) The Percentage Interest of each Member is set forth on Exhibit A attached hereto.

(h) In the event of any changes in any Member's Percentage Interest during the Fiscal Year, the Manager shall take into account the requirements of Code Section 706(d) and shall have the right to select any method of determining the varying interests of the Members during the Fiscal Year which satisfies Code Section 706(d).

**7.4 Profit and Loss Allocations.** The net profit or net loss of the Company, determined on an annual basis in accordance with generally accepted accounting principles, shall be allocated in accordance with the Members' Percentage Interests.

4

AFM000120

**7.5 Tax Allocations.** Except as otherwise required by the Code or the Treasury Regulations promulgated thereunder, income, gain, loss, deduction, credit and other items, as computed for Federal income tax purposes, shall be allocated among the Members in the same manner as the corresponding book items are allocated pursuant to Section 7.4.

**7.6 Distributions of Cash Flow.** Unless otherwise agreed to by unanimous vote of the Members, the Manager shall cause the Company to distribute its net Cash Flow to the Members from time to time, first to the Members who contributed capital to the Company, in proportion to the respective amounts contributed by each, and second, after the capital contribution has been returned to each Member as aforesaid, then to all of the Members in proportion to the Members' respective Membership Interest. The "cash flow" of the Company for any Fiscal Year shall consist of all cash received by the Company during that Fiscal Year from any source (other than proceeds from the sale, exchange or other disposition of all or substantially all of the non-cash assets of the Company, which shall be distributed in accordance with Article XII), less cash expended for the debts and expenses of the Company, principal payments on any indebtedness of the Company, capital expenditures and reasonable reserves otherwise required for the Company business as determined by the Manager.

## ARTICLE VIII
### Rights, Duties, Liabilities and
### Restrictions of the Manager

**8.1 Responsibility of the Manager.** The Members do hereby elect «Manager» as Manager of the Company. The Manager shall serve until his resignation, removal from office or inability to serve. The Manager shall have the sole and exclusive right to manage, control and conduct the affairs of the Company and to do any and all acts on behalf of the Company. The Manager shall make all decisions affecting the affairs and business of the Company to the best of its ability and shall use its best efforts to carry out the purposes of the Company as set forth herein.

**8.2 Authority of Manager.** Except as herein expressly restricted, the Manager shall have all the rights and powers permitted under the applicable provisions of the Act. The Manager has the absolute authority to sell, exchange, mortgage, pledge or otherwise transfer or encumber all or substantially all of the Company's assets, including in a transaction that is not in the ordinary course of business. Nothing herein contained shall impose any obligation on any person or firm doing business with the Company to inquire as to whether or not the Manager has exceeded its authority in executing any contract, lease, mortgage, security agreement, deed or other instrument on behalf of the Company, and any such third person shall be fully protected in relying upon such authority.

**8.3 Bank Accounts.** All funds of the Company shall be deposited in the Company name in such bank account or accounts as shall be designated by the Manager from time

AFM000121

to time. All withdrawals therefrom shall be made upon the signature of such person or persons as the Manager may designate.

**8.4 Proscriptions.** Without the written consent or ratification of all of the Members, the Manager shall have no authority to expend or use Company money or property other than on the account and for the benefit of the Company or to pledge any of the Company's credit or property for other than Company purposes.

**8.5 Management Fees.** During the term of the Company, the Manager shall be entitled, in addition to the share of profits, distributions and reimbursements provided elsewhere in this Agreement, to a reasonable management fee.

**8.6 Expenditures by Manager.** The Company shall reimburse the Manager for any costs that may be properly expended by the Manager on behalf of the Company. The Company shall pay compensation for accounting, administrative, legal, technical and management services rendered to the Company. All of the aforesaid expenditures shall be made on behalf of the Company and each Member, including the Manager, shall be entitled to reimbursement by the Company for any expenditures incurred by such Member on behalf of the Company which is made other than out of funds of the Company.

**8.7 Potential Conflicts.** The Manager shall cause so much time to be devoted to the business of the Company as, in its judgment, the conduct of the Company's business shall reasonably require. Any Member (including the Manager) may engage in business ventures of any nature and description independently or with others, including, but not limited to, business of the character described in Article III (or any part thereof), and neither the Company nor any of the Members shall have any rights in or to such independent ventures or the income or profits derived therefrom. Nothing in this Agreement shall obviate any state law fiduciary duties by which the Manager is otherwise bound.

**8.8 Liability of Manager.** The Manager (which for purposes of this Section 8.8 and Section 8.9 shall include its partners, officers, directors, shareholders, members, managers, employees, agents and affiliates) shall not be liable to a Member or the Company for honest mistakes of judgment, or for action or inaction, taken reasonably and in good faith for a purpose that was reasonably believed to be in the best interests of the Company, or for losses due to such mistakes, action or inaction, or for the negligence, dishonesty or bad faith of any employee, broker or other agent of the Company, provided that such employee, broker or agent was selected, engaged or retained and supervised with reasonable care. The Manager may consult with counsel and accountants in respect of Company affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, provided that they shall have been selected with reasonable care. The Members shall look solely to the assets of the Company for the return of their capital and, if the assets of the Company remaining after payment or discharge of the debts and liabilities of the Company are

AFM000122

insufficient to return such capital, they shall have no recourse against the Manager for such purpose.

Notwithstanding any of the foregoing to the contrary, the provisions of this Section shall not be construed to relieve (or attempt to relieve) any person of any liability by reason of gross negligence, recklessness or intentional wrongdoing or to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Section to the fullest extent permitted by law.

### 8.9 Resignation and Removal of Managers.

(a) A Manager may resign at any time by giving written notice to the Company in care of the remaining Managers (or if there are no remaining Managers to the Members). The resignation shall be effective upon receipt unless a future effective date is set forth in the notice of registration. The pending vacancy may be filled before the effective date, but the successor shall not take office until the effective date.

(b) Vacancies created by the resignation or death of a Manager may be filled by the vote of the Members holding a majority of the Percentage Interests of the Company.

(c) Any Manager or Managers may be removed from office, with or without cause, by the written consent of the Members holding two-thirds of the Percentage Interests in the Company.

(d) If any Manager or Managers are removed, new Managers may be elected at the same meeting of the Members for the unexpired term of the Manager or Managers removed.

**8.10 Indemnification.** The Company shall indemnify every person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding (other than an action by or in the right of the Company), whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a manager, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, officer, manager, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with the action, suit or proceeding, if the person acted in good faith and in a manner the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner that the person reasonably believed to be in, or not opposed to, the

7

AFM000123

best interests of the Company or, with respect to any criminal action or proceeding, that the person had reasonable cause to believe that the person's conduct was unlawful.

**8.11 Tax Matters Partner.** The Manager shall be the Company's Tax Matters Partner as defined in Code Section 6231(a)(7).

**ARTICLE IX**
**Liability of Members**

**9.1 No Control by the Members.** Except for the Manager, the Members shall take no part in the control or management of the affairs of the Company, nor shall a Member have any authority to act for or on behalf of the Company or to sign for or bind the Company.

**9.2 Liability.** No Member shall be personally liable for any of the debts of the Company or any of the losses thereof beyond the amount contributed or required to be contributed by it to the Company under this Agreement and as otherwise specified in the Act.

**9.3 Trustee Liability.**

(e) When this Agreement is executed by the trustee of any trust, such execution is by the trustee, not individually, but solely as trustee in the exercise and under the power of authority conferred upon and vested in such trustee, and it is expressly understood and agreed that nothing herein contained shall be construed as creating any liability on the part of any such trustee personally to pay any amounts required to be paid hereunder, or to perform any covenant, either express or implied, contained herein, all such liability, if any, being expressly waived by the parties hereto by their execution hereof. Any liability of any Member which is a trust to the Company or to any third person shall be only that of such trust to the full extent of its trust estate and shall not be a personal liability of any trustee, grantor or beneficiary thereof.

(f) Any successor trustee or trustees of any trust which is a Member herein shall be entitled to exercise the same rights and privileges and be subject to the same duties and obligations as his predecessor trustee. As used in this Agreement, the term "trustee" shall include any or all such successor trustees.

**ARTICLE X**
**Admission of Additional Members; Assignment Provisions**

**10.1 Admission of Additional Members.**

(g) The Manager may admit one or more additional Members or sell additional Member interests to current Members upon executing an appropriate amendment hereto.

(h) Upon the admission of one or more additional Members, the Manager is authorized to adjust the Percentage Interests of the Members to reflect the dilution

8

AFM000124

required to admit such additional Members. Any such dilution shall be in proportion to the Members' Percentage Interests. The Percentage Interest to be granted to a newly admitted Member shall take due account of the value of the additional Member's capital contribution and commitment in relation to the value of Company property upon admission.

(c) Additional Members shall be entitled to all of the rights and privileges of the original Members hereunder and shall be subject to all of the obligations and restrictions hereunder, and in all other respects their admission shall be subject to all of the terms and provisions hereof; provided, however, that allocations to the additional Members for the Fiscal Year of their.admission to the Company shall be determined in accordance with Section 7.3(b).

**10.2 Transfers by the Manager.**
(a) The Manager's interest in the Company is that of an agent of the Company and is not susceptible of being sold, assigned, pledged, mortgaged or otherwise disposed of or transferred. Insofar as the Manager may also be a Member, Section 10.3 shall govern the transfer of the Manager's membership interest.

**10.3 Transfers by Members.**
(i) The death, retirement, resignation, expulsion, bankruptcy (under the Federal Bankruptcy Code of 1978, as amended), court declaration of incompetency with respect to, dissolution or liquidation of a Member (other than the Manager, in which case Section 5.2(b) shall apply) shall not dissolve the Company, but it shall be continued with the successor or legal representative of the Member who died, became incapacitated, bankrupt, insolvent, dissolved or liquidated; such person shall, to the extent of the interest acquired, be entitled only to the predecessor Member's rights, if any, in the capital, profits and losses and distributions of the Company, and no such person shall have any right to participate in the management of the affairs of the Company or vote on any Company matter without the consent of the Manager.

(j) Except as provided in paragraphs (c) and (d), no Member shall sell, assign, pledge, mortgage or otherwise dispose of or transfer its interest in the Company without the prior written consent of the Manager.

(k) Notwithstanding anything set forth herein to the contrary, a Member may transfer all or part of his interest in the Company to his spouse, siblings or lineal descendants (collectively his "Family Members") or to one or more trusts or other entities created for the benefit of a Member or his Family members; provided, that such transfer will not constitute a default under any mortgage, lease or other material agreement to which the company is party.

(l) (i) If any Member shall receive a bona fide written offer (the "Offer") to sell for cash all (but not less than all) of its interest in the Company (the "Offered Interest"), and such Member desires to sell the Offered Interest, such Member (the

9

AFM000125

"Selling Member") shall promptly furnish the Manager and each Member with notice thereof (the "Option Notice"), as well as a copy of the Offer.

(ii) The Company shall have the right and option (the "Primary Option") to purchase all or any portion of the Offered Interest upon the express terms and conditions and at the purchase price set forth in the Offer, said Primary Option being exercised by notice to the Selling Member given within 20 days of the Manager's receipt of the Option Notice. If the Company does not elect to purchase all of the Offered Interest by notice to the Selling Member within said 20 day period, the Manager shall so advise all of the other Members and the Members shall thereupon have the right and option (the "Secondary Option"), and each Member may elect, by written notice to the Manager and the Selling Member on or before the 45th day following receipt of the Option Notice, to purchase that portion of the Offered Interest which the Company has not elected to acquire pursuant to the Primary Option upon the express terms and conditions and at the purchase price set forth in the Offer (the "Secondary Option"). Said notice from a Member to the Manager and the Selling Member shall specify the maximum amount of the remaining Offered Interest which the Member would like to acquire. The portion of the remaining Offered Interest which may be acquired by each Member shall be determined by the Manager ratably according to the relative maximum amounts that the Members propose to acquire in their notices to the Manager and the Selling Member. No Member, however, shall be required to acquire more than the maximum portion of the remaining Offered Interest that it proposed to acquire. If pursuant to the foregoing sentences the Members do not elect to acquire all of the remaining Offered Interest, the Company shall have a further option, which shall continue through the closing date hereafter specified, to acquire such portion of the remaining Offered Interest which is not acquired by the Members.

(i)     If the Company and/or any one or more or all of the Members elect to exercise their respective options to acquire the entire Offered Interest, the Selling Member shall sell and assign the Offered Interest to the Company and/or the Members, in the proportions described above, which sale and assignment shall be closed at the Company's principal office at any time on or before the 60th day following the Manager's receipt of the Option Notice or on such later date certain for closing contained in the Offer, as the Manager may select.

(i)   In the event that the Company and Members do not in the aggregate purchase all of the Offered Interest as described above, the right of first refusal options provided to the Company and the Members in this paragraph shall be deemed to have lapsed and expired. Thereupon the Selling Member shall be entitled to sell and assign the Offered Interest to the offeror, provided such sale or assignment (A) would not (i) result in a termination of the Company for Federal income tax purposes, (ii) result in the Company not qualifying for an exemption from the registration requirements of any applicable Federal or state securities laws, (iii) result in any violation of any applicable Federal or state securities laws, (iv) result in a default under or the acceleration of any indebtedness of, or secured by assets of, the Company, (v) result

10

AFM000126

in the Company having to register as an investment company under the Investment Company Act of 1940, as amended, or (vi) require the Company, the Manager or any affiliate to register as an investment advisor under the Investment Advisers Act of 1940, as amended, (B) is consummated pursuant to all of the terms and conditions set forth in the Offer, including but not limited to the purchase price and terms of payment for the Offered Interest, or on terms and conditions not more favorable to the offeror purchaser, and (C) is closed within 65 days of the date the Offer was originally received by the offeree Member or on such later date certain for closing contained in the Offer. The purchaser of the Offered Interest shall, to the extent of the interest acquired, be entitled only to the predecessor Member's rights, if any, in the capital, profits and losses and distributions of the Company, and no such person shall have any right to participate in the management of the affairs of the Company or vote on any Company matter without the consent of the Manager.

**10.4 General Provisions.** The following rules shall apply to transfers of Company interests and the admission of additional persons to the Company:

(m) No person shall be admitted as an additional Member hereunder unless and until (i) in the case of an assignment of an interest in the Company permitted hereby, the assignment is made in writing, signed by the assignor and accepted in writing by the assignee, and a duplicate original of the assignment is delivered to and accepted by the Manager, (ii) the prospective Member executes and delivers to the Company a written agreement, in form and substance satisfactory to the Manager, pursuant to which said person agrees to be bound by and confirms the covenants, representations and warranties contained herein and (iii) an appropriate amendment hereto is executed and, if required, filed of record.

(n) Any person acquiring or claiming an interest in the Company, in any manner whatsoever, shall be subject to and bound by all terms, conditions and obligations hereof to which its predecessor in interest, if any, was subject or bound, without regard to whether such person has executed a counterpart hereof or any other document contemplated hereby. Notwithstanding anything else contained in this Agreement, an assignee of an interest in the Company shall only be entitled to a share of the Company's profits, losses and distributions, and shall acquire the rights of a Member, until the requirements of this Section 10.4 are satisfied. No person, including the legal representatives, heirs or legatees of a deceased Member, shall have any rights or obligations greater than those set forth herein and no person shall acquire an interest in the Company or become a Member except as permitted hereby.

(o) The effective date of such assignment or admission shall be not earlier than the date that the documents specified in paragraph (a), above, are delivered to and accepted by the Manager.

11

AFM000127

## ARTICLE XI
## Withdrawals, Priorities and Loans

**11.1 Withdrawals.** No Member (including the Manager) shall be entitled to receive any money or property from the Company except (a) by way of distributions upon the winding up of the Company pursuant to Article XII, (b) as provided in Section 7.6, (c) in respect of any bona fide loans to the Company then due and owing and (d) as expressly provided elsewhere in this Agreement.

**11.2 Priorities.** Except as expressly provided in this Agreement to the contrary, no Members shall have a priority right as to withdrawals, distributions or the return of contributions.

**11.3 Interest.** During the term of the Company, no interest shall be allowed to any Member upon the amount of its Capital Account. In the event that the Company shall borrow any funds from any Member above and beyond such Member's Capital Account, such Member shall be paid such interest as shall then be agreed and such loan shall be accounted for as a liability of the Company.

## ARTICLE XII
## Winding Up

**12.1 Liquidation Procedures.** Upon termination of the Company pursuant to Article V, the affairs of the Company shall be wound up and the Company shall be dissolved, unless the Members elect to continue the Company in accordance with Section 5.2(c). As part of the winding up of the Company, a proper accounting shall be made of the profit or loss of the Company from the date of the last previous accounting to the date of termination, and the Capital Account of each Member shall be appropriately adjusted.

**12.2 Distribution on Winding Up.** In the event of the winding up of the Company for any reason, the proceeds of liquidation shall be applied by the end of the taxable year in which the liquidation occurs or, if later, within 90 days after the date of such liquidation, in the following rank and order:

(p) To the creditors of the Company, including Members who are creditors, in satisfaction of liabilities of the Company, all in the order of priority and to the extent provided by law.

(q) To each Member, the amount of its positive Capital Account (after all Capital Account adjustments for the Fiscal Year during which the liquidation occurs).

**12.3 Partition.** No Member shall have the right to partition any property of the Company during the term of this Agreement, nor shall any Member make application to any court of authority having jurisdiction in the matter or commence or prosecute any action or proceeding for such partition and the sale thereof, and upon any breach of the provisions of this Section by any Member, the other Members, in addition to all of the

AFM000128

rights and remedies in law and in equity that they may have, shall be entitled to a decree or order restraining and enjoining such application, action or proceeding.

## ARTICLE XIII
## Amendments

Amendments to this Agreement and/or the Articles of Organization shall be made only upon the unanimous written consent of all of the Members.

## ARTICLE XIV
## Notices    •

All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given or made upon personal delivery or on the third business day following mailing from within the United States by first class United States mail, postage prepaid, certified mail return receipt requested, and addressed to the address of the Company set forth in Section **4.1**, if to the Company, and to the address beneath a Member's name on the signature pages hereto, if to a Member. Any Member may change its address by giving 15 days advance written notice stating its new address to the Company. Commencing with the giving of such notice, such newly designated address shall be such Member's address for purposes of all notices or other communications required or permitted to be given pursuant to this Agreement.

## ARTICLE XV
## General Provisions

**15.1 Further Assurances.** Each of the Members shall here-after execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

**15.2 Successors.** This Agreement and all the terms and provisions hereof shall be binding upon and shall inure to the benefit of all Members and their legal representatives, heirs, successors and permitted assigns, except as expressly herein otherwise provided.

**15.3 Governing Law.** This Agreement shall be construed in conformity with the laws of the State of Illinois, as applied to agreements among Illinois residents made and to be performed entirely within Illinois. The Company and each Member agree that any dispute among or between them concerning the Company or this Agreement shall be litigated either in the United States District Court for the Northern District of Illinois or in the Circuit Court of Cook County, Illinois. In any such proceeding, the Company and each Member shall be deemed to have waived its right to a trial by jury.

**15.4 Counterparts.** This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

AFM000129

**15.5 Pronouns and Headings.** As used herein, all pronouns shall include the masculine, feminine, neuter, singular and plural thereof wherever the context and facts require such construction. The headings, titles and subtitles herein are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

**15.6 Members Not Agents.** Nothing contained herein shall be construed to constitute any Member the agent of another Member, except as specifically provided herein, or in any manner to limit the Members in the carrying on of their own respective businesses or activities.

**15.7 Entire Understanding.** This Agreement constitutes the entire understanding among the Members and supersedes any prior understanding and/or written or oral agreements among them with respect to the Company.

**15.8 Severability.** If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid by a court of competent jurisdiction, the remainder of this Agreement, or the application of such provision to persons or circumstances other then those to which it is held invalid by such court, shall not be affected thereby.

**15.9 Construction.** Whenever there shall be more than one Manager, the term "Manager" shall be understood as referring to all of the Managers, acting unanimously.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

GINA V. GRECO IRREVOCABLE TRUST II
DATED DECEMBER 16, 1998

By: _____
    Dominic S. Maduri, Co-Trustee

By: _____
    Pasquale F. Greco, Co-Trustee


PASQUALE P. GRECO IRREVOCABLE TRUST
II DATED DECEMBER 16, 1998

By: _____
    Dominic S. Maduri, Co-Trustee

By: _____
    Pasquale F. Greco, Co-Trustee


EDUARDO E. GRECO, JR. IRREVOCABLE
TRUST II DATED DECEMBER 16, 1998

By: _____
    Dominic S. Maduri, Co-Trustee

By: _____
    Pasquale F. Greco, Co-Trustee

AFM000131

## EXHIBIT A
## MEMBER INFORMATION

| Member's Names | Membership Units | Participating Percentages |
|---|---|---|
| Gina V. Greco Irrevocable Trust II Dated December 16, 1998 | 33 1/3 | 33 1/3% |
| Pasquale P. Greco Irrevocable Trust II Dated December 16, 1998 | 33 1/3 | 33 1/3% |
| Eduardo E. Greco, Jr. Irrevocable Trust II Dated December 16, 1998 | 33 1/3 | 33 1/3% |
| TOTAL | 100 | 100% |

AFM000132

# OPERATING AGREEMENT

## OF

## GSI FAMIILY OFFICE LLC

## A DELAWARE LIMITED LIABILITY COMPANY

AFM000133

## Table of Contents

**Page**

ARTICLE 1 - DEFINITIONS ................................................................................................ 1

   1.1    Act .................................................................................................................... 1

   1.2    Affiliate ............................................................................................................ 1

   1.3    Agreed Value ................................................................................................... 1

   1.4    Capital Account ............................................................................................... 1

   1.5    Capital Contribution ........................................................................................ 1

   1.6    Capital Interest ................................................................................................ 1

   1.7    Certificate of Formation .................................................................................. 1

   1.8    Code ................................................................................................................. 1

   1.9    Company .......................................................................................................... 2

   1.10   Company Property or Property ........................................................................ 2

   1.11   Deficit Capital Account .................................................................................. 2

   1.12   Dissociating Member ...................................................................................... 2

   1.13   Dissociation .................................................................................................... 2

   1.14   Distributable Cash .......................................................................................... 2

   1.15   Economic Interest ........................................................................................... 2

   1.16   Economic Interest Owner ................................................................................ 3

   1.17   Economic Interest Units .................................................................................. 3

   1.18   Entity .............................................................................................................. 3

   1.19   Fiscal Year ...................................................................................................... 3

   1.20   Majority Interest ............................................................................................. 3

   1.21   Manager .......................................................................................................... 3

   1.22   Member ........................................................................................................... 3

   1.23   Membership Interest ....................................................................................... 3

   1.24   Membership Units ........................................................................................... 3

   1.25   Minimum Rate ................................................................................................ 4

   1.26   Net Profits and Losses .................................................................................... 4

   1.27   Operating Agreement ...................................................................................... 4

   1.28   Participating Percentage .................................................................................. 4

   1.29   Permitted Transferee ....................................................................................... 4

| 1.30 | Person | 4 |
|------|--------|---|
| 1.31 | Reserves | 4 |
| 1.32 | Sale Proceeds | 4 |
| 1.33 | Sell | 4 |
| 1.34 | Selling Member | 4 |
| 1.35 | Transfer | 4 |
| 1.36 | Transferee | 4 |
| 1.37 | Transferring Member | 5 |
| 1.38 | Treasury Regulations | 5 |
| 1.39 | Units | 5 |

| ARTICLE 2 - FORMATION OF COMPANY | | 5 |
|------|--------|---|
| 2.1 | Formation | 5 |
| 2.2 | Name | 5 |
| 2.3 | Principal Place of Business | 5 |
| 2.4 | Registered Office and Registered Agent | 5 |
| 2.5 | Term | 5 |
| 2.6 | Business of Company | 5 |

| ARTICLE 3 - RIGHTS AND DUTIES OF MANAGER | | 5 |
|------|--------|---|
| 3.1 | Management | 5 |
| 3.2 | Number, Tenure, Designation and Qualifications | 6 |
| 3.3 | Authority of Manager | 6 |
| 3.4 | Duties of Manager | 7 |
| 3.5 | Authority of Others | 8 |
| 3.6 | Limitation of Authority of Manager | 8 |
| 3.7 | Tax Matters Partner | 9 |
| 3.8 | Liability for Certain Acts | 9 |
| 3.9 | Resignation | 9 |
| 3.10 | Indemnification by Company | 9 |
| 3.11 | No Exclusive Duty to Company | 9 |
| 3.12 | Removal | 10 |
| 3.13 | Vacancies | 10 |
| 3.14 | Salaries | 10 |
| 3.15 | Other Agreements | 10 |

| ARTICLE 4 - RIGHTS AND OBLIGATIONS OF MEMBERS | | 10 |
|------|--------|---|

| 4.1 | Limitation of Liability | 10 |
|-----|------------------------|-----|
| 4.2 | Dissociation by Members | 10 |
| 4.3 | Expulsion of Members | 10 |
| 4.4 | Company Books | 11 |
| 4.5 | Priority and Return of Capital | 11 |
| 4.6 | Return of Distributions | 11 |
| 4.7 | No Exclusive Duty to Company | 11 |

ARTICLE 5 - COMPANY CAPITAL .......... 11

| 5.1 | Capital Contributions | 11 |
|-----|----------------------|-----|
| 5.2 | Additional Contributions | 11 |
| 5.3 | Capital Accounts | 12 |
| 5.4 | Special Allocations to Capital Accounts | 13 |
| 5.5 | Interest On and Return of Contributions | 14 |
| 5.6 | Accounting Principles | 14 |
| 5.7 | Loans to Company | 14 |
| 5.8 | Accounting Period | 14 |

ARTICLE 6 - ALLOCATIONS AND DISTRIBUTIONS .......... 14

| 6.1 | Allocations of Profits and Losses | 14 |
|-----|----------------------------------|-----|
| 6.2 | Distributions | 14 |
| 6.3 | Limitation Upon Distributions | 15 |
| 6.4 | Withdrawal or Reduction of Contributions | 15 |

ARTICLE 7 - MEMBERSHIP CERTIFICATES AND TRANSFERABILITY .......... 16

| 7.1 | Certificates for Membership Interest | 16 |
|-----|-------------------------------------|-----|
| 7.2 | Restrictions on Transfer | 16 |
| 7.3 | Transfers on Company Books | 16 |
| 7.4 | Right of First Refusal | 16 |
| 7.5 | Transferee Not Member in Absence of Consent | 18 |
| 7.6 | Option Upon Involuntary Transfer | 19 |
| 7.7 | Options Upon Dissociation | 20 |
| 7.8 | Agreed Value | 21 |

ARTICLE 8 - ADDITIONAL MEMBERS .......... 21

ARTICLE 9 - DISSOLUTION AND TERMINATION .......... 22

| 9.1 | Dissolution | 22 |
|-----|-------------|-----|
| 9.2 | Dissolution and Liquidation of Assets | 22 |

| | | |
|---|---|---|
| 9.3 | Articles of Dissolution | 23 |
| 9.4 | Effect of Filing of Articles of Dissolution | 23 |
| 9.5 | Assets Distributed on Dissolution | 24 |
| ARTICLE 10 - MISCELLANEOUS | | 24 |
| 10.1 | Waiver of Conflict of Interest | 24 |
| 10.2 | Notices | 24 |
| 10.3 | Application of Delaware Law | 24 |
| 10.4 | Arbitration/No Lawsuits | 24 |
| 10.5 | Equitable Relief | 25 |
| 10.6 | Waiver of Action for Partition | 25 |
| 10.7 | Attorney Fees | 25 |
| 10.8 | Amendments | 25 |
| 10.9 | Execution of Additional Instruments | 25 |
| 10.10 | Construction | 25 |
| 10.11 | Headings | 25 |
| 10.12 | Waivers | 25 |
| 10.13 | Rights and Remedies Cumulative | 26 |
| 10.14 | Severability | 26 |
| 10.15 | Heirs, Successors and Assigns | 26 |
| 10.16 | Creditors | 26 |
| 10.17 | Incorporation of Recitals | 26 |
| 10.18 | Counterparts | 26 |
| 10.19 | Entire Agreement | 26 |

## GSI FAMILY OFFICE LLC
## OPERATING AGREEMENT

THIS OPERATING AGREEMENT ("Operating Agreement") is made and entered into as of the 3RD day of November, 2016, by and among GSI FAMILY OFFICE LLC, a Delaware limited liability company (the "Company"), the manager and the members set forth on attached Exhibit A.

WHEREAS, the Company was formed as a Delaware limited Liability Company on November 3, 2016;

WHEREAS, the parties hereto desire to enter into this Operating Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE 1 - DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings:

1.1     Act. The "Act" shall mean the Delaware Limited Liability Company Act, as it may be amended from time to time.

1.2     Affiliate. "Affiliate" shall mean: (1) any Person directly or indirectly controlling, controlled by or under common control with another Person; (2) a Person owning or controlling ten percent (10%) or more of the outstanding voting securities of such other Person; (3) any officer, director, partner, spouse, parent, or lineal descendant of such other Person; and (4) if such other Person is an officer, director or partner, any company or partnership for which such Person acts in any capacity.

1.3     Agreed Value. "Agreed Value" is defined in Section 7.11.

1.4     Capital Account. "Capital Account" shall mean as of any given date the account maintained for each Member pursuant to Article 5.

1.5     Capital Contribution. "Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

1.6     Capital Interest. "Capital Interest" shall mean as of any given date the proportion that a Member's positive Capital Account bears to the aggregate positive Capital Accounts of all Members whose Capital Accounts have positive balances as of such date.

1.7     Certificate of Formation. The "Certificate of Formation" shall mean the Certificate of Formation as filed with the Secretary of State of Delaware, as amended from time to time.

1.8     Code. The "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue laws.

1.9    Company. The "Company" shall mean GSI FAMILY OFFICE LLC, a Delaware limited liability company.

1.10    Company Property or Property. "Company Property" or "Property" shall mean all properties, assets and rights of any type owned by the Company.

1.11    Deficit Capital Account. "Deficit Capital Account" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

   (a)    Credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2(g)(1) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner for nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations); and

   (b)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

   (c)    This definition of Deficit Capital Account is intended to comply with the provisions of Treasury Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and shall be interpreted consistently with those provisions.

1.12    Dissociating Member. "Dissociating Member" shall mean a Member for which an event of Dissociation has occurred.

1.13    Dissociation. "Dissociation" shall mean the notice by a Member to withdraw from the Company, a Transfer of all of a Member's Membership Interest, the expulsion of a Member, the bankruptcy or insolvency of a Member, the dissolution of a Member, or such other events as set forth in the Act.

1.14    Distributable Cash. "Distributable Cash" shall mean all cash, revenues and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company: (a) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (b) all cash expenditures incurred in the normal operation of the Company's business; and (c) Reserves as the Manager deems reasonably necessary for working capital and to pay taxes, insurance, debt service and other costs or expenses incident to the ownership and operation of the business of the Company.

1.15    Economic Interest. "Economic Interest" shall mean a Member's or Economic Interest Owner's share of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not confer any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members or Manager.

1.16    Economic Interest Owner. "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.17    Economic Interest Units. "Economic Interest Units" shall mean ownership interests in the Company held by Economic Interest Owners. Economic Interest Units shall have an Economic Interest only. Subject to the provisions herein, each Economic Interest Unit has equal rights with every other Membership Unit and Economic Interest Unit with respect to sharing of profits and losses and with respect to distributions. An Economic Interest Unit may be diluted if the Company issues additional Units.

1.18    Entity. "Entity" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust or foreign business organization.

1.19    Fiscal Year. "Fiscal Year" shall mean the Company's fiscal year as determined by the Manager. The initial Fiscal Year shall be the calendar year.

1.20    Majority Interest. "Majority Interest" shall mean the Members holding in the aggregate in excess of fifty percent (50%) of all Membership Units outstanding at the time of any determination.

1.21    Manager. "Manager" or "Managers" shall mean one (1) or more managers who have the authority to manage the Company in accordance with the provisions of this Operating Agreement.

1.22    Member. "Member" shall mean each owner of a Membership Interest who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become Members. If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be. In the case of a Member which is a revocable grantor trust, references herein to the Member shall include the grantor of such trust.

1.23    Membership Interest. "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement and the Act.

1.24    Membership Units. Ownership interests in the Company shall be represented by "Membership Units." The initial ownership of Membership Units shall be as set forth on attached Exhibit A. Each Membership Unit has equal governance rights with every other Membership Unit and in matters subject to a vote of the Members has one (1) vote. Subject to the provisions herein, each Membership Unit has equal rights with every other Membership Unit with respect to sharing of profits and losses and with respect to distributions. A Membership Unit may be diluted if the Company issues additional Membership Units.

1.25 Minimum Rate. "Minimum Rate" shall mean the minimum rate of interest which can be used without causing additional interest to be imputed pursuant to the Code.

1.26 Net Profits and Losses. "Net Profits" and "Net Losses" shall mean the net amount of all income, gain, loss, and deductions of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the method of accounting selected by the Manager at the close of each fiscal year on the Company's tax return filed for federal income tax purposes.

1.27 Operating Agreement. "Operating Agreement" shall mean this Amended and Restated Operating Agreement as originally executed and as amended from time to time. If a provision of this Operating Agreement differs from a provision of the Articles of Organization, then to the extent allowed by law this Operating Agreement shall govern.

1.28 Participating Percentage. "Participating Percentage" shall mean a Member's or Economic Interest Owner's right to allocations of Net Profits and Net Losses of the Company calculated as the Units owned by such Member or Economic Interest Owner divided by the total number of Units outstanding. The Initial Participating Percentages are set forth on Exhibit A attached hereto and made part hereof.

1.29 Permitted Transferee. "'Permitted Transferee" when used herein shall mean another Member; provided, however, that a Permitted Transferee shall not be a Permitted Transferee unless he, she, or it complies with the provisions of Section 7.5(d).

1.30 Person. "Person" shall mean an individual, partnership, limited partnership, limited liability company, trust, estate, association, corporation, or other entity.

1.31 Reserves. "Reserves" shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts deemed sufficient by the Manager for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

1.32 Sale Proceeds. "Sale Proceeds" "Sale Proceeds" shall mean (1) the proceeds to the Company from the sale of property of the Company, including interest on any deferred or installment payments and (2) the net proceeds to the Company from the refinancing of any property of the Company.

1.33 Sell. "Sell" shall mean to sell, assign, pledge, hypothecate or otherwise transfer for consideration all or any portion of a Membership Interest or Economic Interest.

1.34 Selling Member. "Selling Member" shall mean any Member or Economic Interest Owner which Sells all or any portion of its Membership Interest or Economic Interest.

1.35 Transfer. "Transfer" shall mean to Sell, gift or otherwise transfer, for or without consideration, all or any part of a Membership Interest or Economic Interest.

1.36 Transferee. "Transferee" shall mean the recipient of a Membership Interest or Economic Interest which has been Transferred.

1.37    Transferring Member. "Transferring Member" shall mean a Member who Transfers the Member's Membership Interest, or an Economic Interest Owner who Transfers the Economic Interest Owner's Economic Interest.

1.38    Treasury Regulations. "Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code.

1.39    Units. "Units" shall mean collectively Membership Units and Economic Interest Units.

## ARTICLE 2 - FORMATION OF COMPANY

2.1    Formation. The Company has been organized as a Delaware limited liability company by the execution and delivery of Certificate of Formation to the Delaware Secretary of State in accordance with and pursuant to the Act.

2.2    Name. The name of the Company is GSI FAMILY OFFICE LLC, a Delaware limited liability company.

2.3    Principal Place of Business. The principal place of business of the Company shall be 1301 Schiferl, Bartlett, Illinois 60103. The Company may locate its places of business and registered office at any other place or places as the Manager may from time to time deem advisable.

2.4    Registered Office and Registered Agent. The Company's current registered office is at the office of its registered agent, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The registered office and registered agent may be changed by filing the address of the new registered office and/or the name of the new registered agent with the Delaware Secretary of State pursuant to the Act.

2.5    Term. The term of the Company shall be perpetual, unless the Company is dissolved in accordance with either the provisions of this Operating Agreement or the Act.

2.6    Business of Company. The business of the Company shall be to transact any and all lawful business for which a company may be organized under the Act.

## ARTICLE 3 - RIGHTS AND DUTIES OF MANAGER

3.1    Management. The business and affairs of the Company shall be directed, managed and controlled by its Manager. Except as otherwise expressly required by this Operating Agreement or by non-waivable provisions of the Act, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. Except as provided otherwise in this Agreement, at any time when there is more than one (1) Manager, the decision of a majority of all of the Managers shall be required for the Manager to take any action permitted to be taken under this Operating Agreement or the Act.

3.2    Number, Tenure, Designation and Qualifications. As of the date hereof, the Company shall have one (1) Manager: Eduardo Greco. The Manager shall hold office until its resignation, removal from office or inability to serve. The Manager may be replaced by the Members holding at least two-thirds (2/3) of the Membership Units. Managers need not be Members of the Company.

3.3    Authority of Manager. Except as provided in Section 3.6, and without limiting the generality of Section 3.1, the Manager shall have power and authority, on behalf of the Company to:

(a)    Acquire property from any Person as the Manager may determine, whether or not such Person is directly or indirectly affiliated or connected with any Manager or Member;

(b)    Pledge, encumber, and allow or cause security interests to be placed on any and all assets of the Company;

(c)    Hire or fire any and all employees, agents, or contractors for the Company;

(d)    Enter into or terminate employment agreements or other compensation arrangements;

(e)    Modify or make distributions to the Members;

(f)    Borrow money for the Company from banks, other lending institutions, the Manager, Members, or Affiliates of the Manager or Members or refinance any debts or obligations of the Company;

(g)    Hypothecate, encumber and grant any security interest in any of the assets of the Company to secure repayment of borrowed sums;

(h)    Purchase liability and other insurance to protect the Company's property and business or for any other reason the Manager in their sole discretion may determine;

(i)    Enter into or settle any litigation, arbitration or other similar proceeding involving the Company;

(j)    Make any decision related to the tax status of the Company, or any actions involving tax issues;

(k)    Hold and own Company real and personal properties in the name of the Company;

(l)    Invest Company funds in time deposits, short-term governmental obligations, commercial paper or other investments;

(m)    Open, as it deems necessary or convenient, from time to time such bank accounts in the name of the Company;

AFM000143

(n)     Execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; deeds; assignments; bills of sale; leases; and any other instruments or documents necessary to the business of the Company;

(o)     Employ accountants, legal counsel, managing agents or other experts to perform services for the Company;

(p)     Enter into any and all other agreements on behalf of the Company, in such forms as the Manager may approve; and

(q)     Do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

3.4     <u>Duties of Manager</u>. At the expense of the Company, the Manager shall be responsible for the following duties:

(a)     The Manager shall maintain records and accounts of the operations and expenditures of the Company, which shall at a minimum include the following records which the Manager shall keep at the principal place of business of the Company:

(i)     proper and complete records and books of account in which shall be entered fully and accurately all transactions relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company;

(ii)     a current list of the full name and last known address of each Member and Economic Interest Owner setting forth the amount of cash each Member and Economic Interest Owner has contributed, a description and statement of the agreed value of the other property or services each Member and Economic Interest Owner has contributed or has agreed to contribute in the future, and the date on which each became a Member or Economic Interest Owner;

(iii)     a copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(iv)     copies of the Company's federal, state, and local income tax returns and reports, if any, for the three (3) most recent years;

(v)     copies of the Company's currently effective written Operating Agreement;

(vi)     copies of any financial statements of the Company for the three (3) most recent years;

(vii)     any written consents obtained from Members for actions taken by Members without a meeting;

(viii)    other than as set forth in the Articles of Organization or herein, a writing prepared by the Manager setting out the following: (A) the times at which or events on the happening of which any additional contributions agreed to be made by each Member and Economic Interest Owner are to be made; (B) any right of a Member or Economic Interest Owner to receive distributions that include a return of all or any part of the Member or Economic Interest Owner's contributions; and any power of a Member or Economic Interest Owner to grant the right to become an assignee of any part of the Member's or Economic Interest Owner's interest, and the terms and conditions of the power.

(b)     The Manager shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year upon a Member's written request. Subject to Section 3.6, all elections permitted to be made by the Company under federal or state laws shall be made by the Manager in their sole discretion, provided that the Manager shall make any tax election permitted by law which is requested by the holders of a Majority Interest.

3.5     Authority of Others.

(a)     Unless authorized to do so by this Operating Agreement, no attorney- in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

(b)     No Member acting as a Member shall have any power or authority to bind the Company unless the Member has been authorized by the Manager to act as an agent of the Company in accordance with the provision of Section 3.5(a).

(c)     No debt shall be contracted or liability incurred by or on behalf of the Company except by the Manager, or to the extent permitted under the Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Manager.

3.6     Limitation of Authority of Manager. Notwithstanding any other provision herein to the contrary, a vote of the Members holding two-thirds (2/3) of the Membership Units of all Members shall be required before any Manager shall:

(a)     Admit a new Member to the Company or redeem any Member's interest in the Company;

(b)     Require an additional Capital Contribution from any Member without its consent;

(c)     Amend the Operating Agreement of the Company in any manner which would affect the contents of this Section 3.6;

(d)     Sell, exchange, or otherwise dispose of, finance or refinance all, or substantially all of the assets of the Company as part of a single transaction or plan and sell exchange or otherwise dispose of substantially all of the assets of the Company;

(e)     Voluntarily dissolve the Company, unless all or substantially all of its non-cash assets have been sold.

3.7     <u>Tax Matters Partner</u>. Eduardo Greco is designated the Tax Matters Partner"(as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

3.8     <u>Liability for Certain Acts</u>. Manager shall perform all duties as Manager in good faith, in a manner reasonably believed to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager.

3.9     <u>Resignation</u>. A Manager of the Company may resign at any time by giving written notice to the Members. The resignation of a Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a Dissociation.

3.10     <u>Indemnification by Company</u>. The Company shall indemnify the Manager for liability it may incur in its capacity as Manager of the Company.

3.11     <u>No Exclusive Duty to Company</u>. Except as otherwise agreed to between Company and Manager, a Manager shall not be required to manage the Company as the Manager's sole and exclusive function and a Manager may have other business interests and engage in activities in addition to those relating to the Company. A Manager and its Affiliates may engage in or possess any interests in other business ventures of any kind, independently or with others, including but not limited to engaging in other ventures having a purpose similar to that of the Company. The fact that the Manager or any Affiliate may encounter and take advantage of opportunities to do any of the foregoing themselves or on behalf of others in whom they may or may not have an interest shall not subject the Manager or any Affiliate to any liability to the Company or any of the Members or Manager on account of any lost opportunity. None of the Company, any Member, any Manager, or the holder of any interest in the Company shall have any right by virtue of this Operating Agreement or the relationship created hereby in or to any other such ventures or

activities, or to the income or profits derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company shall not be deemed wrongful or improper.

3.12 <u>Removal</u>. At a meeting called expressly for that purpose, all or any lesser number of Managers may be removed at any time, with or without cause, by Members holding two- thirds (2/3) of the Membership Units of all Members. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a Dissociation.

3.13 <u>Vacancies</u>. Any vacancy occurring for any reason in the number of Manager of the Company may be filled by the affirmative vote of Members holding at least two-thirds (2/3) of the Membership Units.

3.14 <u>Salaries</u>. The salaries and other compensation of the Manager shall be fixed from time to time by an affirmative vote of the Members holding a Majority Interest, and no Manager shall be prevented from receiving such salary because the Manager is also a Member of the Company.

3.15 <u>Other Agreements</u>. None.

## ARTICLE 4 - RIGHTS AND OBLIGATIONS OF MEMBERS

4.1 <u>Limitation of Liability</u>. Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law. A Member shall not be personally liable for any debts or losses of the Company beyond the Member's Capital Contribution or as otherwise provided herein or required by law.

4.2 <u>Dissociation by Members</u>.

(a) Before the dissolution of the Company, any voluntary Dissociation by a Member without the prior written consent of the remaining Members holding two- thirds (2/3) of the remaining Membership Units shall be a wrongful Dissociation.

(b) If a Member Dissociates before the dissolution of the Company, and the Dissociation results from volitional conduct of the Member that could reasonably be characterized as resignation, retirement, or withdrawal, then the Dissociating Member is liable to the Company for damages resulting from such wrongful Dissociation.

(c) Upon a Dissociation by a Member, such Member shall cease to be a Member and shall become an Economic Interest Owner whose Membership Interest may be purchased by the remaining Members or the Company pursuant to <u>Article 7</u>. The Company may offset any amounts or obligations owed by a Dissociated Member to the Company including damages arising from such wrongful Dissociation against any amounts due the Dissociating Member, regardless of the cause of a Member's Dissociation and regardless of whether the Member's Dissociation results in dissolution of the Company.

4.3 <u>Expulsion of Members</u>. Members may be expelled from the Company by the Company or the other Members only upon judicial determination that the Member engaged in wrongful conduct that adversely and materially affected the business of the Company, willfully or

persistently committed a material breach of this Operating Agreement or of a duty owed to the Company or the other Members under the Act, or engaged in conduct relating to the business of the Company that makes it not reasonably practicable to carry on the business of the Company if such Member remains a Member.

4.4    Company Books. Upon reasonable written request, each Member and Economic Interest Owner shall have the right, at a time during ordinary business hours as reasonably determined by the Manager, to inspect and copy at the requesting Member's or Economic Interest Owner's expense, the books and records of the Company, including the records maintained pursuant to Section 3.4 herein, the Company documents identified in the Act, and such other documents which the Manager, in their discretion, deem appropriate.

4.5    Priority and Return of Capital. Except as may be expressly provided herein, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Section 4.5 shall not apply to loans which a Member has made to the Company.

4.6    Return of Distributions. A Member who receives a distribution or the return in whole or in part of the Member's Capital Contribution is liable to the Company only to the extent provided by the Act.

4.7    No Exclusive Duty to Company. Except as otherwise agreed to by Company and Member, a Member shall not be required to devote the Member's efforts to the Company as the Member's sole and exclusive function, and a Member may have other business interests and engage in activities in addition to those relating to the Company. A Member and the Member's Affiliates may engage in or possess any interests in other business ventures of any kind, independently or with others, including but not limited to engaging in other ventures having a purpose similar to that of the Company. The fact that the Member or any Affiliate may encounter and take advantage of opportunities to do any of the foregoing themselves or on behalf of others in whom they may or may not have an interest shall not subject the Member or any Affiliate to any liability to the Company or any of the Members or Manager on account of any lost opportunity. None of the Company, any Member, any Manager, or the holder of any interest in the Company shall have any right by virtue of this Operating Agreement or the relationship created hereby in or to any other such ventures or activities, or to the income or profits derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company shall not be deemed wrongful or improper.

## ARTICLE 5 - COMPANY CAPITAL

5.1    Capital Contributions. Each Member who has made a Capital Contribution shall have such Capital Contribution credited to his Capital Account.

5.2    Additional Contributions. No Member shall be required to make additional Capital Contributions without such Member's consent. With the Member's consent, the Member shall make such additional Capital Contributions as shall be determined by the Manager. None of the terms, covenants, obligations or rights contained in this Section 5.2 is or shall be deemed to be for

AFM000148

the benefit of any Person other than the Members and the Company, and no such third party shall under any circumstances have any right to compel any actions or payments by the Manager and/or the Members.

5.3     Capital Accounts. A separate Capital Account shall be maintained for each Member and, if applicable, each Economic Interest Owner, and subject to the provisions of Section 5.4, the following allocations shall be made to the Capital Accounts of the Members and Economic Interest Owners.

(a)     Each Member's and Economic Interest Owner's Capital Account will be increased by:

(i)     the amount of money contributed by such Member or Economic Interest Owner to the Company;

(ii)     the fair market value of property contributed by such Member or Economic Interest Owner to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752);

(iii)     allocations to such Member or Economic Interest Owner of Net Profits;

(iv)     allocations to such Member or Economic Interest Owner of income described in Code Section 705 (a)(1)(B).

(b)     Each Member's or Economic Interest Owner's Capital Account will be decreased by:

(i)     the amount of money distributed to such Member or Economic Interest Owner by the Company;

(ii)     the fair market value of property distributed to such Member or Economic Interest Owner by the Company (net of liabilities secured by such distributed property that such Member or Economic Interest Owner is considered to assume or take subject to under Code Section 752);

(iii)     allocations to such Member or Economic Interest Owner of expenditures described in Code Section 705(a)(2)(B); and

(iv)     allocations to the account of such Member or Economic Interest Owner of Net Losses and deduction as set forth in the Treasury Regulations promulgated under Code Section 704(b), taking into account adjustments to reflect book value.

(c)     The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder. If the Manager determines that the manner

AFM000149

in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.3 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members and/or Economic Interest Owners as set forth in this Operating Agreement.

(d)     Upon liquidation of the Company, liquidating distributions will be made in accordance with the positive Capital Account balances of the Members and Economic Interest Owners, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation). The Company may offset damages for breach of this Operating Agreement by a Member or Economic Interest Owner whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member or Economic Interest Owner.

(e)     Except as otherwise required in the Act, no Member or Economic Interest Owner shall have any liability to restore all or any portion of a deficit balance in such Member's or Economic Interest Owner's Capital Account.

5.4     Special Allocations to Capital Accounts. Notwithstanding Section 5.3 hereof:

(a)     No allocations of loss, deduction and/or expenditures described in Code Section 705(a)(2)(B) shall be charged to the Capital Account of any Member or Economic Interest Owner if such allocation would cause such Member or Economic Interest Owner to have a Deficit Capital Account. The amount of the loss, deduction and/or Code Section 705(a)(2)(B) expenditure which would have caused a Member or Economic Interest Owner to have a Deficit Capital Account shall instead be charged to the Capital Account of any Members or Economic Interest Owners which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Members or Economic Interest Owners exist, then to the Members and Economic Interest Owners in proportion to their respective interests in Company Net Profits pursuant to Section 6.1.

(b)     In the event any Member or Economic Interest Owner unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member or Economic Interest Owner, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of such Member or Economic Interest Owner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit Capital Account so created as quickly as possible. It is

AFM000150

the intent that this Section 5.4(b) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

5.5     Interest On and Return of Contributions. No Member or Economic Interest Owner shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution.

5.6     Accounting Principles. The profits and losses of the Company shall be determined in accordance with generally accepted accounting principles applied on a consistent basis using the method of accounting selected by the Manager.

5.7     Loans to Company. Nothing in this Operating Agreement shall prevent any Member or Economic Interest Owner from making secured or unsecured loans to the Company by agreement with the Company.

5.8     Accounting Period. The Company's accounting period shall be the Fiscal Year.

## ARTICLE 6 - ALLOCATIONS AND DISTRIBUTIONS

6.1     Allocations of Profits and Losses. Except as otherwise provided in this Agreement to the contrary or as determined by the Company's regularly employed accountant in accordance with the applicable law, Net Profits and Net Losses of the Company for each Fiscal Year will be allocated in proportion with the Participating Percentages of the Members and Economic Interest Owners.

6.2     Distributions.

(a)     Subject to the restrictions of Section 6.3, to the extent that the Company reports a Net Profit and said Net Profit is allocated to the Members, then the Company shall be required to distribute to the Members an amount equal to the product of said sum and the sum of the highest federal and applicable state marginal income tax rates. In determining the highest applicable rate, the Company shall apply the rates of the state which taxes a Member at the highest income tax rates. All such distributions shall be made to Members pro rata, in proportion to the amount of profit allocated to each Member.

(b)     Subject to the restrictions of Section 6.3, the Manager, in its sole discretion, may authorize, and the Company may make, additional distributions to the Members and the Economic Interest Owners. The distribution of any Distributable Cash pursuant to this Section 6.2(b) shall be distributed in accordance with the following priority:

(i)     first, repayment of Members' and Economic Interest Owners' loans to the Company, plus any accrued interest.

(ii)     then, payments to the Members and Economic Interest Owners in proportion to their Participating Percentages.

(c)     All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members or Economic

Interest Owners from the Company shall be treated as amounts distributed to the relevant Member or Economic Interest Owner pursuant to Section 6.2(b).

(d)     Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Member's Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

6.3     Limitation Upon Distributions.

(a)     No distributions or return of Capital Contributions shall be made and paid if, after the distribution or return of Capital Contribution is made, the Company would be insolvent or the net assets of the Company would be less than zero. In addition, no Distributable Cash shall be distributed until all Company's debt is paid in full.

(b)     The Manager may base a determination that a distribution or return of Capital Contribution may not be made as a result of Section 6.3(a) or Section 6.3(b) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the Person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

(c)     No distributions or return of Capital Contributions shall be made or paid if, at the time of the distribution or return of Capital Contribution, the Company is party to an agreement or agreements with third party lenders which prohibit the making or payment of distributions or the return of Capital Contributions. If the Company is a party to an agreement with third party lenders which restricts the time or amount of distributions or return of Capital Contributions, any distributions or return of Capital Contributions shall not be approved, made or paid in excess or in violation of such restrictions.

6.4     Withdrawal or Reduction of Contributions.

(a)     A Member shall not receive out of the Company's property any part of the Member's Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

(b)     A Member, irrespective of the nature of the Member's Capital Contribution, has only the right to demand and receive cash in return for such Capital Contribution.

(c)     Upon a Dissociation of a Member, the purchase of a Membership Interest shall be governed by Article 7.

## ARTICLE 7 - MEMBERSHIP CERTIFICATES AND TRANSFERABILITY

7.1     Certificates for Membership Interest. The Company may issue, in such form as deemed appropriate, membership interest certificates to represent Membership Interests in the Company. Such membership certificates issued shall be signed by such Persons as are authorized by the Manager.

7.2     Restrictions on Transfer. Except as otherwise specifically provided in this Article 7, neither a Member nor an Economic Interest Owner shall have the right to Transfer all or any part of the Member's Membership Interest or the Economic Interest Owner's Economic Interest.

7.3     Transfers on Company Books. All Transfers of whatever nature of interests in the Company shall be made exclusively on the books of the Company in which such Transfers are regularly recorded, and such Transfers may only be made in compliance with the restrictions and requirements established by the Articles of Organization, this Operating Agreement, any agreement entered into by and between the Members, and any provision of the laws of the State of Delaware, as any such restrictions and requirements shall exist from time to time.

7.4     Right of First Refusal.

(a)     If any Member or an Economic Interest Owner (a "Transferring Member") desires to Transfer all or any portion of the Transferring Member's Membership Interest or Economic Interest in the Company (the "Offered Interest") to a third party who is not a Permitted Transferee, the Transferring Member shall first obtain from such third party a bona fide written offer to purchase such Offered Interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered therefor (the "Offer"). The Transferring Member shall give written notification to the remaining Members and the Company of the Transferring Member's intention to Transfer the Offered Interest, furnishing to the remaining Members a copy of the Offer (the "Transfer Notice").

(b)     Upon receipt of a Transfer Notice, the remaining Members, the Manager, and the Company shall have the option to purchase the Offered Interest as follows:

(i)     the Company shall have the right to purchase the Offered Interest for the lower of: (A) the purchase price stated in the Offer; or (B) the Agreed Value. The Company shall exercise its option by giving written notice to the Transferring Member within fifteen (15) days after the end of the Response Period (the "Company Response Period").

(ii)     if the Company shall fail to exercise its right to purchase all of the Offered Interest, then the remaining Members shall, on a basis pro rata to their Membership Units or upon such other basis as they shall mutually agree, have the right to purchase all, or any portion, of the Offered Interest for the lower of: (A) the purchase price stated in the Offer; or (B) the Agreed Value. The remaining Members shall exercise their option by giving written notice to the Transferring Member within forty-five (45) days after receiving the Transfer Notice from the Transferring Member (the "Remaining Members Response Period").

(iii)    the failure of the remaining Members and the Company to notify the Transferring Member of their desire to exercise their right to purchase all of the Offered Interest prior to the end of the Remaining Members Response Period shall result in the termination of the right of first refusal under this <u>Section 7.4</u> and the Transferring Member shall be entitled to consummate the Transfer of the Offered Interest to the third party; provided, that the Transfer shall be consummated within thirty (30) days following the expiration of the Remaining Members Response Period. Any rights a Transferring Member may have as a Member shall terminate upon the consummation of such sale.

(c)    If the remaining Members and/or the Company shall give written notice to the Transferring Member as set forth herein, such parties shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within sixty (60) days after the last such parties have given written notification to the Transferring Member of their respective elections to exercise their right of first refusal to purchase the Offered Interest under this <u>Section 7.4</u>.

(d)    In the event of a purchase of an Offered Interest pursuant to this <u>Section 7.4</u>, the purchase price shall be payable upon the terms set forth in the Offer.

(e)    Notwithstanding any provision in this <u>Section 7.4</u> to the contrary,

(i)    In the event that, within three (3) years after one or more Members and/or the Company purchases all of the Offered Interest pursuant to this <u>Section 7.4</u>, the remaining Members and Economic Interest Owners sell all or substantially all of their Membership Interests and Economic Interests to a third party for a purchase price in excess of the purchase price paid pursuant to this <u>Section 7.4</u>, after deducting the expenses of sale, at the closing of such sale the Transferring Member shall be paid an amount equal to the difference between (i) the price per Unit at which the Transferring Member sold the Offered Interest to the remaining Members and/or the Company and (ii) the price per Unit paid by the third party for the purchase of all or substantially all of the Units, including all compensation amounts for employment, consulting and non-competition agreements paid to the remaining Members and/or the Company; provided, however, such amount otherwise payable to the Transferring Member hereunder shall be reduced by an amount equal to ten percent (10%) for each year (and a proportionate amount for any period of less than a year) between the closing of the purchase of the Offered Interest and the closing of the purchase by the third party.

(ii)    In the event that, within three (3) years after one or more Members and/or the Company purchases all of the Offered Interest, the Company sells substantially all of the assets of the Company to a third party for a purchase price in excess of the price paid pursuant to this <u>Section 7.4</u> on a per Unit basis, after deducting the expenses of sale, at the closing of such sale, the Transferring Member shall be paid an amount equal to the difference between (i) the price per Unit at which the Transferring Member sold the Offered Interest to the remaining Members and/or the Company and (ii) the asset purchase price paid by the third party,

including all compensation amounts for employment, consulting and non-competition agreements paid to the remaining Members and/or the Company, divided by the number of Units issued and outstanding immediately prior to the sale of the Offered Interest to the remaining Members and/or the Company.

7.5     Transferee Not Member in Absence of Consent.

(a)     Notwithstanding anything to the contrary contained herein if, immediately prior to the Transfer, the Members holding two-thirds (2/3) of the Membership Units of all Members who are not the Transferring Member do not approve, in writing, the proposed Transfer of an Economic Interest or Membership Interest to a non-Member Transferee, then the proposed Transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The Transferee shall be merely an Economic Interest Owner. No Transfer of a Member's interest in the Company shall be effective unless and until written notice (including the name and address of the proposed Transferee and the date of such Transfer) has been provided to the Company and the non-Transferring Member(s).

(b)     Upon and contemporaneously with any Transfer of a Transferring Member's Economic Interest in the Company which does not at the same time Transfer the balance of the rights associated with the Membership Interest of the Transferring Member (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), all remaining rights and interests which were owned by the Transferring Member immediately prior to such Transfer or which were associated with the Transferred Economic Interest shall immediately lapse until either: (i) the written reinstatement of the rights to the transferee Economic Interest Owner by unanimous consent of the remaining Members; or (ii) the written reinstatement of such rights to a successor or Transferee of such Economic Interest Owner by unanimous consent of the remaining Members.

(c)     The restrictions on Transfer contained in this Section 7.5 are intended to comply (and shall be interpreted consistently) with the restrictions on transfer as set forth in the Act.

(d)     As a condition to the recognition by the Company of the effectiveness of a Transfer of a Member's Membership Interest or Economic Interest Owner's Economic Interest in the Company, the Transferring Member, the proposed purchaser, donee or successor-in-interest, as the case may be, shall execute, acknowledge and deliver to the Company such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and shall perform all such other acts which the remaining Members may deem necessary or desirable to:

(i)     verify the Transfer;

(ii)     confirm that the Person desiring to acquire an Economic Interest in the Company, or to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of this

AFM000155

Operating Agreement, (whether such Person is to be admitted as a new Member or an Economic Interest Owner); and

(iii)    assure compliance with any applicable state and federal laws including securities laws and regulations.

(e)    Any permitted Transfer of an Economic Interest or admission of a Member in compliance with this <u>Article 7</u> shall be deemed effective as of the end of the calendar month in which the remaining Members' consent thereto was given, or, if no such consent was required, then on such date that the donee or successor in interest complies with the conditions set forth in <u>Section 7.5(d)</u>. The Transferring Member agrees, upon request of the remaining Members, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the remaining Members from time to time in connection with the Transfer. The Transferring Member hereby agrees to indemnify the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any Transfer or purported Transfer in violation of this <u>Article 7</u>.

7.6    <u>Option Upon Involuntary Transfer.</u>

(a)    If a Member's Membership Interest or Economic Interest is Transferred by operation of law (an "Involuntary Transfer") to any Person other than the Company or a Permitted Transferee (such as but not limited to a Member's trustee in bankruptcy or to a purchaser at any creditor's or court sale) (an "Involuntary Transferee"), the Company, for sixty (60) days following the receipt of actual notice of the Transfer (the "Notice Period"), shall have an option to purchase all or any portion of the Membership Interest or Economic Interest subject to the Involuntary Transfer (the "Involuntarily Transferred Interest"). Such option shall be exercised by written notice to the Member and the Involuntary Transferee. The purchase price of such Involuntarily Transferred Interest by the remaining Members shall be the Agreed Value.

(b)    If the Company fails to exercise its options to purchase all of the Involuntarily Transferred Interest, the remaining Members on a basis pro rata to their Membership Units or upon such other basis they shall mutually agree shall have the right to purchase the remaining Involuntarily Transferred Interest, for the Agreed Value, by giving written notification to the Involuntary Transferee and the Member within thirty (30) days after the expiration of the Notice Period (the "Remaining Members Notice Period").

(c)    In the event of a purchase of a Membership Interest pursuant to this <u>Section 7.6</u>, a portion of the purchase price for such Membership Interest equal to twenty-five percent (25%) thereof shall be paid in cash at the closing of the transaction. The remaining portion of the purchase price shall be deferred and payable, together with interest on the unpaid balance from time to time at the Minimum Rate, in sixty (60) equal installments of principal and interest, the first installment being due and payable on the thirtieth day following the date of closing of the sale, and subsequent installments being due on the same day of each succeeding month until the remaining unpaid balance plus interest accrued thereon has been paid in full. The indebtedness of each purchaser shall be evidenced by

his, her or its promissory note payable to the order of the selling party. Each such promissory note shall be in substantially the form set forth in Exhibit B attached hereto.

(d)     The failure of the remaining Members and the Company to notify the Involuntary Transferee of their desire to exercise their rights to purchase the Involuntarily Transferred Interest at or prior to the end of the Remaining Members Notice Period shall result in the termination of the right to purchase and the Involuntary Transferee may retain such Involuntarily Transferred Interest in the form of an Economic Interest, and shall have no right to participate in the management of the business or affairs of the Company or become a Member except as set forth in Section 7.4.

7.7     Options Upon Dissociation. A Member may not withdraw or dissociate from the Company, except as permitted herein. In the event of the Dissociation, for any reason ("Terminating Event"), of any Member (a "Dissociated Member"), the Manager, remaining Members and the Company shall have the option to acquire the Dissociated Member's Membership Interest, including the Economic Interest of each donee of the Dissociated Member as follows:

(a)     The Company shall have the right of first refusal to purchase all, or any portion, of the Membership Interest of the Dissociated Member by giving written notification to the Dissociated Member within ninety (90) days after the Terminating Event (the "Company Response Period").

(b)     If the Company fails to exercise its option, then the remaining Members on a basis pro rata to their Membership Units or upon such other basis they shall mutually agree shall have the right to purchase the remaining Membership Interest of the Dissociated Member by giving written notification to the Dissociated Member within thirty (30) days after the expiration of the Company Response Period (the "Remaining Members Response Period").

(c)     If the remaining Members and/or the Company shall give written notice to the Dissociated Member of their desire to exercise their right to purchase all of the Dissociated Member's Membership Interest, the remaining Members and/or the Company shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within sixty (60) days after the last of the Members and/or the Company has given written notification to the Dissociated Member of the election to exercise their right to purchase or the end of the Remaining Members Response Period, whichever is earlier.

(d)     The purchase price for the entire Membership Interest and/or Economic Interest of a Dissociated Member shall be the Agreed Value.

(e)     In the event of a purchase of a Membership Interest as a result of the Dissociation of a Dissociated Member, a portion of the purchase price for such Membership Interest equal to twenty-five percent (25%) thereof shall be paid in cash at the closing of the transaction. The remaining portion of the purchase price shall be deferred and payable, together with interest on the unpaid balance from time to time at the Minimum Rate, in sixty (60) equal installments of principal and interest, the first installment being

due and payable on the thirtieth day following the date of closing of the sale, and subsequent installments being due on the same day of each succeeding month until the remaining unpaid balance plus interest accrued thereon has been paid in full. The indebtedness of each purchaser shall be evidenced by each purchaser's promissory note payable to the order of the selling party. Each such promissory note shall be in substantially the form set forth in Exhibit B attached hereto.

(f) The failure of the remaining Members and the Company to notify the Dissociated Member of their desire to exercise their respective rights to purchase all of the Dissociated Member's Membership Interest prior to the end of the Remaining Members Response Period shall result in the termination of the right to purchase and the Dissociated Member shall retain such Membership Interest, in the form of an Economic Interest, and shall have no right to participate in the management of the business or affairs of the Company or become a Member except as set forth in Section 7.5. The Company shall not be required to purchase the Membership Interest or Economic Interest of a Member in the case of the Dissociation of that Member.

7.8    Agreed Value. The term "Agreed Value" shall mean a Member's proportionate share (determined on the basis of a Member's Participating Percentage of the fair market value of the Company. As of September 30, 2010, the fair market value of the Company was the amount established by the independent valuation performed Clifton Gunderson LLP. This amount shall continue to be the fair market value of the Company until December 31, 2012. Thereafter, the fair market value of the Company shall be determined by using any one of the three following methods that results in the highest value: (i) sixty-five percent (65%) of the total Member's equity reflected on the books and records of the Company, (ii) 25% of the 5-year Average Profit (hereafter defined) of the Company, or (iii) the amount established by an independent certified public accountant pursuant to the methodology and formula, including discounts referenced therein, utilized in the valuation referenced in this Section 7.8. For purposes hereof, the term "5-year Average Profit means the average Net Profit for the five most recent years ending prior to the year in which an event described in this Article 7 has occurred.

## ARTICLE 8 - ADDITIONAL MEMBERS

From the date of the formation of the Company, upon consent of the Manager, a Person may become a Member in this Company either by the issuance by the Company of Membership Interests for such consideration as the Manager determines, or as a transferee of a Member's Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Manager may, at its option, at the time a Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Code Section 706(d) and the Treasury Regulations promulgated thereunder.

## ARTICLE 9 - DISSOLUTION AND TERMINATION

9.1    Dissolution.

(a)    The Company shall be dissolved upon the occurrence of any of the following events:

(i)    when the period fixed for the duration of the Company, if any, shall expire pursuant to Section 2.5 hereof;

(ii)    by the written agreement of Members holding two- thirds (2/3) of the Membership Units; or

(iii)    upon the occurrence of an event causing dissolution as specified in the Act.

(b)    The Dissociation of a Member shall not constitute a dissolution of the Company.

(c)    Unless otherwise approved by Members owning a Majority Interest, a Member who resigns (a "Resigning Member") or whose Membership Interest is otherwise terminated by virtue of a Dissociation, shall not be entitled to receive any liquidating distributions in excess of those distributions to which such Member would have been entitled had such Resigning Member remained a Member. Except as otherwise expressly provided herein, a Resigning Member shall immediately become an Economic Interest Owner.

9.2    Dissolution and Liquidation of Assets.

(a)    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

(b)    If the Company is dissolved and its affairs are to be wound up, the Manager shall:

(i)    sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Manager may determine to distribute any assets to the Members in kind);

(ii)    allocate any profit or loss resulting from such sales to the Members' and Economic Interest Owners' Capital Accounts in accordance with Article 5 hereof;

(iii)    discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners

for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent claims or liabilities of the Company, provided that for purposes of determining the Capital Accounts of the Members and Economic Interest Owners, the amounts of such Reserves shall be deemed to be an expense of the Company.

(c)     If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the holders of a Majority Interest. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of Section 5.3 and Section 5.5 of this Operating Agreement to reflect such deemed sale.

(d)     The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Manager, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to Section 9.2(c). Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(e)     Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(f)     The Manager shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

9.3     Articles of Dissolution. When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, articles of dissolution as required by the Act, shall be executed in duplicate and filed with the Delaware Secretary of State.

9.4     Effect of Filing of Articles of Dissolution. Upon the filing of Articles of Dissolution with the Delaware Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other Proceedings and appropriate action as provided in the Act. The Manager shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

9.5     <u>Assets Distributed on Dissolution</u>. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Member's Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one (1) or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

## ARTICLE 10 - MISCELLANEOUS

10.1     <u>Waiver of Conflict of Interest</u>. The law firm of Hamilton Thies Lorch LLP hereby discloses to the parties its potential conflicts of interest arising from the negotiation of this Operating Agreement and all documents related thereto and arising from the organization and operation of the Company, which may include without limitation conflicts regarding management, voting, and distributions. Hamilton Thies Lorch LLP represents the Company with regard to all such matters, and Hamilton Thies Lorch LLP has urged all other Members to seek independent representation. The Members and the Company acknowledge that they have been advised of all conflicts of interest arising from the representation. The parties hereby waive any conflict of interest resulting from the past, current and future representation provided by Hamilton Thies Lorch LLP to the Company in both matters related and unrelated to this Operating Agreement.

10.2     <u>Notices</u>. Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if: (a) delivered personally to the party or to an officer of the party to whom the same is directed; or (b) sent by facsimile transmission, receipt of which is acknowledged by the recipient by customary fax receipt acknowledgment and by sending a copy of such notice, demand and communication by regular mail; or (c) sent by registered or certified mail, postage and charges prepaid; or (d) sent by recognized overnight delivery service (e.g., FedEx or UPS), charges prepaid, in any case addressed to the Member's and/or Company's address, as appropriate, which addresses are set forth in this Operating Agreement. Except as otherwise provided herein, any such notice shall be deemed to be given two (2) business days after the date on which the same was deposited in the United States mail, or one (1) business day after the date on which the same was deposited with an overnight delivery service for next business day delivery, in either case addressed and sent as aforesaid or, if by telefax as above provided, then any such notice shall be deemed to be given at the time of the fax receipt acknowledgment.

10.3     <u>Application of Delaware Law</u>. This Operating Agreement and its interpretation shall be governed exclusively by its terms and by the laws of the State of Delaware, and specifically the Act.

10.4     <u>Arbitration/No Lawsuits</u>. Other than equitable relief, any controversy or claim arising out of, or relating to, this Operating Agreement, or its breach, shall be settled by arbitration. The panel of arbitrators shall be composed of three (3) Persons, one of whom shall be selected by each of the parties. Such selection of arbitrators shall be made within thirty (30) days after the date on which the parties agree that they will be unable to agree as to the settlement of the controversy or claim. The third arbitrator shall be Dominic Maduri or, in the event Dominic Maduri is unavailable, by an arbitrator appointed by the American Arbitration Association. The decision of a majority of the panel of arbitrators shall be final, conclusive and binding upon the parties hereto

AFM000161

and not subject to judicial review and judgment on the decision rendered may be entered in any court having jurisdiction. Except as provided herein, the arbitration shall be governed in accordance with the rules of the American Arbitration Association. Except for claims to enforce a non-competition restriction, the parties to this Operating Agreement agree that they will not institute any lawsuit against any other party to this Operating Agreement relating to any controversy, claim, or alleged breach to this Operating Agreement.

10.5 <u>Equitable Relief</u>. As the rights and obligations of the parties are unique and damages cannot be readily measured, irreparable damage would result in the event this Operating Agreement is not specifically enforced. The rights and obligations of the parties shall be enforceable in a court of equity by a decree of specific performance, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedy and all other remedies provided for in this Operating Agreement shall, however, be cumulative and not exclusive and shall be available in addition to any other remedies which any party may have under this Operating Agreement or otherwise.

10.6 <u>Waiver of Action for Partition</u>. Each Member and Economic Interest Owner irrevocably waives during the term of the Company's existence any right that it may have to maintain any action for the partition with respect to the property of the Company.

10.7 <u>Attorney Fees</u>. In the event any party hereto commences litigation or arbitration for the judicial interpretation, enforcement, termination, cancellation or rescission of this Operating Agreement, or for damages for the breach hereof, then, in addition to any or all other relief awarded in such litigation or arbitration, the prevailing party therein shall be entitled to a judgment against the other for an amount equal to reasonable attorneys' fees, court costs, arbitration fees and expenses, and other costs incurred (including paralegal, legal assistant and computerized legal research fees). For purposes of this Section, "prevailing party" shall mean, in the case of the claimant, one who is successful in obtaining substantially all relief sought, and in the case of the defendant or respondent, one who is successful in denying substantially all of the relief sought by the claimant.

10.8 <u>Amendments</u>. This Operating Agreement may not be amended except in a writing signed by the holders of two-thirds (2/3) of the Membership Units.

10.9 <u>Execution of Additional Instruments</u>. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments as are necessary to comply with any laws, rules or regulations.

10.10 <u>Construction</u>. Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

10.11 <u>Headings</u>. The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

10.12 <u>Waivers</u>. The failure of any party to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a

subsequent act, which would have originally constituted a default, from having the effect of an original default.

10.13 <u>Rights and Remedies Cumulative</u>. The rights and remedies provided by this Operating Agreement are cumulative and the use of any individual right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have.

10.14 <u>Severability</u>. If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application of the provisions hereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

10.15 <u>Heirs, Successors and Assigns</u>. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

10.16 <u>Creditors.</u> None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

10.17 <u>Incorporation of Recitals</u>. The Recitals contained herein are hereby incorporated and made a part of the terms and mutual covenants and agreements contained in this Operating Agreement.

10.18 <u>Counterparts</u>. This Operating Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

10.19 <u>Entire Agreement</u>. This Operating Agreement constitutes the entire agreement of the parties, and it merges and supersedes all prior discussions and agreements among them with respect to the subject matter hereof.

The parties have executed this Operating Agreement as of the date first above written.

COMPANY:

GSI FAMILY OFFICE LLC, a Delaware limited
liability company

By: _____

Name: Eduardo E. Greco

Its: Manager

Signature Page

AFM000164

**MEMBERS:**

_(signature)_

Eduardo E. Greco, Trustee of the Eduardo E.
Greco Revocable Trust u/a/d 11/14/96

_(signature)_

Pasquale F. Greco (aka Pasquale F. Greco II),
Trustee of the Pasquale F. Greco Trust u/a/d
September 29, 2003

_(signature)_

Gian Greco, Trustee of the Gian Greco Trust u/a/d
September 25, 2003

_(signature)_

Roberto Greco, Trustee of the Roberto Greco
Trust u/a/d September 25, 2003

_(signature)_

Francesca C.M. Greco-Jaffe, Co-Trustee of the
Francesca C.M. Greco-Jaffe GSI Irrevocable
Trust dated 12/18/02

_(signature)_

Dominic S. Maduri, Co-Trustee of the Francesca
C.M. Greco-Jaffe GSI Irrevocable Trust dated
12/18/02

_(signature)_

Gian F. Greco, Co-Trustee of the Pasquale P.
Greco GSI Irrevocable Trust u/a/d 12/18/02

_(signature)_

Dominic S. Maduri, Co-Trustee of the Pasquale P.
Greco GSI Irrevocable Trust u/a/d 12/18/02

_(signature)_

Gian F. Greco, Co-Trustee of the Gina V. Greco
GSI Irrevocable Trust u/a/d 12/18/02

_(signature)_

Dominic S. Maduri, Co-Trustee of the Gina V.
Greco GSI Irrevocable Trust u/a/d 12/18/02

Gian F. Greco, Co-Trustee of the Eduardo E.
Greco, Jr. GSI Irrevocable Trust u/a/d 12/18/02

Dominic S. Maduri, Co-Trustee of the Eduardo E.
Greco, Jr. GSI Irrevocable Trust u/a/d 12/18/02

Gian F. Greco, Co-Trustee of the Roberto Greco
Irrevocable Trust II u/a/d 12/16/98

Dominic S. Maduri, Co-Trustee of the Roberto
Greco Irrevocable Trust II u/a/d 12/16/98

Gian F. Greco, Co-Trustee of the Pasquale F.
Greco Irrevocable Trust II u/a/d 12/16/98

Dominic S. Maduri, Co-Trustee of the Pasquale F.
Greco Irrevocable Trust II u/a/d 12/16/98

Gian F. Greco, Co-Trustee of the Eduardo E. Greco
Irrevocable Trust II u/a/d 12/16/98

Dominic S. Maduri, Co-Trustee of the Eduardo E.
Greco Irrevocable Trust II u/a/d 12/16/98

Pasquale F. Greco II, Co-Trustee of the Gian F.
Greco Irrevocable Trust II u/a/d 12/16/98

Dominic S. Maduri, Co-Trustee of the Gian F.
Greco Irrevocable Trust II u/a/d 12/16/98

Pasquale F. Greco II, Co-Trustee of the Francesca
C.M. Greco-Jaffe Irrevocable Trust II u/a/d
12/16/98

Dominic S. Maduri, Co-Trustee of the Francesca
C.M. Greco-Jaffe Irrevocable Trust II u/a/d
12/16/98

Signature Page

AFM000166

# EXHIBIT A
## MEMBER INFORMATION

| Member's Names | Membership Units | Participating Percentage |
|---|---|---|
| Eduardo E. Greco, Trustee of the Eduardo E. Greco Revocable Trust u/a/d 11/14/96 | 35.902 | 36% |
| Pasquale F. Greco (aka Pasquale F. Greco II), Trustee of the Pasquale F. Greco Trust u/a/d 9/29/03 | 10.256 | 10% |
| Gian Greco, Trustee of the Gian Greco Trust u/a/d 9/25/03 | 10.256 | 10% |
| Roberto Greco, Trustee of the Roberto Greco Trust u/a/d 9/25/03 | 10.256 | 10% |
| Francesca C.M. Greco-Jaffe and Dominic S. Maduri, Co-Trustees of the Francesca C.M. Greco-Jaffe GSI Irrevocable Trust dated 12/18/02 | 10.256 | 10% |
| Gian F. Greco and Dominic S. Maduri, Co-Trustees of the Pasquale P. Greco GSI Irrevocable Trust u/a/d 12/18/02 | 5.128 | 5% |
| Gian F. Greco and Dominic S. Maduri, Co-Trustees of the Gina V. Greco GSI Irrevocable Trust u/a/d 12/18/02 | 5.128 | 5% |
| Gian F. Greco and Dominic S. Maduri, Co-Trustees of the Eduardo E. Greco, Jr. GSI Irrevocable Trust u/a/d 12/18/02 | 5.128 | 5% |
| Gian F. Greco and Dominic S. Maduri, Co-Trustees of the Roberto Greco Irrevocable Trust II u/a/d 12/16/98 | 1.538 | 1.5% |
| Gian F. Greco and Dominic S. Maduri, Co-Trustees of the Pasquale F. Greco Irrevocable Trust II u/a/d 12/16/98 | 1.538 | 1.5% |
| Gian F. Greco and Dominic S. Maduri, Co-Trustees of the Eduardo E. Greco Irrevocable Trust II u/a/d 12/16/98 | 1.538 | 1.5% |

AFM000167

| | | |
|---|---|---|
| Pasquale F. Greco II and Dominic S. Maduri, Co-Trustees of the Gian F. Greco Irrevocable Trust II u/a/d 12/16/98 | 1.538 | 1.5% |
| Pasquale F. Greco II and Dominic S. Maduri, Co-Trustees of the Francesca C.M. Greco-Jaffe Irrevocable Trust II u/a/d 12/16/98 | 1.538 | 1.5% |

# EXHIBIT B

## INSTALLMENT PROMISSORY NOTE

(insert closing date)

_____, 20____

     FOR VALUE RECEIVED, on or before _____ *(insert final installment date)* the undersigned promises to pay to the order of _____ *(insert name of selling party)* the principal sum of _____ ($_____ *(insert amount of deferred portion of the purchase price)*, together with interest from the date hereof at the rate of _____ percent (_____%) per annum on the principal balance from time to time unpaid. The said principal and interest shall be payable in installments as hereinafter provided.

     (a)    Commencing on _____, 20____ (insert date 30 days following closing or other agreed upon payment date), and on the day of each month thereafter for consecutive months to and including _____, 20___, the sum of _____ ($_____ shall be payable, said sum to be applied first to accrued and unpaid interest and thereafter to principal.

     (b)    The entire unpaid balance of principal together with accrued and unpaid interest thereon shall be payable on _____, 20____ *(insert the month following the last monthly installment under (a)).*

     At the option of the undersigned, at any time or times during the term of this Note, all or any portion of the unpaid principal sum and accrued interest on this Note may be prepaid without premium or penalty, the amount of the prepayment to be applied first to accrued interest and the remainder to the unpaid principal. If the undersigned so designates in a written prepayment notice delivered to the holder of this Note concurrently with the making of the prepayment, the amount of the monthly installments shall be reduced by recomputing the monthly installment amount required to amortize the remaining principal balance together with interest as aforesaid over the period remaining to the original maturity date. If no such prepayment notice is so delivered, the same installment amounts stated above shall continue to be payable on the dates designated until such time as the entire principal sum, together with all accrued interest, is paid, at which time this Note shall be paid in full. In such case, the portion of each of the installment amounts attributable to principal shall be recomputed in order to adjust for the decreased interest payable on the reduced unpaid principal balance.

     At the election of the holder or holders hereof, upon notice to the maker, the principal sum remaining unpaid hereon, together with accrued and unpaid interest thereon, shall become at once due and owing.

     The maker hereby waives presentment for payment, notice of dishonor protest and notice of protest.

_____

AFM000169

*(Signature of Purchasing Party)*

Exhibit B

**AFM000170**